**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTOPHER MANHART, *individually and on behalf of all others similarly situated*,

*Plaintiff,*

v.

AJP EDUCATION FOUNDATION, INC. d/b/a
AMERICAN MUSLIMS FOR PALESTINE,
WESPAC FOUNDATION, INC.,
NATIONAL STUDENTS FOR JUSTICE IN PALESTINE,
DISSENTERS,
EDUCATION FOR A JUST PEACE IN THE MIDDLE
EAST, d/b/a US CAMPAIGN FOR PALESTINIAN RIGHTS,
JEWISH VOICE FOR PEACE,
TIDES CENTER, d/b/a COMMUNITY JUSTICE
EXCHANGE,
JINAN CHEHADE,
SUPERIOR MURPHY,
RIFQA FALANEH,
and SIMONE TUCKER,

*Defendants.*

No. 1:24-cv-08209

**CLASS ACTION COMPLAINT**
**AND**
**DEMAND FOR JURY TRIAL**

**FIRST AMENDED VERIFIED COMPLAINT**

## INTRODUCTION

1.      Americans rightly celebrate their rights to speak and protest. But this right does not extend to imprisoning motorists in their vehicles. As the Supreme Court has said, "The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights."[1] Protestors may speak loudly, they may be rude, they may shock audiences, but they cease being protestors when they use force to block expressways full of bystanders trapped on the roads to create a massive public nuisance. The Defendants did this in a misguided, self-defeating effort to extort political change from faraway luminaries, and by so doing harmed thousands of ordinary people. Plaintiff Manhart was among those victimized, and he demands damages on behalf of himself and thousands of others wronged by the Defendants on April 15, 2024, when they conspired to block traffic to O'Hare International Airport, and an injunction to preclude Defendants from repeating this public nuisance.

2.      Defendants' blockade executed part of an international campaign to disrupt major economic centers in support of "Palestinian liberation." That campaign drew support from Hamas and the Iranian Revolutionary Guard Corps (IRGC), foreign terrorist organizations opposed to Israel's existence. Both were upset with how Israel responded to Hamas's October 7, 2024, terrorist attacks against Israel—the deadliest in that nation's history. These groups hoped that Defendants, and those like them across the world, would draw attention to their cause by bringing economic centers to a halt. And on the I-190 expressway, the Defendants succeeded, trapping thousands in their cars.

3.      The Defendants chose to stop traffic on the entry roadway into O'Hare International Airport, one of the largest airports in the world. Planning for the blockade started weeks in advance; it involved selecting the site, advertising the blockade, recruiting activists to make the human blockade,

---

[1] *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 776 (1994).

buying supplies, and establishing a bail fund for arrested activists. Then on April 15, 2024, the individual Defendants in this Amended Complaint—along with nearly forty other activists—rushed the I-190 off-ramp in Chicago heading into O'Hare and used PVC pipe to connect their arms and block the entire intersection—the so-called "sleeping dragon" designed to prevent police from using bolt-cutters to more easily remove activists from roadblocks. Defendants broadcasted the blockade on their social media accounts along with pre-coordinated pro-Palestinian boilerplate, hoping to generate international publicity against the "Zionist war machine."

4.      All traffic into the airport stopped for almost three hours because of the blockade. People missed flights and downstream commitments. Vacations, interviews, weddings, and other important lifetime events were cast aside as the activists forced the public to participate in their demonstration by falsely imprisoning them. Commuters were stuck waiting in the middle of the highway trapped in their cars for hours with no inkling as to when their freedom of movement would be restored or whether their plans were salvageable.

5.      Plaintiff Christopher Manhart and other innocent class members heading into O'Hare that morning had nothing to do with an international dispute thousands of miles away; many likely have no opinion at all on the issue. But these innocent Americans were dragged into the conflict because the Defendants and foreign terrorist organization Hamas have decided a propaganda offensive in America is their best weapon against Israel.

6.      Plaintiff is just one victim of Defendants' blockade: The morning of April 15, Plaintiff drove from his home in Valparaiso, Indiana, to O'Hare to catch a flight to Norfolk, Virginia for business. But because of Defendants, he was trapped in his car on the ramp to I-190 for over an hour with no way to maneuver out of the brutal, standstill traffic. Defendants' tortious activity caused Manhart to miss his flight that morning and he spent the next several hours at the airport adjusting his travel plans. Although he eventually reached his destination late that night, he missed an important work dinner and networking function. Manhart seeks to hold Defendants accountable for their illegal and tortious conspiracy to falsely imprison unsuspecting motorists and for creating a public nuisance that unreasonably interfered with the Plaintiff and class members' right to freely travel.

7.     Defendants held innocent Americans hostage on I-190 by blocking the interstate in the hopes of generating pro-Palestinian press and attention. While the federal courts exist to protect the core First Amendment rights of individuals and organizations to peaceably assemble, speak freely, and publicly air their grievances, they should remedy tortious behavior masquerading as protest.

8.     By their own admission, Defendants' activism that day sought to "to identify and blockade major choke points in the economy … with the aim of causing the most economic impact." This was not speech. Such conduct is punished without remorse or hesitation in a society that upholds the rule of law and respects its voters. Otherwise, Defendants' tortious conduct as a form of purported protest will metastasize in the body politic. Plaintiff, on behalf of himself and thousands of others stuck in traffic that day, brings this Complaint with the Court to seek class relief against Defendants for their tortious blockade.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

10.     There are over a thousand Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interests and costs.

11.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

12.     Plaintiff Christopher Manhart is an attorney and a resident of Valparaiso, Indiana. On the morning of April 15, 2024, he traveled from his home in Indiana to catch a flight out of Chicago's O'Hare International Airport.

13.     Defendant AJP Educational Foundation, Inc. d/b/a American Muslims for Palestine ("AMP") is a 501(c)(3) non-profit corporation incorporated in California with its principal place of

business in Falls Church, Virginia.[2] (Hedley Decl. ¶¶ 24, 25). AMP "is a grassroots organization dedicated to advancing the movement for justice in Palestine" and "the premier voice on Palestine in the US."[3] However, its true purpose is more insidious: AMP is Hamas's primary propaganda arm in the United States;[4] it seeks to reduce support for Israel by the American public and politicians, and to impose a domestic cost on pro-Israeli policies implemented by American leaders, in support of Hamas's geopolitical goals. In short, AMP is a Hamas agent. Much of AMP's leadership is simply left over from the Holy Land Foundation for Relief and Development, the American Muslim Society, and the Islamic Association for Palestine, prior legacy organizations in the United States that attempted the same propaganda operations on behalf of Hamas before being designated by and criminally charged by the government as terrorist organizations.[5] There is "significant overlap between AMP and people who worked for or on behalf of organizations that were designated, dissolved, or held civilly liable by federal authorities for supporting Hamas."[6]

14.     Defendant National Students for Justice in Palestine ("NSJP") is an unincorporated association with no formal principal place of business or transparent leadership structure. (Hedley Decl. ¶ 13). AMP established NSJP in 2010 to manage campus engagements and coordinate hundreds

---

[2] Jason Miyares, Attorney General of Virginia, Attorney General's Office Opens Investigation Into American Muslims for Palestine Nonprofit (Oct. 31, 2023), https://tinyurl.com/4rcmp9p9.

[3] *About AMP*, https://tinyurl.com/ywx6h772 (accessed July 28, 2024).

[4] *See* First Amended Complaint, *Parizer et al. v. AJP Education Foundation et al.*, No. 1:24-cv-00724-RDA-IDD (E.D. Va. July 9, 2024), ECF 24 (ongoing), a true and accurate copy of which is Attachment 2 accompanying this complaint. *See also* First Amended Complaint, *Boim v. Am. Muslims for Palestine*, No. 1:17-CV-3591 (N.D. Ill. Dec. 17, 2019), ECF 179 (ongoing); *see also Boim v. Am. Muslims for Palestine*, 9 F.4th 545 (7th Cir. 2021).

[5] *E.g.*, *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (*en banc*) (holding HLF and AMS civilly liable for financially supporting terrorism that killed American teenager); *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (affirming terrorist designation blocking HLF's assets).

[6] Israel Imperiled: Threats to the Jewish State: Joint Hearing before the Subcomm. On Terrorism, Nonproliferation, and Trade & the Subcomm. on the Middle East and North Africa, 114 Cong. 156 (2016) (Statement of Jonathan Schanzer), https://tinyurl.com/55ctrujw.

of university chapters of Students for Justice in Palestine ("SJP"), all of which—at AMP's direction—act as Hamas's propaganda arm on American college campuses and beyond. (Hedley Decl. ¶¶ 38-39). The principal-agent relationship between AMP and NSJP is substantiated by both their own literature and the U.S. Congress Committee on Oversight and Accountability.[7] (Hedley Decl. ¶ 39). Accordingly, during the relevant time, NSJP acted as an agent of AMP, thereby subjecting AMP to vicarious liability under Illinois law. *See Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530 ¶ 42 (Ill. 2012) (principal may be held liable for torts of an agent even if the principal does not engage in any conduct directed at the plaintiff).

15.     Until recently, and at times relevant to this complaint, defendant WESPAC acted as the fiscal sponsor and the formal legal entity for tax-exempt donations to NSJP. (Hedley Decl. ¶ 40). This arrangement enables NSJP to collect and distribute funds without transparency. The financial interactions between WESPAC and its anti-Israel and pro-Hamas clientele is intentionally opaque to largely shield from public view the flow of funds between and among them. For instance, WESPAC reported $2.4 million in revenue in 2022 but spent nearly $1.5 million solely on "office expenses," a category that, according to the IRS, should include only basic costs to keep the physical office operational, such as computers, software, office cleaning services, and postage.[8] Upon information and belief, individuals associated with NSJP received funds directly from WESPAC, but the recipient(s) of these funds are unknown to the Plaintiff. While NSJP keeps its structure intentionally obscure, it appears to be guided by a "national steering committee" whose current members include

---

[7] Congressman James Comer, Chairman, House Committee on Oversight and Accountability, *Letter to National Students for Justice in Palestine* (May 29, 2024) https://tinyurl.com/4utvuduz.

[8] Joseph Simonson, Is This Suburban New York Charity a Terrorist Front Group?, WASH. FREE BEACON (May 20, 2024), https://freebeacon.com/national-security/is-this-suburban-new-yorkcharity-a-terrorist-front-group/.

Carrie Zaremba, Sean Eren, and Dylan Kupsh.[9] (Hedley Decl. ¶ 13). The steering committee includes "about a dozen members" and it distributes "tool kits" to inspire action by local chapters and allied groups it does not formally control.[10] Upon information and belief, steering committee members are "officers" of the unincorporated association within the meaning of 735 ILCS 5/2-205.1.

16.     Hamas and AMP target college campuses for organizing because they are flush with impressionable students, already host a swath of sympathetic and/or supportive populations (of students, staff, and professors), have a history of disruptive organizing efforts like those Hamas and AMP employed here, and have uniquely strong social and political capital in American society. As is relevant here, NSJP has multiple affiliates at Chicago-area campuses, including on the campuses of Northwestern University, the University of Chicago, DePaul University, and the School of the Art Institute of Chicago. (Hedley Decl. ¶¶ 42-43). These groups are centrally organized under the umbrella of SJP Chicago, which states that it is "[a] unified front of Chicagoland SJPs, supporting and uplifting one another in the struggle for Palestinian liberation."

17.     Defendant WESPAC Foundation, Inc. (WESPAC), is a New York corporation with its principal place of business in New York state, and a tax-exempt organization under I.R.C. § 501(c)(3). During the relevant time, WESPAC acted as the fiscal sponsor and the formal legal entity for tax-exempt donations for affiliates such as Defendant NSJP and similar organizations such as the Palestinian Youth Movement and the US Palestinian Community Network. (Hedley Decl. ¶¶ 10-13). During the relevant time, the donation link on the NSJP website showed that donations go to WESPAC, as demonstrated by a disclaimer that donors may cover credit card transaction fees "so more of my donation goes to WESPAC Foundation, Inc." (*Id.* ¶ 40). WESPAC

---

[9] Emma Green, *How a Student Group Is Politicizing a Generation on Palestine*, THE NEW YORKER (Dec. 15, 2023), https://www.newyorker.com/news/annals-of-education/how-a-generation-is-being-politicized-on-palestine. Kupsh disclosed his steering committee membership while running for office in his union. *See* https://www.rnfdu.org/dylan.

[10] Alan Blinder, *Inside the Pro-Palestinian Group Protesting Across College Campuses*, NEW YORK TIMES (Nov. 17, 2023), https://www.nytimes.com/2023/11/17/us/students-justice-palestine-campus-protests.html.

has launched fundraisers for NSJP, promoted NSJP events through its social media accounts after October 7, and indicated that their missions were aligned. (*Id.* ¶ 12). As fiscal sponsor for NSJP, WESPAC was responsible to "retain control and discretion over the use of funds" allocated to NSJP, and to "maintain[] records establishing that the funds were used for section 501(c)(3) purposes" Rev. Rul. 68-489, 1968-2 C.B. 210. Accordingly, during the relevant time, NSJP acted as an agent of WESPAC, thereby subjecting WESPAC to vicarious liability under Illinois law. *See Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530 ¶ 42 (Ill. 2012) (principal may be held liable for torts of an agent even if the principal does not engage in any conduct directed at the plaintiff). On information and belief, WESPAC has dissociated itself from NSJP recently; however, it was part and parcel of the tortious behavior at issue in this Complaint.

18.     Defendant Dissenters is an Illinois corporation with its principal place of business in Chicago, and a tax-exempt organization under I.R.C. § 501(c)(3) whose mission is "leading a new generation of young people to reclaim our resources from the war industry, reinvest in life-giving services, and repair collaborative relationships with the earth and people around the world." Like NSJP, Dissenters also maintains a Chicago chapter. (Hedley Decl. ¶¶ 17, 61-63).

19.     Defendant Education for a Just Peace in the Middle East is a tax-exempt organization under I.R.C. § 501(c)(3) doing business as US Campaign for Palestinian Rights (USCPR) and proclaims that it is the "political home for all who believe that freedom for the Palestinian people is an integral part of achieving our collective liberation." It was incorporated in the District of Columbia in 2004 and on information and belief its principal place of business is there. (Hedley Decl. ¶¶ 21, 73).

20.     Defendant Jewish Voice for Peace, Inc. (JVP) is a California corporation and a tax-exempt organization under I.R.C. § 501(c)(3). JVP has multiple chapters across the United States, including one in Chicago. JVP describes itself as "the largest progressive Jewish anti-Zionist organization in the world." (Hedley Decl. ¶¶ 15, 52-54). JVP has a history of organizing and promoting disruption, including blockades of highways and major transportation hubs. For instance, on October 27, 2023, JVP organized a nuisance that, according to its own website, "took over Grand Central Station" in New York City during a busy Friday rush hour and "fully shut down" the main terminal.

8

Similarly, JVP organized human barricades on the eighth day of Hanukkah in 2023 to prevent use of roadway bridges in eight major cities, including Chicago. (Hedley Decl. ¶¶ 59-60). The organization has a place of business and mailing addresses in Northern California in the San Francisco Bay area. (Hedley Decl. ¶¶ 15-16). JVP also has its own local Chicago chapter, with a separate website and social media presence. (Hedley Decl. ¶¶ 54-55). Its organizer, Simone Tucker, was a participant in the tortious activity at issue in this Complaint and is named as an individual Defendant. (Hedley Decl. ¶¶ 57-58).

21.     Defendant Tides Center is a California corporation and tax-exempt entity under I.R.C. § 501(c)(3); its principal place of business is in San Francisco, California. (Hedley Decl. ¶¶ 18-20). The Tides Center partners with other individuals and organizations to "advance social justice by shifting resources and power to historically excluded communities." Tides Center runs the Community Justice Exchange, which is a "nonprofit 501(c)(3) project of the Tides Center" that is "[o]rganizing to end all forms of incarceration, criminalization, and surveillance." (Hedley Decl. ¶ 18). Tides Center also is the fiscal sponsor of Palestinian Legal, where Defendant Rifqa Falaneh works as a legal fellow. Falaneh was a participant in the tortious activity at issue in this Complaint and is named as an individual Defendant. (Hedley Decl. ¶¶ 49-50).

22.     Defendant Jinan Chehade is a recent Georgetown Law School graduate whose job offer from Foley & Lardner was rescinded for publicly cheering the October 7, 2024, massacre of innocent Israeli citizens by Hamas militants. Chehade was a primary organizer of the blockade at issue in this Complaint; she was also present at the blockade and used her own body to help stop the flow of traffic around O'Hare. For her participation in the blockade, she was arrested by the Chicago Police Department. Additionally, Chehade had leadership roles in local chapters of SJP during her time at both Georgetown Law and DePaul University for undergrad. (Hedley Decl. ¶ 51). She claimed to have co-founded the SJP Chicago. (*Id.*) On information and belief, she is domiciled in Illinois.

23.     Defendant Superior Murphy is an "evaluation strategist" at UBUNTU Research and Evaluation and a Board Member of the Queer Food Foundation non-profit. Murphy was present at the blockade and narrated a video of the blockade that was posted to social media which showed

activists blockading the highway and cars stopped in traffic. (Hedley Decl. ¶ 69). For her participation in the blockade, she was arrested by the Chicago Police Department. On information and belief, she is domiciled in Illinois.

24.    Defendant Rifqa Falaneh is the Michael Ratner Justice Fellow at the public interest law firm Palestine Legal, which is sponsored by Defendant Tides Center. (Hedley Decl. ¶¶ 49-50). According to her biography, Falaneh had been president of Defendant SJP's affiliate at DePaul University in Chicago and had helped re-establish SJP's Chicago affiliate in 2019. Falaneh was an organizer of the blockade at issue in this Complaint, and was present at the blockade. On information and belief, she is domiciled in Illinois.

25.    Defendant Simone Tucker is a student organizer for JVP in Chicago and was present at the blockade on I-190 the morning of April 15, 2024. She helped organize the blockade and stop the flow of traffic around O'Hare using her own body. After the blockage, she bragged to the media that "we made our point. We stood in solidarity with our comrades in Palestine, and we disrupted business as usual." (Hedley Decl. ¶¶ 57-58). On information and belief, she is domiciled in Illinois.

## FACTS

**A. The tortious conduct at issue derives from the generational conflict between Hamas and Israel over Israel's right to exist, which Hamas has now exported to the United States as part of its propaganda operation against Israel.**

26.    Israel has had to fight for its right to exist since it became a State in 1948. Perhaps Israel's greatest enemy in defending its sovereignty in the twenty-first century is Hamas,[11] the terrorist organization and current governing authority in certain Palestinian lands neighboring Israel, specifically the Gaza Strip.

27.    Hamas arose out of the "First Intifada"—or violent uprising—against Israel by the Palestinians in 1987, who were led at the time by the International Muslim Brotherhood. Hamas does

---

[11] Kali Robinson, *What is Hamas?*, COUNCIL ON FOREIGN RELATIONS (last updated Apr. 28, 2024), https://tinyurl.com/3z49yzsu.

not recognize Israel's right to exist, and it rules Palestinian territory under an Islamist government. As a result of its anti-Israel operations, including acts of terrorism in other nations, Hamas was designated as a foreign terrorist organization in 1997 by the U.S. State Department when it first started such designations, a status it reaffirmed in 1999 and 2001.

28.     Hamas militants regularly embed among the civilian population in Gaza, which puts civilians at risk when there is direct conflict with Israel.[12] Not surprisingly, this results in civilian casualties which Hamas exploits as part of its propaganda campaign against Israel.

29.     Moreover, Hamas employs terrorism, propaganda, and falsehoods to portray itself as opposing a phony "settler-colonial" narrative of Israel; this includes the myth that Israel is a colonizer which has oppressed the Palestinian people. In promoting this lie, Hamas ignores actual events of the recent past in which Israel ceded the Palestinians the Gaza Strip, which it won from Egypt in the Six Day War in 1967. Israel is one of the only nations in memory to cede land won in a war in an effort to establish peace. Similarly, Hamas's narrative of the Palestine-Israeli conflict ignores that Israel unilaterally withdrew from the Gaza Strip in 2005.

30.     Hamas is also a proxy of Iran and Iran's Revolutionary Guard Corps (IRGC), a foreign terrorist organization itself which seeks to eliminate the State of Israel entirely.

31.     While Hamas has won over some supporters worldwide, American foreign policymakers have remained generally supportive of Israel's right to exist. For example, America continues to generously share some intelligence and weapons with the Israeli government. And while Hamas seems to have won over some sympathetic American politicians and diplomats, the American public still largely supports Israel's defending itself against attacks from Hamas.[13]

---

[12] Natalie Ecanow, Hamas Officials Admit its Strategy is to Use Palestinian Civilians as Human Shields, N.Y. POST (Nov. 1, 2023) https://tinyurl.com/34jjnuer; Michael D. Shear, U.S. Says Hamas Operates Out of Gaza Hospitals, Endorsing Israel's Allegations, N.Y. TIMES (Nov. 14, 2023).

[13] Laura Silver et al., *Majority in U.S. Say Israel Has Valid Reasons for Fighting; Fewer Say the Same About Hamas*, PEW RESEARCH CENTER (Mar. 21, 2024) https://tinyurl.com/4uudmhdn.

32.     Hamas recognizes that its ultimate goal of eliminating the State of Israel is impossible without a drastic shift in America's pro-Israel paradigm. Accordingly, the focus of its propaganda war now centers on our shores.

**B. On October 7, 2023, Hamas launched the deadliest attack against Israel in its history—killing almost 1,200 Israelis, most of them innocent civilians, and taking even more hostage (including some Americans living in Israel).**

33.     On October 6, 2023, Israel and Hamas were engaged in a ceasefire that had brought some relative stability to the region and the longtime warring between the factions. Hamas decided to break the ceasefire without provocation the following day.

34.     With support from the IRGC and other foreign terrorist organizations, Hamas launched a terrorist attack—one which resembled a military operation—toward southern Israel.[14] It involved launching thousands of rockets at civilian-heavy targets and invading other locations (including a popular music festival and private homes) with infantry to shoot, rape, and kidnap innocent Israelis. Hamas killed almost 1200 people and injured nearly 7,000 in the vicious assault.

35.     More than 200 victims were kidnapped and *brought back into Gaza* by Hamas operatives as leverage in anticipated diplomatic negotiations and to provide cover to deter potential Israeli counterstrikes. While most of these victims were Israeli, eight Americans were also taken by Hamas— and those Hamas have not already executed remain captive to this day.

36.     October 7 was the deadliest day in Israel's history, even though it has faced the threat of violence from various nation-states and foreign terrorist organizations since it became a nation in 1948.

37.     Hamas continues to hold hostages from the October 7 attacks captive and launch rockets into Israel. The cumulative attacks have upended the lives of the Israeli people and tested Israel's relations with other Gulf states—which, prior to the attack, had been improving and even

---

[14]     Bill     Hutchinson,     *Israel-Hamas     War*,     ABC     NEWS     (Nov.     22,     2023), https://tinyurl.com/549yh8fn.

normalizing through agreements such as the 2020 Abraham Accords. One of Iran and Hamas's goals in the October 7 attack was to drive a wedge between Israel and the Gulf nations like Saudi Arabia, which prior to normalization was more adversarial to Israel's existence.

38.    Israel responded to the October 7 attack by Hamas with a military campaign against Hamas that has resulted in hardship for the Palestinian people living in Gaza. Hamas soldiers use innocent Palestinian non-combatants as human shields and intercept aid trucks to resell supplies for profit. Hamas then quickly amplified its propaganda message to portray Israel as an indiscriminate aggressor in the dispute.

39.    Hamas's propaganda operations "transcend[] conventional warfare tactics, aiming to exploit the international community's response to civilian casualties, generate global condemnation of Israel, hamstring the IDF's operations, and protect Hamas's military capabilities under the guise of civilian safety."[15]

40.    Just hours after its October 7 attack, "Hamas' Qatar-based politburo web operatives flipped the switch on a slickly produced global social media disinformation campaign calculated to trigger an outpouring of pro-Palestinian/anti-Israel sentiment across global social media platforms to amplify (and justify) Hamas'[s] terror."[16]

41.    Hamas leaders called for Hamas's "resistance abroad"—which includes Defendants— to "join this battle any way they can."[17] Given Hamas and Iran's propaganda strategy against Israel,

---

[15] Joshua Klein, Exclusive: Renown Urban Warfare Expert John Spencer Warns 'World Playing Into Hamas's Strategy', BREITBART (Apr. 1, 2024), https://tinyurl.com/yc326urd.

[16] Coalition for a Safer Web, *The Hamas "Influencer" Intifada* (Nov. 16, 2023), https://tinyurl.com/3dp8pajx.

[17] Al-Jazeera Airs Hamas Leader Ismail Haniyeh's Statement On Hamas's Invasion Of Southern Israel: I Call On Palestinians In The West Bank, Israeli Arabs, And The Entire Nation Abroad To Join The Battle; To The Enemy I Say: Get Out Of Our Land!, MEMRI TV (Oct. 7, 2023), https://tinyurl.com/v2wmpruj; Former Hamas Leader Khaled Mashal Calls For 'Friday Of The Al-Aqsa Flood': Muslims Should Take To The Streets Worldwide, Join The Battle; The West, America, Zionists Will See Convoys Of Mujahideen On Their Way To Palestine, MEMRI TV (Oct. 10, 2023), https://tinyurl.com/2x8mkp4x.

this means through agitation, the spreading of mis- and disinformation through social media, and visible economic disruption. Defendants' blockade fulfills these propaganda goals to a tee.[18]

42. Defendants AMP, NSJP, and WESPAC heeded these calls. The day after the attack, NSJP—which is funded by WESPAC and directed by AMP (Hedley Decl. ¶¶ 12, 39-40)—released its Day of Resistance Toolkit ("NSJP Toolkit") to local chapters on more than 300 American college campuses and on the internet.[19]

43. As the NSJP Toolkit made clear, NSJP operatives and members across this country had an "unshakable responsibility to join the call for mass mobilization" for Palestinian political aims. The NSJP Toolkit proclaims that "[l]iberation is not an abstract concept … [it] is a real process that requires **confrontation by any means necessary** (emphasis added)." Supporting the Palestinian cause "calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric. **Resistance comes in all forms—armed struggle, general strikes, and popular demonstrations.** All of it is legitimate, and **all of it is necessary**." The Defendants would execute on Defendant NSJP's own language when planning and executing the blockade at issue.

44. Defendants AMP, NSJP, and WESPAC—through NSJP's opaque organizational structure—implemented the NSJP toolkit by either planning, sponsoring, and then publicizing (during and after) large-scale barricades across the United States designed to inconvenience and illegally disrupt the lives of everyday Americans. At first these were largely confined to college campuses: On October 12, 2023, Defendant NSJP organized a national "Day of Resistance" to coincide with Hamas's "Day of Rage" in Gaza and the West Bank. Local SJP chapters and their members chanted anti-Semitic jeers, occupied public spaces, spat on and harassed Jewish students, and obstructed

---

[18] The Office of the Director of National Intelligence has identified a nexus between Iran's anti-Israel propaganda objectives and American agitators. *See* ODNI News Release No. 17-24 (July 9, 2024), available at: https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2024/3842-statement-from-director-of-national-intelligence-avril-haines-on-recent-iranian-influence-efforts.

[19] https://dw-wp-production.imgix.net/2023/10/DAY-OF-RESISTANCE-TOOLKIT.pdf

normal foot traffic and operations around many elite college campuses.[20] Many campuses saw their local SJP chapters continue this activity throughout the school year. This blockade strategy was only the beginning of Defendants NSJP and AMP's propaganda offensive—funded by WESPAC—on behalf of Hamas in the United States.

### C. Defendants decided to extend the blockade strategy they'd tested on college campuses into the real world, resulting in the tortious conduct at issue.

45.    There is a cultural expression (some would say myth) in American politics that dumb and radical ideas are safely confined to college campuses, because students quickly mature and abandon them once the "real world" kicks in after graduation. Not so for Defendants—they decided to take the blockades which local SJP chapters had employed at college campuses and introduce them to the "real world."

46.    Defendants NSJP and AMP started to organize disruptive activities beyond college campuses, expanding their operations into American cities to maximize visibility and chaos to exert pressure on political leaders to oppose the "Zionist entity."[21]

47.    Sometime in March 2024, the IRGC issued an internal memorandum entitled "Supporting and Encouraging Palestinian Movements towards the Political Isolation of Zionism" that called for "an economic blockade across four continents in solidarity with Palestinians" to take place on April 15, 2024. The name of the organizing effort became "A15 Action."

48.    The IRGC's A15 Action effort is consistent with a statement by the Biden Administration's Director of National Intelligence that both Iran and Hamas see physical disruption as a key component of their propaganda objectives. *See* n.15.

---

[20] *See* First Amended Complaint, *Parizer*, No. 1:24-cv-00724-RDA-IDD, ECF 24 ¶¶ 96-98, a true and accurate copy of which is Attachment 2 accompanying this complaint.

[21] Hamas, *Monday, Dec. 11 global #StrikeForGaza*, INT'L ACTION CENTER (Dec. 10, 2023), https://tinyurl.com/c5wz3xm5.

49. A15 Action's stated goal was to block "the arteries of capitalism and jam[] the wheels of production." Defendants and their co-conspirators intended "to identify and blockade major choke points in the economy … with the aim of causing the most economic impact" all in the cause of supporting a "free Palestine" and stopping the alleged genocide in Palestine. (Hedley Decl. ¶¶ 26, 28-29).

50. The IRGC's memo was disseminated to Hamas and other IRGC subordinates. Defendants AMP and NSJP acting as Hamas's propaganda arm in the United States, in turn implemented that strategy of disruption.

51. A website, a15action.com, was created less than a month before the worldwide "economic blockade" to organize and advertise the operation. (Hedley Decl. ¶ 27). Chicago was one of the cities intended for A15 Action-related disruption. The creation of this website also demonstrates that the planning for the A15 Action began at least three weeks before the worldwide disruptions were executed.

52. The A15 Action website includes a proposal with a stated purpose "to coordinate a multi-city economic blockade on April 15th in solidarity with Palestine." The proposal states that in cities across the world, participating organizations and individuals "will identify and blockade major choke points in the economy, focusing on points of production and circulation with the aim of causing the most economic impact." (Hedley Decl. ¶ 28). It admits that the goal of the planned stoppage was to "cause pain to the economy" and "to disrupt and blockade economic logistical hubs and the flow of capital." (Hedley Decl. ¶ 29).

53. The A15 Action website provided a list of regional and local contacts, noting that "[d]ue to the sensitive nature of this action, some folks organizing for April 15th prefer to remain anonymous, or embedded solely within their existing communities." The website then goes on to list email addresses and/or Instagram links for connecting with the organizers of the disruptions in different cities. The contact for the Chicago blockade is listed as A15Chicago@proton.me (Hedley Decl. ¶ 33); on information and belief, various Defendants had access to that Proton messaging account.

54.     Defendants NSJP and USCPR, were instrumental in coordinating the national A15 Action plan and the plans specific to the Chicago area.

55.     On information and belief, Defendants JVP, NSJP, and USCPR (a) furthered the A15 Action plan with other Defendants and tortious actors involved in this litigation; (b) selected the A15 Action areas for blockade nationwide, including in Chicago; (c) coordinated funding to purchase necessary supplies for the blockade; (d) recruited personnel to participate in the blockades; (e) harmonized the overall strategy to choke off key economic centers of gravity in America across the A15 Action operations in various U.S. cities; and (f) actively promoted the bail fund and the O'Hare blockade on social media both during and after the event. (Hedley Decl. ¶¶ 35-37, 75-78).

56.     Defendant Dissenters was also involved in the planning process for A15 Action's Chicago operations. Dissenters helped organize the blockade and specifically helped select O'Hare Airport as a target for the Chicago blockade because: (1) O'Hare is a major international airport; and (2) Boeing Corporation is headquartered in Chicago. O'Hare serves as a hub for two major airline carriers, United Airlines and American Airlines, both of which are major customers of Boeing Corporation. (Hedley Decl. ¶ 48). Boeing Corporation was a target because it is a major weapons manufacturer and supplies armaments to the Israeli Defense Forces for use in Lebanon and Gaza. (Hedley Decl. ¶ 48). Thus, Dissenters—in addition to JVP, NSJP, and USCPR—was instrumental in identifying and justifying the key chokehold in the Chicago area for executing that specific A15 Action blockade.

57.     On information and belief, Defendants Jinan Chehade, Superior Murphy, Rifqa Falaneh, and Simone Tucker—who were all present at the actual A15 Action blockade at O'Hare—helped plan and organize the operation, too.

58.     At least five days prior to April 15, 2024, a bail fund was also established to incentivize participation in A15 Action blockades and to ensure arrested activists would quickly return to the streets to cause more chaos on Hamas's (and by extension, Defendants AMP and NSJP's) behalf. The bail fund encouraged donors to "[d]onate here to support community members who are criminalized in the U.S. for their solidarity with Palestine." (Hedley Decl. ¶ 37). It also announced a "[c]oordinated

Economic Blockade to Free Palestine United States Bail & Legal Defense Fund." The "Community Justice Exchange," which is a subordinate organization of Defendant Tides Center, is listed as the "Fundraiser" for the bail fund. (Hedley Decl. ¶ 34).

59.     Defendant Tides Center, through the Community Justice Exchange, assisted the other Defendants in creating a bail fund for A15 Action activists and helped advertise and manage this fund. The A15 Action website promoted the fund under the banner "Anti-Repression Resources" and stated that "these funds will be used for bail, legal defense, and support for defendants." (Hedley Decl. at ¶ 30). Because the fund was designed specifically for A15 Action, the stated purpose of which was to engage in unlawful conduct, Defendant Tides Center was fully aware of the risks associated with the blockade and complicit in the creation and promotion of a fund that incentivized and encouraged that unlawful conduct that violated both state and federal laws

**D. Defendants block entry to O'Hare International Airport in Chicago on April 15, leading to mass chaos, standstill traffic, and a shutdown of society and commerce in the area.**

60.     On April 15, 2024, Defendants willfully, intentionally, and illegally blockaded Interstate 190 (I-190) leading into Chicago's O'Hare International Airport—one of the largest airports in the world, and a key center of gravity for our society and economy.

61.     The blockade started at roughly 7:00am local time, and lasted until roughly 9:30am.

62.     Defendants Jinan Chehade, Superior Murphy, Rifqa Falaneh, and Simone Tucker were all present at the blockade and active participants in its execution. (Hedley Decl. ¶¶ 49-51, 57, 69).

63.     Defendant Rifqa Falaneh is an agent of Defendant Tides Center (through its dependent project Palestine Legal) and Defendant Simone Tucker is an agent of Defendant JVP. (Hedley Decl. ¶¶ 50, 58). These individuals attended the blockade in their personal capacity and on behalf of their principal organizations, which supported the actions taken by the activists. Moreover, Simone Tucker's participation in the blockade is consistent with Defendant JVP's prior history of blockades on behalf of Palestinian political aims. This is a tactic the organization regularly employs. (Hedley Decl. ¶¶ 59-60).

64.     On information and belief, Tucker was not the only representative of JVP present at and participating in the blockade at issue.

65.     To blockade the traffic and isolate the airport, Defendants Chehade, Murphy, Falaneh, and Tucker—along with at least thirty-eight other activists who later were arrested—rushed the inbound I-190 connector with the airport. Nearly twenty of the activists then linked their arms with PVC piping to create a continuous "wall" across the interstate while others held signs or filmed and broadcasted the activity across social media. (Hedley Decl. ¶¶ 36, 44-45, 56, 69, 70, 76-77).

66.     The cars closest to the activists came to a halt. Very quickly, a traffic jam built up behind them. Soon enough, traffic was at a total standstill for miles. Anyone looking to commute to the airport for any reason through I-190—which is the primary onramp into one of the world's largest airports—was now stuck. O'Hare was inaccessible, and thousands of innocent commuters and travelers were trapped in their cars.

67.     Because Hamas and AMP planned A15 Action to maximize the public relations effect, it was critical that activists on the ground broadcasted the event to satisfy this strategic objective. Accordingly, the social media accounts—including X (formerly known as Twitter), Instagram, and TikTok—of Defendants Dissenters, NSJP, and JVP amplified the activists' message worldwide.

68.     Many of the social media postings by Defendants Dissenters, NSJP, USCPR and JVP were tagged with hashtags or keywords such as "#A15Action." (Hedley Decl. ¶¶ 56, 77). Frequently, the social media posts were done in collaboration with other Defendants, allied entities, and/or the social media accounts associated with A15 Action. (Hedley Decl. ¶¶ 36, 44-45, 47, 66, 70, 76-77). The collaboration feature of the Instagram mobile app for Android and iPhone allows users posting content to suggest other accounts join in the post as a collaborator: "If the account accepts the invite, their username will be added to the post and the post will be shared with their followers. It will also

show on their profile."[22] "Note that the invited account can remove themselves at any time, and the creator of the original post can remove the collaborator at any time." *Id.* All the defendants remained collaborators of the posts as noted in the Hedley Declaration, at least as of September 9, 2024.

69.     Defendants Dissenters, NSJP, USCPR, and JVP all posted original content and video from the event, which suggested (a) they had on-the-ground agents participating in the blockade on their behalf; (b) they played a role in coordinating the stoppage by ensuring they had members there to participate; and (c) they were giving the activists blocking traffic what they wanted—worldwide media attention—to incentivize their participation in the blockade. (Hedley Decl. ¶¶ 36, 44-45, 56, 69, 70, 75-78).

70.     As a result of Defendants' actions, inbound vehicle traffic to O'Hare stopped entirely. Videos from Defendants' social media accounts demonstrate that travelers, airport employees, and locals going to pick up their loved ones were stuck in their vehicles with no knowledge whether and when the traffic blockage would end. Many had no idea what caused it. These innocent people could not reasonably move because they were on the middle of an interstate, they could not move their cars, and had no place to safely go. Several people exited stopped vehicles and walked the long distance to the terminals.

71.     Plaintiff was en route to a flight out of Chicago to Norfolk, Virginia, for a business trip that morning in Virginia Beach. As a result of the blockade, Plaintiff was frozen on the highway for well over an hour, unable to move or navigate out of the traffic jam. He was also too far away from the blockade to simply get out of his car and walk to the airport (plus that would have required abandoning his car). He was, thanks to Defendants' activity, trapped.

72.     Law enforcement eventually cleared the blockade and arrested 40 individuals for blockading traffic. Included in the arrestees were Defendants Jinan Chehade, Superior Murphy.

---

[22] *See* INSTAGRAM, *Help Center: Create collaborative posts on Instagram* (for iPhone), https://help.instagram.com/5861247717337470/?cms_platform=iphone-app, and *id.* (for Android), https://help.instagram.com/5861247717337470/?cms_platform=android-app.

73.     Traffic flow resumed again around 9:30am local time.

74.     As a result of being stuck in traffic, Plaintiff missed his flight that morning and spent the next several hours re-booking his flight. When he finally arrived in Virginia Beach that night, he had missed an important work dinner and networking session.

## CLASS ALLEGATIONS

**A.  Class Definition**

75.     Plaintiff brings this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification under Federal Rules of Civil Procedure 23(b)(2) and (b)(3). Plaintiff seeks to represent a Class of persons preliminarily defined as: all non-Illinois residents who were either drivers or passengers of vehicles traveling on the morning of April 15, 2024, between the hours of 7:00 a.m. and 10:00 a.m. in Chicago, Illinois on Interstate 190 and nearby highways that connect to Interstate 190, who were confined in their vehicles because of the activists blockading traffic on Interstate 190 as it approaches the terminals at O'Hare International Airport.

76.     Excluded from the class are Defendants, officers and directors of Defendants and their parents, subsidiaries, and affiliates, and all judges assigned to hear any aspect of this case, as well as their immediate family members.

77.     Plaintiff reserves the right to propose one or more subclasses if discovery reveals that such subclasses are appropriate and to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

78.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

> a.  The Class, which includes thousands of members, is so numerous that joinder of all members in impracticable;
>
> b.  There are substantial questions of law and fact common to the Class, including those set forth in more detail herein;

c.   Questions of law and fact which are common to the Class predominate over any questions of law or fact affecting only individual members of the Class;

d.   The claims of the representative are typical of the claims of the Class;

e.   A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

f.   The relief sought in the class action will effectively and efficiently provide relief to all members of the Class;

g.   There are no unusual difficulties foreseen in the management of this class action; and,

h.   Plaintiff's claims are typical of those of the Class and, through experienced counsel, will zealously and adequately represent the Class.

## B.  Numerosity

79.   The number of travelers and motorists within the Class is over 1000, and therefore is so numerous that joinder is impracticable.

## C.  Commonality

80.   The common questions of law and fact predominate over any individual questions affecting Class Members, including but not limited to: (1) elements of the tort of public nuisance; (2) the elements of the tort of false imprisonment; (3) the elements of a violation of 625 ILCS § 5/11-1416, Obstructing persons in highways; and (4) the elements of civil conspiracy.

## D.  Typicality

81.   Plaintiff has the same interests in this matter as all the other members of the Class and his claims are typical of all the members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, utilize the same evidence, rely upon the same legal theories, and seek the same type of relief.

82.     The claims of the Plaintiff and other Class Members have a common cause and their damages are of the same type. The claims originate from the same unlawful, willful and concerted actions of the Defendants.

83.     All Class Members have suffered injury in fact as a result of Defendants' concrete actions because they were unlawfully confined to their vehicles during the blockade the morning of April 15, 2024, and because Defendants' actions unreasonably interfered with the Class Members' right to freely travel on public roads and highways. All Class Members suffer a substantial risk of repeated injury in the future, as Defendants have shown a willingness to continue to engage in traffic blockages and similar systemically disruptive conduct that is likely to result in injury to all members of the Class.

### E. Adequacy of Representation

84.     Plaintiff's claims are sufficiently aligned with the interests of absent Class Members to ensure that the Class claims will be prosecuted with diligence and care by Plaintiff as a representative of the Class. Plaintiff will fairly and adequately represent the interests of the Class and he does not have interests adverse to the Class.

85.     Plaintiff has retained the services of counsel who are experienced litigators, particularly with respect to class actions, Rule 23 of the Federal Rules of Civil Procedure, and the Class Action Fairness Act (CAFA). Plaintiff's counsel will vigorously prosecute this action and will otherwise fairly and adequately represent Plaintiff and all absent Class Members.

### F. Class Treatment is the Superior Method for Adjudication

86.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in the Complaint because:

        a.   Individual claims by the Class Members would be impracticable as the cost of pursuing those claims would exceed what any one Class Member has at stake;

b. Little or no individual litigation has been commenced over the controversies and conduct alleged in the Complaint and individual Class Members are unlikely to have an interest in separately litigating individual actions;

c. The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

d. The proposed action is manageable.

87.     The prosecution of separate actions by individual members of the Class would create the risk of (1) inconsistent or varying adjudications with respect to individual Class Members which could establish incompatible standards of conduct for one or more of the Defendants; and (2) adjudications with respect to individual Class Members would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

88.     Notice can be provided to members of the Class by publication and broadcast, including but not limited to news media, social media platforms, and commercial radio (including satellite radio).

## CAUSES OF ACTION

### Count I: Statutory Violation of 625 ILCS § 5/11-1416, Obstructing Highways

89.     Plaintiff reasserts and realleges paragraphs 1 through 88 as if fully set forth therein.

90.     As a result of the aforementioned actions by Defendants Chehade, Murphy, Falaneh, and Tucker, I-190 leading toward O'Hare was obstructed and their blockade deprived Plaintiff of his right to freely travel I-190, a highway within Illinois.

91.     The Illinois Vehicle Code prohibits persons from "willfully and unnecessarily hinder[ing], obstruct[ing] or delay[ing], or willfully and unnecessarily attempt[ing] to delay, hinder or obstruct any other person in lawfully driving or traveling along or upon any highway within" the State of Illinois. 625 ILCS § 5/11-1416.

92.     A direct and foreseeable result of Chehade's, Murphy's, Falaneh's, and Tucker's willful and coordinated actions on April 15, 2024, including their personal on-foot presence blocking traffic as pedestrians on and around I-190, was that Plaintiff and Class Members were unnecessarily hindered, obstructed and delayed from traveling on highways leading to O'Hare International Airport in violation of § 5/11-1416 of the Illinois Vehicle Code.

## Count II: Public Nuisance

93.     Plaintiff reasserts and realleges paragraphs 1 through 88 as if fully set forth therein.

94.     As a result of the aforementioned actions by Defendants Chehade, Murphy, Falaneh, and Tucker, a public nuisance was created on I-190 leading toward O'Hare for two and a half hours. These Defendants were physically present and participated in the blockade; two were arrested for their behavior. Their unlawful conduct inhibited freedom of movement on a federal interstate for drivers heading toward O'Hare during the relevant timeframe.

95.     As a foreseeable, direct and proximate result of Defendants' actions, Plaintiff and others on the road suffered damages, including but not limited to:

   a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

   b.   Loss of time having to rearrange travel plans after missing his flight; and,

   c.    The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

96.     Plaintiff and the other class members on I-190 at the time suffered special harm because of Defendants' actions since they were unfairly deprived of a right common to the general public—to travel freely on public highways and roads without unreasonable interference. Plaintiff's injuries are different from the general public in the area commuting the morning of April 15, 2024, who were not trapped, hindered or otherwise delayed by the Defendants' actions.

97.     Plaintiff and other commuters on the road at the same time also suffered a special harm because they were falsely imprisoned as a result of Defendants' conduct, which is not the case for other travelers on other roads in the area at that time.

## Count III: False Imprisonment

98.     Plaintiff reasserts and realleges paragraphs 1 through 88 as if fully set forth therein.

99.     As a result of the aforementioned actions by Defendants Chehade, Murphy, Falaneh, and Tucker, traffic was brought to a standstill on I-190 leading toward O'Hare for two and a half hours. These Defendants were physically present and participated in the traffic blockade; two were arrested for their behavior. Their unlawful conduct trapped drivers and commuters alike on the road in their cars for two and a half hours, as no reasonable person would reasonably abandon their car on an interstate given the circumstances.

100.    A direct and foreseeable result of Defendants' actions was that Plaintiff and others on the road at the same time suffered damages including, but not limited to:

    a.  Loss of personal freedom;

    b.  Lost business opportunities; and,

    c.  Annoyance, inconvenience, and physical discomfort, anxiety and emotional distress by being confined in a stationary vehicle for an unreasonable period of time and uncertainty about when he might be free to resume traveling.

## Count IV: Highway Obstruction In-Concert

101.    Plaintiff reasserts and realleges paragraphs 1 through 88 and 80 through 92 as if fully set forth therein.

102.    "In-concert liability is a separate form of action" from an underlying tort. *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (Ill. App. Ct. 2002). A defendant is subject to in-concert liability for tortious conduct of another if it "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives

substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 716.

103.    The underlying statutory tort of highway obstruction is pleaded in Count I above.

104.    Defendants NSJP, JVP and Dissenters planned and/or advertised the blockade beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade, including by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts. They were aware of the blockade and its unlawfulness, but provided assistance to it anyway. Thus, these Defendants contributed in-concert to the highway obstruction that resulted from the blockade.

105.    Defendants AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

106.    Defendant WESPAC also shares in-concert liability for highway obstruction because it had awareness of NSJP's blockade strategy—or, as its fiscal sponsor, should have—and NSJP breached its duty to this class via the O'Hare blockade, which was substantially assisted by WESPAC. Separately, WESPAC also has in-concert liability here because it gives substantial fiscal assistance to NSJP which help fund its tortious blockade operations, and that funding breached WESPAC's duty to "retain control and discretion over the use of funds by" NSJP so to not injure the class.

107.    Defendant USCPR knew that the individuals' conduct blockading the highway was a breach yet gave substantial assistance and encouragement to it by authoring and sharing joint social media posts with the other organizational Defendants to (a) raise bail money for them; (b) amplify its message; and (c) create political pressure in support of their cause. (Hedley Decl. ¶¶ 75-78).

108.    Under any of the three definitions of in-concert liability, Defendants NSJP, JVP, USCPR, and Dissenters are liable for highway obstruction.

109.    As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others on the same road at the time suffered damages, including but not limited to:

a. Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

b. Loss of time having to rearrange travel plans after missing his flight; and,

c. The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count V: Public Nuisance In-Concert

110. Plaintiff reasserts and realleges paragraphs 1 through 88 and 94 through 97 as if fully set forth therein.

111. "In-concert liability is a separate form of action" from an underlying tort. *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (Ill. App. Ct. 2002). A defendant is subject to in-concert liability for tortious conduct of another if it "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 716.

112. The underlying tort of public nuisance, including Plaintiff's special injury, is pleaded in Count II above.

113. Defendants NSJP, JVP, and Dissenters planned and/or advertised the blockade beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade, including by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts. They were aware of the blockade and its unlawfulness, but provided assistance to it anyway. Thus, these Defendants contributed in-concert to the public nuisance from the blockade.

114.     Defendants AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

115.     Defendant WESPAC also shares in-concert liability for public nuisance because it had awareness of NSJP's blockade strategy—or, as its fiscal sponsor, should have—and NSJP breached its duty to this class via the O'Hare blockade, which was substantially assisted by WESPAC. Separately, WESPAC also has in-concert liability here because it gives substantial fiscal assistance to NSJP which help fund its tortious blockade operations, and that funding breached WESPAC's duty to "retain control and discretion over the use of funds by" NSJP so to not injure the class.

116.     Defendant USCPR knew that the individuals' conduct blockading the highway was a breach yet gave substantial assistance and encouragement to it by authoring and sharing joint social media posts with the other organizational Defendants to (a) raise bail money for them; (b) amplifying its message and (c) create political pressure in support of their cause. (Hedley Decl. ¶¶ 75-78).

117.     Under any of the three definitions of in-concert liability, Defendants NSJP, JVP, USCPR, and Dissenters are liable for public nuisance. WESPAC is liable under the latter two elements, and both AMP and WESPAC are vicariously liable due to NSJP's acts.

118.     As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others on the same road at the time suffered damages, including but not limited to:

> a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);
>
> b.   Loss of time having to rearrange travel plans after missing his flight; and,
>
> c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## Count VI: False Imprisonment In-Concert

119.     Plaintiff reasserts and realleges paragraphs 1 through 88 and 99 through 100 as if fully set forth therein.

120.     "In-concert liability is a separate form of action" from an underlying tort. *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (Ill. App. Ct. 2002). A defendant is subject to in-concert liability for tortious conduct of another if "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 716.

121.     The underlying tort of false imprisonment is pleaded in Count III above.

122.     Defendants NSJP, JVP, USCPR and Dissenters planned and/or advertised the blockade beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. These Defendants knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts. They were aware of the blockade and its unlawfulness, but provided assistance to it anyway. Thus, these Defendants contributed in-concert to the false imprisonment of commuters such as Plaintiff due to the blockade.

123.     Defendants AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

124.     Defendant WESPAC also shares in-concert liability for false imprisonment because it had awareness of NSJP's blockade strategy—or, as its fiscal sponsor, should have—and NSJP breached its duty to this class via the O'Hare blockade, which was substantially assisted by WESPAC. Separately, WESPAC also has in-concert liability here because it gives substantial fiscal assistance to NSJP which help fund its tortious blockade operations, and that funding breached WESPAC's duty to "retain control and discretion over the use of funds by" NSJP so not to injure the class.

125.    Under any of the three definitions of in-concert liability, Defendants NSJP, JVP, USCPR, and Dissenters are liable for the false imprisonment of Plaintiff.

126.    As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

      a.  Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

      b.  Loss of time having to rearrange travel plans after missing his flight; and,

      c.  The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count VII: Conspiracy to Obstruct Highways

127.    Plaintiff reasserts and realleges paragraphs 1 through 88 and 89 through 92 as if fully set forth therein.

128.    To plead a civil conspiracy, Plaintiff must show an agreement between two or more persons "for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means," in which "one of the conspirators committed an overt tortious or unlawful act." *Madonis v. Sterling Bay Cos., LLC*, 2020 IL App (1st) 191657-U ¶ 28.

129.    As described in these paragraphs, Defendants NSJP, JVP, Dissenters, Chehade, Murphy, Falaneh, and Tucker, knowingly and voluntarily agreed to unlawfully block traffic on I-190 leading into O'Hare. This is an unlawful public nuisance which they agreed to create. Defendants Chehade, Murphy, Falaneh, and Tucker committed the tort of highway obstruction by overt act by participating in the blockade directly, and Defendants AMP, NSJP, JVP, and Dissenters committed an overt act in support of the highway obstruction by organizing it.

130.    Defendant Tides Center also conspired to support Defendants' scheme. Its creating, managing, and advertising a bail fund for A15 Action activists incentivized their participation in

blockading I-190 into O'Hare Airport. This is an unlawful act on its own which justifies conspiracy liability. *See United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (affirming the existence of a criminal conspiracy in part due to "paying bail … and attorney's fees"). But Tides Center is independently liable for agreeing to the blockade—as demonstrated by its organized and advertised bail fund support—and the other Defendants' subsequent decision to execute it and create a highway obstruction.

131.    Defendants AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

132.    The underlying tort of obstructing a highway is pleaded in Count I above.

133.    As a foreseeable, direct and proximate result of Defendants' conspiracy, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

    a.    Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

    b.    Loss of time having to rearrange travel plans after missing his flight; and,

    c.    The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

**Count VIII: Conspiracy to Commit Public Nuisance**

134.    Plaintiff reasserts and realleges paragraphs 1 through 88 and 94 through 97 as if fully set forth therein.

135.    To plead a civil conspiracy, Plaintiff must show an agreement between two or more persons "for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means," in which "one of the conspirators committed an overt tortious or unlawful act." *Madonis v. Sterling Bay Cos., LLC*, 2020 IL App (1st) 191657-U ¶ 28.

136.     As described in these paragraphs, Defendants NSJP, JVP, Dissenters, Chehade, Murphy, Falaneh, and Tucker, knowingly and voluntarily agreed to unlawfully block traffic on I-190 leading into O'Hare. This is an unlawful public nuisance which they agreed to create. Defendants Chehade, Murphy, Falaneh, and Tucker committed the public nuisance tort by overt act by participating in the blockade directly, and Defendants NSJP, JVP, and Dissenters committed an overt act in support of the public nuisance by organizing it.

137.     Defendant Tides Center also conspired to support Defendants' scheme. Its creating, managing, and advertising a bail fund for A15 Action activists incentivized their participation in blockading I-190 into O'Hare Airport. This is an unlawful act on its own which justifies conspiracy liability. *See United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (affirming the existence of a criminal conspiracy in part due to "paying bail … and attorney's fees"). But Tides Center is independently liable for agreeing to the blockade—as demonstrated by its organized and advertised bail fund support—and the other Defendants' subsequent decision to execute it and create a public nuisance.

138.     Defendants AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

139.     The underlying tort of public nuisance, including Plaintiff's special injury, is pleaded in Count II above.

140.     As a foreseeable, direct and proximate result of Defendants' conspiracy, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

    a.  Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

    b.  Loss of time having to rearrange travel plans after missing his flight; and,

    c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## Count IX: Conspiracy to Commit False Imprisonment

141.     Plaintiff reasserts and realleges paragraphs 1 through 88 and 99 through 100 as if fully set forth therein.

142.     To plead a civil conspiracy, Plaintiff must show an agreement between two or more persons "for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means," in which "one of the conspirators committed an overt tortious or unlawful act." *Madonis*, 2020 IL App (1st) 191657-U ¶ 28.

143.     As described in these paragraphs, Defendants NSJP, JVP, Dissenters, Chehade, Murphy, Falaneh, and Tucker, knowingly and voluntarily agreed to unlawfully blockade I-190's offramp into O'Hare. As a result, Plaintiff and many others heading toward O'Hare during the blockade were stuck in traffic and—like any reasonable person—felt compelled to remain in their cars until the cops dealt with the issue ahead of them.

144.     Defendant Tides Center also conspired to support Defendants' scheme. Its creating, managing, and advertising a bail fund for A15 Action activists incentivized their participation in blockading I-190 into O'Hare Airport. This is an unlawful act on its own which justifies conspiracy liability. *See United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (affirming the existence of a criminal conspiracy in part due to "paying bail … and attorney's fees"). But Tides Center is independently liable for agreeing to the blockade—as demonstrated by its organized and advertised bail fund support—and the other Defendants' subsequent decision to execute it and falsely imprison Plaintiff and many others.

145.     Defendant AMP and WESPAC are vicariously liable due to the acts of their agent NSJP.

146.     The underlying tort of false imprisonment is pleaded in Count III above.

147.     As a foreseeable, direct and proximate result of Defendants' conspiracy, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

        a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress,
             by being confined in a stationary vehicle for an unreasonable period of time with

absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

b.  Loss of time having to rearrange travel plans after missing his flight; and,

c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## Count X: Aiding and Abetting Obstructing a Highway

148.    Plaintiff reasserts and realleges paragraphs 1 through 88 and 89 through 92 as if fully set forth therein.

149.    To be liable for aiding and abetting, the "party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Madonis*, 2020 IL App (1st) 191657-U ¶ 30.

150.    The underlying statutory tort of obstructing a highway is pleaded in Count I above. Defendants Chehade, Murphy, Falaneh, and Tucker performed the wrongful act of public nuisance by blockading the highway, and this act injured Plaintiff and others by causing them to miss flights and downstream activities, and depriving them of freedom of movement.

151.    Defendants NSJP, JVP, and Dissenters were aware of their role in supporting the blockade; they planned and/or advertised it beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts.

152.    Defendant Tides Center was aware of its role in support of the blockade; it created and advertised a bail fund for A15 Action activists *before* the blockade of I-190 into O'Hare Airport, in anticipation of arrests from that event. Tides Center knowingly and substantially assisted the blockade through its creation and management of the bail fund, because that fund incentivized

participation in the event giving activists security against longer-term detainment if they were arrested. Moreover, the bail fund helped raise money in support of the blockade.

153.     As a foreseeable, direct and proximate result of Defendants' aiding and abetting, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

      a.  Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

      b.  Loss of time having to rearrange travel plans after missing his flight; and,

      c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## Count XI: Aiding and Abetting a Public Nuisance

154.     Plaintiff reasserts and realleges paragraphs 1 through 88 and 94 through 97 as if fully set forth therein.

155.     To be liable for aiding and abetting, the "party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Madonis*, 2020 IL App (1st) 191657-U ¶ 30.

156.     The underlying tort of public nuisance, including Plaintiff's special injury, is pleaded in Count II above. Defendants Chehade, Murphy, Falaneh, and Tucker performed the wrongful act of public nuisance by blockading the highway, and this act injured Plaintiff and others by causing them to miss flights and downstream activities, and depriving them of freedom of movement.

157.     Defendants AMP, NSJP, JVP, and Dissenters were aware of their role in supporting the blockade; they planned and/or advertised it beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail

fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts.

158.    Defendant Tides Center was aware of its role in support of the blockade; it created and advertised a bail fund for A15 Action activists *before* the blockade of I-190 into O'Hare Airport, in anticipation of arrests from that event. Tides Center knowingly and substantially assisted the blockade through its creation and management of the bail fund, because that fund incentivized participation in the event giving activists security against longer-term detainment if they were arrested. Moreover, the bail fund helped raise money in support of the blockade.

159.    As a foreseeable, direct and proximate result of Defendants' aiding and abetting, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

      a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

      b.   Loss of time having to rearrange travel plans after missing his flight; and,

      c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count XII: Aiding and Abetting False Imprisonment

160.    Plaintiff reasserts and realleges paragraphs 1 through 88 and 98 through 100 as if fully set forth therein.

161.    To be liable for aiding and abetting, (1) the "party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Madonis*, 2020 IL App (1st) 191657-U ¶ 30.

162.    The underlying tort of false imprisonment is pleaded in Count III above. Defendants Chehade, Murphy, Falaneh, and Tucker performed the wrongful act of false imprisonment by blockading the highway, and this act injured Plaintiff and others by causing them to miss flights and downstream activities, and depriving them of freedom of movement.

163.    Defendants AMP, NSJP, JVP, and Dissenters were aware of their role in supporting the blockade; they planned and/or advertised it beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts.

164.    Defendant Tides Center was aware of its role in support of the blockade; it created and advertised a bail fund for A15 Action activists *before* the blockade of I-190 into O'Hare Airport, in anticipation of arrests from that event. Tides Center knowingly and substantially assisted the blockade through its creation and management of the bail fund, because that fund incentivized participation in the event giving activists security against longer-term detainment if they were arrested. Moreover, the bail fund helped raise money in support of the blockade.

165.    As a foreseeable, direct and proximate result of Defendants' aiding and abetting, Plaintiff suffered damages, including but not limited to:

    a.    Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

    b.    Loss of time having to rearrange travel plans after missing his flight; and,

    c.    The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## REQUEST FOR RELIEF

Therefore, Plaintiff respectfully requests the following relief:

A.   Certify the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Designate Plaintiff as representative of the proposed Class and designate his counsel as Class Counsel;

C.   Enter Judgment in favor of the Plaintiff and Class Members against the Defendants; and

D.   Award Plaintiff and the Class Members compensatory and punitive damages and attorneys' fees and costs, including pre-judgment interest and post-judgment interest; and

E.   Order injunctive relief prohibiting Defendants from further engaging in the unlawful conduct alleged in this Complaint; and,

F.   Any other legal or equitable relief that the Court deems appropriate.

Dated: November 10, 2024          Respectfully submitted,

*/s/ Neville S. Hedley*
Neville S. Hedley (IL Bar No. 6237279)
ned.hedley@hlli.org
(312) 342-6008

Theodore H. Frank (IL Bar. No. 6224948)
ted.frank@hlli.org
(703) 203-3848

M. Frank Bednarz (IL Bar No. 6299073)
frank.bednarz@hlli.org
(312) 801-2690

HAMILTON LINCOLN LAW INSTITUTE
1440 W. Taylor Street, #1487
Chicago, IL 60607

Max Schreiber (IN Bar No. 37357-45)
max.schreiber@hlli.org
(401) 408-9370

HAMILTON LINCOLN LAW INSTITUTE
5868 E. 71st Street, Suite E-709
Indianapolis, IN 46220

*Attorneys for Plaintiff Christopher Manhart*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Christopher Manhart have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.

Executed on November 10, 2024

*Christopher M Manhart*

Christopher Manhart