# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MANHART, *individually and on behalf of all others similarly situated*,<br><br>                                        *Plaintiff*,<br><br>                    v.<br><br>NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, a project of WESPAC FOUNDATION, INC.;<br>WESPAC FOUNDATION, INC.;<br>DISSENTERS;<br>JEWISH VOICE FOR PEACE;<br>TIDES CENTER, d/b/a COMMUNITY JUSTICE EXCHANGE;<br>JINAN CHEHADE;<br>SUPERIOR MURPHY;<br>RIFQA FALANEH;<br>and SIMONE TUCKER,<br><br>                                        *Defendants*. | No. 1:24-cv-08209<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

**[PROPOSED] SECOND AMENDED VERIFIED COMPLAINT**

## INTRODUCTION

1.      Americans rightly celebrate their rights to speak and protest. But this right does not extend to imprisoning motorists in their vehicles. As the Supreme Court has said, "The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights."[1] Protestors may speak loudly, they may be rude, they may shock audiences, but they cease being protestors when they use force to block expressways full of bystanders trapped on the roads to create a massive public nuisance. The Defendants did this in a misguided, self-defeating effort to extort political change from faraway luminaries, and by so doing intentionally harmed thousands of ordinary people as part of their goal to "cause pain" to Americans and the economy. Plaintiff Manhart was among those victimized, and he demands damages on behalf of himself and thousands of others wronged by the Defendants on April 15, 2024, when they conspired to block traffic to O'Hare International Airport, and an injunction to preclude Defendants from repeating this public nuisance.

2.      Defendants' blockade executed part of an international campaign to disrupt major economic centers in support of "Palestinian liberation." That campaign drew support from Hamas and the Iranian Revolutionary Guard Corps (IRGC), foreign terrorist organizations opposed to Israel's existence. Both were upset with how Israel responded to Hamas's October 7, 2024, terrorist attacks against Israel—the deadliest in that nation's history. These groups hoped that Defendants, and those like them across the world, would draw attention to their cause by bringing economic centers to a halt. And on the I-190 expressway, the Defendants succeeded, trapping thousands in their cars. Hamas viewed these protests as critical to its campaign to stop Israeli self-defense efforts, and resisted negotiations for a ceasefire in the hopes that Western activists would cause Western governments to pressure Israel to stop the war and allow Hamas to survive. So, ironically, the blockades and similar actions extended the war by giving Hamas false hope that its leadership could continue to hide behind

---

[1] *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 776 (1994).

Palestinian civilians and outlast the Israeli campaign, resulting in the deaths of thousands of Palestinians and Israelis.

3.      The Defendants chose to stop traffic on the entry roadway into O'Hare International Airport, one of the largest airports in the world. Planning for the blockade started weeks in advance; it involved selecting the site, advertising the blockade, recruiting activists to make the human blockade, buying supplies, and establishing a bail fund for arrested activists so that activists would be less deterred by state and federal criminal laws against their actions. Then on April 15, 2024, the individual Defendants in this Amended Complaint—along with nearly forty other activists—rushed the I-190 off-ramp in Chicago heading into O'Hare and used PVC pipe to connect their arms and block the entire intersection—the so-called "sleeping dragon" designed to prevent police from using bolt-cutters to more easily remove activists from roadblocks. Defendants broadcasted the blockade on their social media accounts along with pre-coordinated pro-Palestinian boilerplate, proud of the injury they were incurring on the class and others.

4.      All traffic into the airport stopped for almost three hours because of the blockade. People missed flights and downstream commitments. Vacations, interviews, weddings, and other important lifetime events were cast aside as the activists forced the public to participate in their demonstration by falsely imprisoning them. Commuters were stuck waiting in the middle of the highway trapped in their cars for hours with no inkling as to when their freedom of movement would be restored or whether their plans were salvageable.

5.      Plaintiff Christopher Manhart and other innocent class members heading into O'Hare that morning had nothing to do with an international dispute thousands of miles away; many likely have no opinion at all on the issue. But these innocent Americans were dragged into the conflict because the Defendants and foreign terrorist organization Hamas have decided a propaganda offensive in America is their best weapon against Israel.

6.      Plaintiff Christopher Manhart is just one victim of Defendants' blockade: The morning of April 15, Mr. Manhart drove from his home in Valparaiso, Indiana, to O'Hare to catch a flight to Norfolk, Virginia for business. But because of Defendants, he was trapped in his car on the

3

ramp to I-190 for over an hour with no way to maneuver out of the brutal, standstill traffic. Illinois law precluded Mr. Manhart from abandoning his vehicle on the road, even if he had thought it prudent to do so to catch his flight. Defendants' tortious activity caused Mr. Manhart to miss his flight that morning and he spent the next several hours at the airport adjusting his travel plans. Although he eventually reached his destination late that night, he missed an important work dinner and networking function. Mr. Manhart seeks to hold Defendants accountable for their illegal and tortious conspiracy to falsely imprison unsuspecting motorists and for creating a public nuisance that unreasonably interfered with his and class members' right to freely travel.

7.      Defendants held innocent Americans hostage on I-190 by blocking the interstate in the hopes of generating attention, and, by their own admission, "disrupt[] business as usual" and "blockade major choke points in the economy … with the aim of causing the most economic impact." While individuals and organizations have First Amendment rights to peaceably assemble, speak freely, and publicly air their grievances, the First Amendment does not protect tortious behavior masquerading as protest. The Defendants intentionally sought to injure innocent Americans, and are liable for that "economic impact."

8.      Plaintiff, on behalf of himself and thousands of others stuck in traffic that day, brings this Complaint with the Court to seek class relief against Defendants for their tortious blockade.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

10.      There are over a thousand Class Members and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interests and costs.

11.      Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

12.     Plaintiff Christopher Manhart is an attorney and a citizen of Indiana. On the morning of April 15, 2024, he traveled from his home in Indiana to catch a flight out of Chicago's O'Hare International Airport. Manhart travels into Chicago several times a year, almost always to visit major economic centers such as O'Hare Airport, the United Center, Midway Airport, Wrigley Field, and to State Street or Michigan Avenue.

13.     Defendant National Students for Justice in Palestine ("NSJP") is an unincorporated association with no formal principal place of business or transparent leadership structure. (Hedley Decl. ¶ 13.) Until recently, and at times relevant to this complaint, defendant WESPAC acted as the fiscal sponsor and the formal legal entity for tax-exempt donations to NSJP. (Hedley Decl. ¶ 40.) This arrangement enables NSJP to collect and distribute funds without transparency. The financial interactions between WESPAC and its anti-Israel and pro-Hamas clientele is intentionally opaque to largely shield from public view the flow of funds between and among them. For instance, WESPAC reported $2.4 million in revenue in 2022 but spent nearly $1.5 million solely on "office expenses," a category that, according to the IRS, should include only basic costs to keep the physical office operational, such as computers, software, office cleaning services, and postage.[2] Upon information and belief, individuals associated with NSJP received funds directly from WESPAC, but the recipient(s) of these funds are unknown to the Plaintiff. While NSJP keeps its structure intentionally obscure, it appears to be guided by a "national steering committee" whose current members include Carrie Zaremba, Sean Eren, and Dylan Kupsh.[3] (Hedley Decl. ¶ 13.) The steering committee includes "about a dozen members" and it distributes "tool kits" to inspire action by local chapters and allied

---

[2] Joseph Simonson, *Is This Suburban New York Charity a Terrorist Front Group?*, WASH. FREE BEACON (May 20, 2024), https://freebeacon.com/national-security/is-this-suburban-new-yorkcharity-a-terrorist-front-group/.

[3] Emma Green, *How a Student Group Is Politicizing a Generation on Palestine*, THE NEW YORKER (Dec. 15, 2023), https://www.newyorker.com/news/annals-of-education/how-a-generation-is-being-politicized-on-palestine. Kupsh disclosed his steering committee membership while running for office in his union. *See* https://www.rnfdu.org/dylan.

groups it does not formally control.[4] Upon information and belief, steering committee members are "officers" of the unincorporated association within the meaning of 735 ILCS 5/2-205.1.As relevant here, NSJP has multiple affiliates at Chicago-area campuses, including on the campuses of Northwestern University, the University of Chicago, DePaul University, and the School of the Art Institute of Chicago. (Hedley Decl. ¶¶ 42-43.) These groups are centrally organized under the umbrella of SJP Chicago, which states that it is "[a] unified front of Chicagoland SJPs, supporting and uplifting one another in the struggle for Palestinian liberation."

14.     Defendant WESPAC Foundation, Inc. (WESPAC), is a New York corporation with its principal place of business in New York state, and a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code. During the relevant time, WESPAC acted as the fiscal sponsor and the formal legal entity for tax-exempt donations for affiliates such as Defendant NSJP and similar organizations such as the Palestinian Youth Movement and the US Palestinian Community Network. (Hedley Decl. ¶¶ 10-13.) During the relevant time, the donation link on the NSJP website showed that donations intended for it go to WESPAC, as demonstrated by a disclaimer that donors may cover credit card transaction fees "so more of my donation goes to WESPAC Foundation, Inc." (*Id.* ¶ 40.) WESPAC has launched fundraisers for NSJP, promoted NSJP events through its social media accounts after October 7, and indicated that their missions were aligned. (*Id.* ¶ 12.) As fiscal sponsor for NSJP, WESPAC was responsible to "retain control and discretion over the use of funds" allocated to NSJP, and to "maintain[] records establishing that the funds were used for section 501(c)(3) purposes" Rev. Rul. 68-489, 1968-2 C.B. 210. Accordingly, during the relevant time, NSJP, which had no independent corporate structure, was a project of WESPAC, and WESPAC was liable for NSJP's actions. On information and belief, WESPAC has since dissociated itself from NSJP precisely to avoid

---

[4] Alan Blinder, *Inside the Pro-Palestinian Group Protesting Across College Campuses*, NEW YORK TIMES (Nov. 17, 2023), https://www.nytimes.com/2023/11/17/us/students-justice-palestine-campus-protests.html.

this legal responsibility; however, it was part and parcel of the tortious behavior at issue in this Complaint.

15.     Defendant Dissenters is an Illinois corporation with its principal place of business in Chicago, and a tax-exempt organization under I.R.C. § 501(c)(3) whose mission is "leading a new generation of young people to reclaim our resources from the war industry, reinvest in life-giving services, and repair collaborative relationships with the earth and people around the world." Like NSJP, Dissenters also maintains a Chicago chapter. (Hedley Decl. ¶¶ 17, 61-63.)

16.     Defendant Jewish Voice for Peace, Inc. (JVP) is a California corporation and a tax-exempt organization under I.R.C. § 501(c)(3). JVP has multiple chapters across the United States, including one in Chicago. JVP describes itself as "the largest progressive Jewish anti-Zionist organization in the world." (Hedley Decl. ¶¶ 15, 52-54.) JVP has a history of organizing and promoting disruption, including blockades of highways and major transportation hubs. For instance, on October 27, 2023, JVP organized a nuisance that, according to its own website, "took over Grand Central Station" in New York City during a busy Friday rush hour and "fully shut down" the main terminal. Similarly, JVP organized human barricades on the eighth day of Hanukkah in 2023 to prevent use of roadway bridges in eight major cities, including Chicago. (Hedley Decl. ¶¶ 59-60.) The organization has a place of business and mailing addresses in Northern California in the San Francisco Bay area.  (Hedley Decl. ¶¶ 15-16.) JVP also has its own local Chicago chapter, with a separate website and social media presence. (Hedley Decl. ¶¶ 54-55.) Its organizer, Simone Tucker, was a participant in the tortious activity at issue in this Complaint and is named as an individual Defendant. (Hedley Decl. ¶¶ 57-58.)

17.     Defendant Tides Center is a California corporation and tax-exempt entity under I.R.C. § 501(c)(3); its principal place of business is in San Francisco, California. (Hedley Decl. ¶¶ 18-20.) Tides Center runs the Community Justice Exchange, which is a "nonprofit 501(c)(3) project of the Tides Center" (Hedley Decl. ¶ 18.) Community Justice Exchange has no independent corporate structure, and Tides is liable for its actions.

18.     Defendant Jinan Chehade is a recent Georgetown Law School graduate whose job offer from Foley & Lardner was rescinded for publicly supporting the October 7, 2024, massacre of innocent Israeli citizens by Hamas militants on social media, which the firm "interpreted to be inconsistent with and violative of its values." *Chehade v. Foley*, No. 24-cv-04414, 2024 U.S. Dist. LEXIS 218680, at *6 (N.D. Ill. Dec. 3, 2024). Chehade was a primary organizer of the blockade at issue in this Complaint; she was also present at the blockade and used her own body to help stop the flow of traffic around O'Hare. For her participation in the blockade, she was arrested by the Chicago Police Department, and was eventually sentenced to community service as part of a favorable plea bargain. Additionally, Chehade had leadership roles in local chapters of SJP during her time at both Georgetown Law and DePaul University for undergrad. (Hedley Decl. ¶ 51). She claimed to have co-founded the SJP Chicago. (*Id.*)

19.     Defendant Superior Murphy is an "evaluation strategist" at UBUNTU Research and Evaluation and a Board Member of the Queer Food Foundation non-profit. Murphy was present at the blockade and narrated a video of the blockade that was posted to social media that showed activists blockading the highway and cars stopped in traffic. (Hedley Decl. ¶ 69.) For her participation in the blockade, she was arrested by the Chicago Police Department, and was eventually sentenced to community service as part of a favorable plea bargain.

20.     Defendant Rifqa Falaneh is the Michael Ratner Justice Fellow at the public interest law firm Palestine Legal, which is sponsored by Defendant Tides Center. (Hedley Decl. ¶¶ 49-50.) According to her biography, Falaneh had been president of Defendant SJP's affiliate at DePaul University in Chicago and had helped re-establish SJP's Chicago affiliate in 2019. Falaneh was an organizer of the blockade at issue in this Complaint, where she was present.

21.     Defendant Simone Tucker is a student organizer for JVP in Chicago and was present at the blockade on I-190 the morning of April 15, 2024. She helped organize the blockade and stop the flow of traffic around O'Hare using her own body or by assisting others in doing so on-site. After the blockage, she bragged to the media that "we made our point. We stood in solidarity with our comrades in Palestine, and we disrupted business as usual." (Hedley Decl. ¶¶ 57-58.)

# FACTS

**A. The tortious conduct at issue derives from the generational conflict between Hamas and Israel over Israel's right to exist, which Hamas has now exported to the United States as part of its propaganda operation against Israel.**

22. Israel has had to fight for its right to exist since it became a State in 1948. Perhaps Israel's greatest enemy in defending its sovereignty in the twenty-first century is Hamas,[5] the terrorist organization and current governing authority in certain Palestinian lands neighboring Israel, specifically the Gaza Strip.

23. Hamas arose out of the "First Intifada"—or violent uprising—against Israel by the Palestinians in 1987, who were led at the time by the International Muslim Brotherhood. Hamas does not recognize Israel's right to exist, and it rules Palestinian territory under an Islamist government. As a result of its anti-Israel operations, including acts of terrorism in other nations, Hamas was designated as a foreign terrorist organization in 1997 by the U.S. State Department when it first started such designations, a status it reaffirmed in 1999 and 2001.

24. Hamas militants regularly embed among the civilian population in Gaza, which puts civilians at risk when there is direct conflict with Israel.[6] Not surprisingly, this results in civilian casualties which Hamas exploits as part of its propaganda campaign against Israel.

25. Moreover, Hamas employs terrorism, propaganda, and falsehoods to portray itself as opposing a phony "settler-colonial" narrative of Israel; this includes the myth that Israel is a colonizer which has oppressed the Palestinian people. In promoting this lie, Hamas ignores actual events of the recent past in which Israel ceded the Palestinians the Gaza Strip, which it won from Egypt in the Six Day War in 1967. Israel is one of the only nations in memory to cede land won in a war in an effort

---

[5] Kali Robinson, *What is Hamas?*, COUNCIL ON FOREIGN RELATIONS (last updated Apr. 28, 2024), https://tinyurl.com/3z49yzsu.

[6] Natalie Ecanow, *Hamas Officials Admit its Strategy is to Use Palestinian Civilians as Human Shields*, N.Y. POST (Nov. 1, 2023) https://tinyurl.com/34jjnuer; Michael D. Shear, *U.S. Says Hamas Operates Out of Gaza Hospitals, Endorsing Israel's Allegations*, N.Y. TIMES (Nov. 14, 2023).

to establish peace. Similarly, Hamas's narrative of the Palestine-Israeli conflict ignores that Israel unilaterally withdrew from the Gaza Strip in 2005.

26. Hamas is also a proxy of Iran and Iran's Revolutionary Guard Corps (IRGC), a foreign terrorist organization itself which seeks to eliminate the State of Israel entirely.

27. While Hamas has won over some supporters worldwide, American foreign policymakers have remained generally supportive of Israel's right to exist. For example, America continues to generously share some intelligence and weapons with the Israeli government. And while Hamas seems to have won over some sympathetic American politicians and diplomats, the American public still largely supports Israel's defending itself against attacks from Hamas.[7]

28. Hamas recognizes that its ultimate goal of eliminating the State of Israel is impossible without a drastic shift in America's pro-Israel paradigm. Accordingly, the focus of its propaganda war now centers on our shores.

**B. On October 7, 2023, Hamas launched the deadliest attack against Israel in its history—killing almost 1,200 Israelis, most of them innocent civilians, and taking even more hostage (including some Americans living in Israel).**

29. On October 6, 2023, Israel and Hamas were engaged in a ceasefire that had brought some relative stability to the region and the longtime warring between the factions. Hamas decided to break the ceasefire without provocation the following day.

30. With support from the IRGC and other foreign terrorist organizations, Hamas launched a terrorist attack—one which resembled a military operation—toward southern Israel.[8] It involved launching thousands of rockets at civilian-heavy targets and invading other locations (including a popular music festival and private homes) with infantry to shoot, rape, and kidnap innocent Israelis. Hamas killed almost 1200 people and injured nearly 7,000 in the vicious assault.

---

[7] Laura Silver et al., *Majority in U.S. Say Israel Has Valid Reasons for Fighting; Fewer Say the Same About Hamas*, PEW RESEARCH CENTER (Mar. 21, 2024) https://tinyurl.com/4uudmhdn.

[8] Bill Hutchinson, *Israel-Hamas War*, ABC NEWS (Nov. 22, 2023), https://tinyurl.com/549yh8fn.

31.     More than 200 victims were kidnapped and forcibly taken into Gaza by Hamas operatives as leverage in anticipated diplomatic negotiations and as human shields to deter potential Israeli counterstrikes. While most of these victims were Israeli, eight Americans were also taken by Hamas—and those Hamas have not already executed remain captive to this day.

32.     October 7 was the deadliest day in Israel's history, even though it has faced the threat of violence from various nation-states and terrorist organizations since it became a nation in 1948.

33.     Hamas continues to hold hostages from the October 7 attacks captive, and its allies continue to launch rockets and drones into Israel. The cumulative attacks have upended the lives of the Israeli people and tested Israel's relations with other Gulf states—which, prior to the attack, had been improving and even normalizing through agreements such as the 2020 Abraham Accords. One of Iran and Hamas's goals in the October 7 attack was to drive a wedge between Israel and the Gulf nations like Saudi Arabia, which prior to normalization was more adversarial to Israel's existence.

34.     Israel responded to the October 7 attack by Hamas with a military campaign against Hamas that has resulted in hardship for the Palestinian people living in Gaza. Hamas soldiers use innocent Palestinian non-combatants as human shields and intercept aid trucks to resell supplies for profit. Hamas then quickly amplified its propaganda message to falsely portray Israel as an indiscriminate aggressor in the dispute.

35.     Hamas's propaganda operations "transcend[] conventional warfare tactics, aiming to exploit the international community's response to civilian casualties, generate global condemnation of Israel, hamstring the IDF's operations, and protect Hamas's military capabilities under the guise of civilian safety."[9]

36.     Just hours after its October 7 attack, "Hamas' Qatar-based politburo web operatives flipped the switch on a slickly produced global social media disinformation campaign calculated to

---

[9] Joshua Klein, Exclusive: Renown Urban Warfare Expert John Spencer Warns 'World Playing Into Hamas's Strategy', BREITBART (Apr. 1, 2024), https://tinyurl.com/yc326urd.

trigger an outpouring of pro-Palestinian/anti-Israel sentiment across global social media platforms to amplify (and justify) Hamas'[s] terror."[10]

37.     Hamas leaders called for Hamas's "resistance abroad"—which includes Defendants— to "join this battle any way they can."[11] Given Hamas and Iran's propaganda strategy against Israel, this means through agitation, the spreading of mis- and disinformation through social media, and visible economic disruption. Defendants' blockade fulfills these propaganda goals.[12]

38.     The day after the attack, NSJP released its Day of Resistance Toolkit ("NSJP Toolkit") to local chapters on more than 300 American college campuses and on the internet.[13]

39.     As the NSJP Toolkit made clear, NSJP operatives and members across this country had an "unshakable responsibility to join the call for mass mobilization" for Palestinian political aims. The NSJP Toolkit proclaims that "[l]iberation is not an abstract concept … [it] is a real process that requires **confrontation by any means necessary**" (emphasis added). Supporting the Palestinian cause "calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric. **Resistance comes in all forms—armed struggle, general strikes, and popular demonstrations.** All of it is legitimate, and **all of it is necessary**." The Defendants would execute on Defendant NSJP's own language when planning and executing the blockade at issue.

---

[10]  Coalition for a Safer Web, *The Hamas "Influencer" Intifada* (Nov. 16, 2023), https://tinyurl.com/3dp8pajx.

[11]  Al-Jazeera Airs Hamas Leader Ismail Haniyeh's Statement On Hamas's Invasion Of Southern Israel: I Call On Palestinians In The West Bank, Israeli Arabs, And The Entire Nation Abroad To Join The Battle; To The Enemy I Say: Get Out Of Our Land!, MEMRI TV (Oct. 7, 2023), https://tinyurl.com/v2wmpruj; Former Hamas Leader Khaled Mashal Calls For 'Friday Of The Al-Aqsa Flood': Muslims Should Take To The Streets Worldwide, Join The Battle; The West, America, Zionists Will See Convoys Of Mujahideen On Their Way To Palestine, MEMRI TV (Oct. 10, 2023), https://tinyurl.com/2x8mkp4x.

[12] The Office of the Director of National Intelligence has identified a nexus between Iran's anti-Israel propaganda objectives and American agitators. *See* ODNI News Release No. 17-24 (July 9, 2024), available at: https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2024/3842-statement-from-director-of-national-intelligence-avril-haines-on-recent-iranian-influence-efforts.

[13]  https://dw-wp-production.imgix.net/2023/10/DAY-OF-RESISTANCE-TOOLKIT.pdf

40.     Defendants NSJP and WESPAC—through NSJP's opaque organizational structure—implemented the NSJP toolkit by either planning, sponsoring, and then publicizing (during and after) large-scale barricades across the United States designed to inconvenience and illegally disrupt the lives of everyday Americans. At first these were largely confined to college campuses: On October 12, 2023, Defendant NSJP organized a national "Day of Resistance" to coincide with Hamas's "Day of Rage" in Gaza and the West Bank. Local SJP chapters and their members chanted anti-Semitic jeers, occupied public spaces, spat on and harassed Jewish students, and obstructed normal foot traffic and operations around many elite college campuses.[14] Many campuses saw their local SJP chapters continue this activity throughout the school year. This blockade strategy was only the beginning of Defendants NSJP's propaganda offensive—funded by its fiscal sponsor WESPAC—on behalf of Hamas in the United States.

## C. Defendants extend the blockade strategy, resulting in the tortious conduct at issue.

41.     Following October 7, NSJP started to organize disruptive activities beyond college campuses, expanding their operations into American cities to maximize visibility and chaos to exert pressure on political leaders to oppose the "Zionist entity"[15] and "disrupt[] business as usual."

42.     NSJP has historically operated as a fiscal sponsorship of WESPAC, meaning that WESPAC has collected and disbursed donations on NSJP's behalf because NSJP lacks tax-exempt status. Fiscal sponsorships are permitted only to the extent that the sponsoring charity does not act as a "conduit." To avoid this improper arrangement—which can "jeopardize [the sponsor's] exemption under section 501(c)(3)"—the sponsor must "retain[] control and discretion over use of the funds for section 501(c)(3) purposes." *New York ex rel. Tzac, Inc. v. New Isr. Fund*, 520 F. Supp. 3d 362, 388-89 (S.D.N.Y. 2021).

---

[14] *See* First Amended Complaint, *Parizer*, No. 1:24-cv-00724-RDA-IDD, ECF 24 ¶¶ 96-98, a true and accurate copy of which is Attachment 2 accompanying this complaint.

[15] Hamas, *Monday, Dec. 11 global #StrikeForGaza*, Intʼl Action Center (Dec. 10, 2023), https://tinyurl.com/c5wz3xm5.

43.     NSJP, JVP, Dissenters, and WESPAC are aware that protests by NSJP, JVP, and Dissenters are often intended to and do result in violence, arrest, and unlawful disruption of government proceedings, roads, bridges, and other traffic infrastructure; and that such unlawful disruptions increasingly occurred after October 7. Nevertheless, WESPAC remained NSJP's fiscal sponsor over the relevant period.

44.     For example, on November 13, 2023, reportedly 106 protestors were arrested in and around the Ogilvie Transportation Center (terminus to several Metra commuter lines) in Chicago after refusing orders to disperse so that commuters could use the facility.[16] At least six of these arrestees were subsequently arrested at O'Hare Airport on April 15. JVP organized the illegal November 13 blockage.[17]

45.     On November 18, 2023, a protest organized in part by SJP blocked traffic in both directions on Lake Shore Drive in Chicago, leading to scuffles with police to clear the road, but no arrests.[18]

46.     On December 14, 2023, 13 protestors were arrested for blocking Washington Street Bridge in downtown Chicago.[19] which JVP claimed credit for, having previously advertised it to be a "Hanukkah Vigil and Musical March" originating at Daley Plaza.[20] (*See also* Hedley Decl. ¶¶ 59-60.)

---

[16] Elyssa Kaufman, Darius Johnson, *More than 100 arrested at downtown Chicago rally to demand ceasefire in Gaza*, CBS NEWS CHICAGO (Nov. 13, 2023), available at: https://www.cbsnews.com/chicago/news/hundreds-protesting-near-chicago-israeli-consulate-calling-for-ceasefire-in-gaza/.

[17]                                         https://www.instagram.com/jvpchicago/reel/Czl4cQLL3Bw/ [https://archive.ph/kuFc3].

[18] Hundreds of Gaza demonstrators block DuSable Lake Shore Drive traffic in Loop, CHICAGO TRIBUNE (Nov. 18, 2023), https://www.chicagotribune.com/2023/11/18/hundreds-of-gaza-demonstrators-block-dusable-lake-shore-drive-traffic-in-loop/ [https://archive.ph/3IkpD]

[19] Jacob Sarracino, *13 arrested as protesters block downtown Chicago bridge amid war in Gaza*, CBSNEWS CHICAGO (Dec. 13, 2023), https://www.cbsnews.com/chicago/news/13-arrested-protesters-block-downtown-chicago-bridge-gaza/.

[20]                                         https://www.instagram.com/ifnotnowchicago/reel/C02lyLVrF-r/?hl=en; https://www.instagram.com/p/C0pwbSerRAv/?hl=en&img_index=1.

47.     On January 6, 2024, protesters entirely blocked the southbound lanes of DuSable Lake Shore Drive near the northside home of Senator Dick Durbin, leading to one arrest.[21] Chicago SJP chapters, with publicity from NSJP, organized this protest.[22]

48.     On February 7, 2024, JVP, Dissenters, and NSJP jointly sponsored a blockage on roads leading to Woodward, Inc., a weapons systems manufacturer in Niles, Illinois, leading to reportedly 33 arrests, including at least two subsequently arrested at O'Hare on April 15.[23] Defendant Chehade was quoted as an organizer for this action, which started at 6 a.m. to prevent workers from starting their shifts. Some protestors bound themselves using PVC pipe, chicken wire, and duct tape, sitting in the roadway at Croname and Howard Street (a four-lane highway in Niles) for several hours, preventing employees from getting in or out by automobile. JVP, Dissenters, and Chicago SJP chapters jointly promoted this action.[24]

49.     Upon information and belief, WESPAC's fiscal-sponsorship arrangement with NSJP provided NSJP with access to WESPAC's administrative services, staff, and facilities, at least some of which were used to plan and/or carry out NSJP's activities as alleged herein. Upon information and belief, WESPAC's fiscal-sponsorship arrangement, whereby WESPAC directly received donations for NSJP, which has no corporate entity of its own, caused NSJP to become an integrated part of WESPAC with no separate legal identity at times relevant to this complaint.

50.     Alternatively, even if WESPAC's fiscal sponsorship did not cause NSJP to act as an integrated part of WESPAC, WESPAC was required to maintain "control and discretion" over NSJP to avoid jeopardizing its tax-exempted status. The high level of control and oversight in sponsorship

---

[21] Jewell Hillery, *Pro-Palestinian protest near home of Sen. Dick Durbin brings portion of DuSable Lake Shore Drive to a halt*, WGN NEWS (Jan. 6, 2024), https://wgntv.com/news/pro-palestinian-protest-near-home-of-sen-dick-durbin-brings-portion-of-dusable-lake-shore-drive-to-a-halt/.

[22] https://www.instagram.com/sjpchicago/p/C1usnpXvlCz/ [https://archive.ph/yqWhR].

[23] Pam DeFiglio, *Palestinian allies protest outside weapons manufacturer in Niles*, CHICAGO TRIBUNE (Feb. 7, 2024), https://www.chicagotribune.com/2024/02/07/palestinian-allies-protest-outside-weapons-manufacturer-in-niles/ [https://archive.ph/OWOPD].

[24] https://www.instagram.com/p/C3DBml1Ox_Q/ [https://archive.ph/QsyZ9].

creates an agency relationship between the fiscal sponsor and NSJP, wherein the fiscal sponsor directs the use of funds—as it must do so under tax rules. Upon information and belief, WESPAC maintained at least this level of control. Upon information and belief, WESPAC maintained complete oversight of NSJP's activities and use of funds derived from WESPAC. Upon information and belief, NSJP used funds, subscriptions, services, or other institutional support from WESPAC in order to organize and execute A15 actions, including the blockage at O'Hare Airport on April 15.

51.     In the alternative, to the extent WESPAC asserts that they did not exercise this control and discretion over NSJP, WESPAC acted tortiously by breaching its duty under federal law to exercise control and discretion over NSJP, and is liable for its negligent or reckless supervision of NSJP for NSJP's tortious acts.

52.     Sometime in March 2024, the IRGC issued an internal memorandum entitled "Supporting and Encouraging Palestinian Movements towards the Political Isolation of Zionism" that called for "an economic blockade across four continents in solidarity with Palestinians" to take place on April 15, 2024. The name of the organizing effort became "A15 Action."

53.     The IRGC's A15 Action effort is consistent with a statement by the Biden Administration's Director of National Intelligence that both Iran and Hamas see physical disruption as a key component of their propaganda objectives. *See* n.12 above.

54.     A15 Action's stated goal was to block "the arteries of capitalism and jam[] the wheels of production." Defendants and their co-conspirators intended "to identify and blockade major choke points in the economy … with the aim of causing the most economic impact" in the hopes of preventing Israel from defending itself with American weapons. (Hedley Decl. ¶¶ 26, 28-29.)

55.     The IRGC's memo was disseminated to Hamas and other IRGC subordinates. NSJP, acting as Hamas's propaganda arm in the United States, in turn implemented that strategy of disruption.

56.     As part of the conspiracy, a website, a15action.com, was created less than a month before the worldwide "economic blockade" to organize and advertise the operation. (Hedley Decl. ¶ 27.) Chicago was one of the cities targeted for A15 Action-related disruption. The creation of this

website also demonstrates that the planning for the A15 Action began at least three weeks before the worldwide disruptions were executed.

57.     The A15 Action website includes a proposal with a stated purpose "to coordinate a multi-city economic blockade on April 15th in solidarity with Palestine." The proposal states that in cities across the world, participating organizations and individuals "will identify and blockade major choke points in the economy, focusing on points of production and circulation with the aim of causing the most economic impact." (Hedley Decl. ¶ 28.) It admits that the goal of the planned stoppage was to "cause pain to the economy" and "to disrupt and blockade economic logistical hubs and the flow of capital." (Hedley Decl. ¶ 29.)

58.     The A15 Action website provided a list of regional and local contacts, noting that "[d]ue to the sensitive nature of this action, some folks organizing for April 15th prefer to remain anonymous, or embedded solely within their existing communities." The website then goes on to list email addresses and/or Instagram links for connecting with the organizers of the disruptions in different cities. The contact for the Chicago blockade is listed as A15Chicago@proton.me (Hedley Decl. ¶ 33); on information and belief, various Defendants had access to that Proton messaging account.

59.     NSJP was instrumental in coordinating the national A15 Action plan and the plans specific to the Chicago area.

60.     On information and belief, Defendants JVP and NSJP (a) furthered the A15 Action plan with other Defendants and tortious actors involved in this litigation; (b) selected the A15 Action areas for blockade nationwide, including in Chicago; (c) coordinated funding to purchase necessary supplies for the blockade; (d) recruited personnel to participate in the blockades; (e) harmonized the overall strategy to choke off key economic centers of gravity in America across the A15 Action operations in various U.S. cities; and (f) actively promoted the bail fund and the O'Hare blockade on social media both during and after the event to incentivize participation in the illegal activity. (Hedley Decl. ¶¶ 35-37, 75-78.)

61.     Defendant Dissenters was also involved in the planning process for A15 Action's Chicago operations. Dissenters helped organize the blockade and specifically helped select O'Hare Airport as a target for the Chicago blockade because O'Hare is a major international airport and because Boeing Corporation is headquartered in Chicago. O'Hare serves as a hub for two major airline carriers, United Airlines and American Airlines, both of which are major customers of Boeing Corporation. (Hedley Decl. ¶ 48.) Boeing Corporation was a target because it is a major weapons manufacturer and supplies armaments to the Israeli Defense Forces used in Lebanon and Gaza. (Hedley Decl. ¶ 48.) Thus, Dissenters—in addition to JVP and NSJP—was instrumental in identifying and justifying the key chokehold in the Chicago area for executing that specific A15 Action blockade.

62.     On information and belief, Defendants Jinan Chehade, Superior Murphy, Rifqa Falaneh, and Simone Tucker—who were all present at the actual A15 Action blockade at O'Hare— helped plan and organize the operation. Chehade and Murphy were among those arrested for their participation in the illegal activity.

63.     At least five days prior to April 15, 2024, a bail fund was also established to incentivize participation in A15 Action blockades and to ensure activists arrested for violations of state and federal criminal law would quickly return to the streets to cause more chaos on Hamas's (and by extension, Defendant NSJP's) behalf. It also could be used to provide arrested activists with counsel that could not only mount a more competent legal defense, but also get them back on the streets faster. The bail fund encouraged donors to "[d]onate here to support community members who are criminalized in the U.S. for their solidarity with Palestine." (Hedley Decl. ¶ 37.) It also announced a "[c]oordinated Economic Blockade to Free Palestine United States Bail & Legal Defense Fund." The "Community Justice Exchange," which is a subordinate organization of Defendant Tides Center, is listed as the "Fundraiser" for the targeted bail fund. (Hedley Decl. ¶ 34.) While state and city prosecutors agreed to avoid serious punishment for the illegal blockades once the threat of disruption to the 2024 Democratic National Convention in Chicago ended, the statute of limitations has not yet run for possible federal prosecution. Federal law provides for cash bail. 18 U.S.C. § 3142.

64. Defendant Tides Center, through the Community Justice Exchange, assisted the other Defendants in creating a bail fund for A15 Action activists and helped advertise and manage this fund. The A15 Action website promoted the fund under the banner "Anti-Repression Resources" and stated that "these funds will be used for bail, legal defense, and support for defendants." (Hedley Decl. ¶ 30.) Because the fund was designed specifically for A15 Action, the stated purpose of which was to engage in unlawful conduct, Defendant Tides Center was fully aware of the risks associated with the blockade and complicit in the creation and promotion of a fund that incentivized and encouraged that unlawful conduct that violated both state and federal laws.

**D. Defendants block entry to O'Hare International Airport in Chicago on April 15, leading to mass chaos, standstill traffic, a shutdown of society and commerce in the area, and injury to thousands of innocent citizens.**

65. On April 15, 2024, Defendants willfully, intentionally, and illegally blockaded Interstate 190 (I-190) leading into Chicago's O'Hare International Airport—one of the largest airports in the world, and a key center of gravity for our society and economy.

66. The blockade started at roughly 7:00am local time, and lasted until roughly 9:30am.

67. Defendants Jinan Chehade, Superior Murphy, Rifqa Falaneh, and Simone Tucker were all present at the blockade and active participants in its execution. (Hedley Decl. ¶¶ 49-51, 57, 69.)

68. Defendant Rifqa Falaneh is an agent of Defendant Tides Center (through its dependent project Palestine Legal) and Defendant Simone Tucker is an agent of Defendant JVP. (Hedley Decl. ¶¶ 50, 58.) These individuals attended the blockade in their personal capacity and on behalf of their principal organizations, which supported the illegal actions taken by the activists. Moreover, Simone Tucker's participation in the blockade is consistent with Defendant JVP's prior history of blockades on behalf of Palestinian and anti-Western political aims. This is a tactic the organization regularly employs. (Hedley Decl. ¶¶ 59-60.)

69. On information and belief, Tucker was not the only representative of JVP present at and participating in the blockade at issue on behalf of JVP's agenda.

70. To blockade the traffic and isolate the airport, Defendants Chehade, Murphy, Falaneh, and Tucker—along with at least thirty-eight other activists who later were arrested—rushed the inbound I-190 connector with the airport. Nearly twenty of the activists then linked their arms with PVC piping to create a continuous "wall" across the interstate while others held signs or filmed and broadcasted the activity across social media. (Hedley Decl. ¶¶ 36, 44-45, 56, 69, 70, 76-77.)

71. The cars closest to the activists came to a halt. Very quickly, a traffic jam built up behind them. Soon enough, traffic was at a total standstill for miles. Anyone looking to commute to the airport for any reason through I-190—which is the primary onramp into one of the world's largest airports—was now stuck. O'Hare was inaccessible, and thousands of innocent commuters and travelers were trapped in their cars.

72. Because Hamas planned A15 Action to maximize the public relations effect, it was critical that activists on the ground broadcasted the event to satisfy this strategic objective. Accordingly, the social media accounts—including X (formerly known as Twitter), Instagram, and TikTok—of Defendants Dissenters, NSJP, and JVP amplified the activists' message worldwide.

73. Many of the social media postings by Defendants Dissenters, NSJP, and JVP were tagged with hashtags or keywords such as "#A15Action." (Hedley Decl. ¶¶ 56, 77.) Frequently, the social media posts were done in collaboration with other Defendants, allied entities, and/or the social media accounts associated with A15 Action. (Hedley Decl. ¶¶ 36, 44-45, 47, 66, 70, 76-77.) The collaboration feature of the Instagram mobile app for Android and iPhone allows users posting content to suggest other accounts join in the post as a collaborator: "If the account accepts the invite, their username will be added to the post and the post will be shared with their followers. It will also show on their profile."[25] "Note that the invited account can remove themselves at any time, and the creator of the original post can remove the collaborator at any time." *Id.* All the defendants remained

---

[25] *See* INSTAGRAM, *Help Center: Create collaborative posts on Instagram* (for iPhone), https://help.instagram.com/5861247717337470/?cms_platform=iphone-app, and *id.* (for Android), https://help.instagram.com/5861247717337470/?cms_platform=android-app.

collaborators of the posts as noted in the Hedley Declaration as of September 9, 2024. None of the Defendants disclaimed the tactics used to injure innocent citizens.

74.     Defendants Dissenters, NSJP, JVP, and other organizations all posted original content and video from the event, which suggested (a) they had on-the-ground agents participating in the blockade on their behalf; (b) they played a role in coordinating the stoppage by ensuring they had members there to participate; and (c) they were giving the activists blocking traffic what they wanted—worldwide media attention—to incentivize their participation in the blockade. (Hedley Decl. ¶¶ 36, 44-45, 56, 69, 70, 75-78.)

75.     As a result of Defendants' actions, inbound vehicle traffic to O'Hare stopped entirely. Videos from Defendants' social media accounts demonstrate that travelers, airport employees, and locals going to pick up their loved ones were stuck in their vehicles with no knowledge whether and when the traffic blockage would end. Many had no idea what caused it. These innocent people could not reasonably move because they were on the middle of an interstate, they could not move their cars, and had no place to safely go. Illinois law precludes the obviously antisocial act of abandoning a vehicle on a highway. Several passengers exited stopped ride-share vehicles or taxis and walked the long distance to the terminals. Several lost revenue or incurred additional pecuniary expense because of the intentional efforts of Defendants to "disrupt[] business as usual."

76.     Plaintiff was en route to a flight out of Chicago to Norfolk, Virginia, for a business trip that morning in Virginia Beach. As a result of the blockade, Plaintiff was frozen on the highway for well over an hour, unable to move or navigate out of the traffic jam. He was also too far away from the blockade to simply get out of his car and walk to the airport (plus that would have required abandoning his car). He was, thanks to Defendants' activity, trapped.

77.     Law enforcement eventually cleared the blockade and arrested forty individuals for blockading traffic. Included in the arrestees were Defendants Jinan Chehade, Superior Murphy.

78.     Traffic flow resumed again around 9:30am local time.

79. As a result of being stuck in traffic, Plaintiff missed his flight that morning and spent the next several hours re-booking his flight. When he finally arrived in Virginia Beach that night, he had missed an important work dinner and networking session.

## CLASS ALLEGATIONS

### A. Class Definition

80. Plaintiff brings this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification under Federal Rules of Civil Procedure 23(b)(2) and (b)(3). Plaintiff seeks to represent a Class of persons preliminarily defined as: all non-Illinois residents who were either drivers or passengers of vehicles traveling on the morning of April 15, 2024, between the hours of 7:00 a.m. and 10:00 a.m. in Chicago, Illinois on Interstate 190 and nearby highways that connect to Interstate 190, who were confined in their vehicles because of the activists blockading traffic on Interstate 190 as it approaches the terminals at O'Hare International Airport.

81. Excluded from the class are Defendants; officers and directors of Defendants and their parents, subsidiaries, and affiliates; and all judges assigned to hear any aspect of this case, as well as their immediate family members.

82. Plaintiff reserves the right to propose one or more subclasses if discovery reveals that such subclasses are appropriate and to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

83. This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

    a. The Class, which includes thousands of members, is so numerous that joinder of all members in impracticable;

    b. There are substantial questions of law and fact common to the Class, including those set forth in more detail herein;

    c. Questions of law and fact which are common to the Class predominate over any questions of law or fact affecting only individual members of the Class;

    d.   The claims of the representative are typical of the claims of the Class;

    e.   A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

    f.   The relief sought in the class action will effectively and efficiently provide relief to all members of the Class;

    g.   There are no unusual difficulties foreseen in the management of this class action; and,

    h.   Plaintiff's claims are typical of those of the Class and, through experienced counsel, will zealously and adequately represent the Class.

## B. Numerosity

84.    The number of travelers and motorists within the Class is over 1000, and therefore is so numerous that joinder is impracticable.

## C. Commonality

85.    The common questions of law and fact predominate over any individual questions affecting Class Members, including but not limited to: (1) the elements of the tort of false imprisonment; (2) the elements of a common-law tort of foreseeable injury caused by the breach of the duty not to violate of 625 ILCS § 5/11-1416, Obstructing persons in highways; (3) the elements of civil conspiracy or in-concert liability; and (4) the elements of negligence.

## D. Typicality

86.    Plaintiff has the same interests in this matter as all the other members of the Class and his claims are typical of all the members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, utilize the same evidence, rely upon the same legal theories, and seek the same type of relief.

87.     The claims of the Plaintiff and other Class Members have a common cause and their damages are of the same type. The claims originate from the same unlawful, willful and concerted actions of the Defendants.

88.     All Class Members have suffered injury in fact as a result of Defendants' concrete actions because they were unlawfully confined to their vehicles during the blockade the morning of April 15, 2024, and because Defendants' actions unreasonably interfered with the Class Members' right to freely travel on public roads and highways. All Class Members suffer a substantial risk of repeated injury in the future, as Defendants have shown a willingness to continue to engage in traffic blockages and similar systemically disruptive conduct that is likely to result in injury to all members of the Class.

**E.  Adequacy of Representation**

89.     Plaintiff's claims are sufficiently aligned with the interests of absent Class Members to ensure that the Class claims will be prosecuted with diligence and care by Plaintiff as a representative of the Class. Plaintiff will fairly and adequately represent the interests of the Class and he does not have interests adverse to the Class.

90.     Plaintiff has retained the services of counsel who are experienced litigators, particularly with respect to class actions, Rule 23 of the Federal Rules of Civil Procedure, and the Class Action Fairness Act (CAFA). Plaintiff's counsel will vigorously prosecute this action and will otherwise fairly and adequately represent Plaintiff and all absent Class Members.

**F.  Class Treatment is the Superior Method for Adjudication**

91.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in the Complaint because:

   a.   Individual claims by the Class Members would be impracticable as the cost of pursuing those claims would exceed what any one Class Member has at stake;

    b.   Little or no individual litigation has been commenced over the controversies and conduct alleged in the Complaint and individual Class Members are unlikely to have an interest in separately litigating individual actions;

    c.   The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

    d.   The proposed action is manageable.

92.    The prosecution of separate actions by individual members of the Class would create the risk of (1) inconsistent or varying adjudications with respect to individual Class Members which could establish incompatible standards of conduct for one or more of the Defendants; and (2) adjudications with respect to individual Class Members would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

93.    Notice can be provided to members of the Class by publication and broadcast, including but not limited to news media, social media platforms, and commercial radio (including satellite radio).

## CAUSES OF ACTION

### Count I: False Imprisonment

94.    Plaintiff reasserts and realleges paragraphs 1 through 93 as if fully set forth therein.

95.    As a result of the aforementioned actions by Defendants Chehade, Murphy, Falaneh, and Tucker, traffic was brought to a standstill on I-190 leading toward O'Hare for two and a half hours. These Defendants were physically present and participated in the traffic blockade; two were arrested for their behavior. Their unlawful conduct trapped drivers and commuters alike on the road in their cars for two and a half hours, as no reasonable person would illegally abandon their car on an interstate given the circumstances.

96.    A direct and foreseeable result of Defendants' intentional actions was that Plaintiff and others on the road at the same time suffered damages including, but not limited to:

a.  Loss of personal freedom;

b.  Lost business opportunities; and,

c.  Annoyance, inconvenience, and physical discomfort; anxiety and emotional distress by being confined in a stationary vehicle for an unreasonable period of time and uncertainty about when he might be free to resume traveling.

**Count II: Common-Law Tort for Foreseeable Injury Caused by Intentional Breach of Duty**

97.     Plaintiff reasserts and realleges paragraphs 1 through 96 as if fully set forth therein.

98.     As a result of the aforementioned actions by Defendants Chehade, Murphy, Falaneh, and Tucker, I-190 leading toward O'Hare was obstructed and their blockade deprived Plaintiff of his right to freely travel I-190, a highway within Illinois.

99.     The Illinois Vehicle Code prohibits persons from "willfully and unnecessarily hinder[ing], obstruct[ing] or delay[ing], or willfully and unnecessarily attempt[ing] to delay, hinder or obstruct any other person in lawfully driving or traveling along or upon any highway within" the State of Illinois. 625 ILCS § 5/11-1416. Defendants had a legal duty to such people not to violate that part of the code or related municipal ordinances.

100.    A direct and foreseeable, and indeed intended, result of Chehade's, Murphy's, Falaneh's, and Tucker's willful and coordinated actions on April 15, 2024, including their personal on-foot presence blocking traffic as pedestrians on and around I-190, was that Plaintiff and Class Members were unnecessarily hindered, obstructed and delayed from traveling on highways leading to O'Hare International Airport in violation of § 5/11-1416 of the Illinois Vehicle Code, and suffered injury as a result.

**Count III: Highway Obstruction In-Concert**

101.    Plaintiff reasserts and realleges paragraphs 1 through 100 as if fully set forth therein.

102.    "In-concert liability is a separate form of action" from an underlying tort. *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (Ill. App. Ct. 2002). A defendant is subject to in-concert liability for

tortious conduct of another if it "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 716.

103.     The underlying common law tort for foreseeable injury caused by intentional breach of duty is pleaded in Count II above.

104.     Defendants NSJP, JVP, and Dissenters planned and/or advertised the blockade beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade, including by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts. They were aware of the blockade and its unlawfulness, but provided assistance to it anyway. Thus, these Defendants contributed in-concert to the highway obstruction that resulted from the blockade.

105.     Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

106.     Defendant WESPAC also shares in-concert liability for highway obstruction because it had awareness of NSJP's blockade strategy—or, as its fiscal sponsor, should have—and NSJP breached its duty to this class via the O'Hare blockade, which was substantially assisted by WESPAC. Separately, WESPAC also has in-concert liability here because it gives substantial fiscal assistance to NSJP which help fund its tortious blockade operations, and that funding breached WESPAC's duty to "retain control and discretion over the use of funds by" NSJP so to not injure the class.

107.     Under any of the three definitions of in-concert liability, Defendants NSJP, JVP, and Dissenters are liable for highway obstruction.

108.     As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others on the same road at the time suffered damages, including but not limited to:

>     a.    Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with

absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

b.  Loss of time having to rearrange travel plans after missing his flight; and,

c.  The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count IV: False Imprisonment In-Concert

109.    Plaintiff reasserts and realleges paragraphs 1 through 108 as if fully set forth therein.

110.    "In-concert liability is a separate form of action" from an underlying tort. *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (Ill. App. Ct. 2002). A defendant is subject to in-concert liability for tortious conduct of another if "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 716.

111.    The underlying tort of false imprisonment is pleaded in Count I above.

112.    Defendants NSJP, JVP, and Dissenters planned and/or advertised the blockade beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. These Defendants knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts. They were aware of the blockade and its unlawfulness, but provided assistance to it anyway. Thus, these Defendants contributed in-concert to the false imprisonment of commuters such as Plaintiff due to the blockade.

113.    Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

114.    Defendant WESPAC also shares in-concert liability for false imprisonment because it had awareness of NSJP's blockade strategy—or, as its fiscal sponsor, should have—and NSJP

breached its duty to this class via the O'Hare blockade, which was substantially assisted by WESPAC. Separately, WESPAC also has in-concert liability here because it gives substantial fiscal assistance to NSJP which help fund its tortious blockade operations, and that funding breached WESPAC's duty to "retain control and discretion over the use of funds by" NSJP so to not injure the class.

115.     Under any of the three definitions of in-concert liability, Defendants NSJP, JVP, and Dissenters are liable for the false imprisonment of Plaintiff.

116.     As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

      a.  Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

      b.  Loss of time having to rearrange travel plans after missing his flight; and,

      c.  The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count V: Conspiracy to Obstruct Highways

117.     Plaintiff reasserts and realleges paragraphs 1 through 116 as if fully set forth therein.

118.     To plead a civil conspiracy, Plaintiff must show an agreement between two or more persons "for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means," in which "one of the conspirators committed an overt tortious or unlawful act." *Madonis v. Sterling Bay Cos., LLC*, 2020 IL App (1st) 191657-U ¶ 28.

119.     As described in these paragraphs, Defendants NSJP, JVP, Dissenters, Chehade, Murphy, Falaneh, and Tucker, knowingly and voluntarily agreed to unlawfully block traffic on I-190 leading into O'Hare. This is an unlawful public nuisance that they agreed to create. Defendants Chehade, Murphy, Falaneh, and Tucker committed the tort of highway obstruction by overt act by

29

participating in the blockade directly, and Defendants AMP, NSJP, JVP, and Dissenters committed an overt act in support of the highway obstruction by organizing it.

120.     Defendant Tides Center also conspired to support Defendants' scheme. Its creating, managing, and advertising a bail fund for A15 Action activists incentivized their participation in blockading I-190 into O'Hare Airport. This is an unlawful act on its own that justifies conspiracy liability. *See United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (affirming the existence of a criminal conspiracy in part due to "paying bail … and attorney's fees"). But Tides Center is independently liable for agreeing to the blockade—as demonstrated by its organized and advertised bail fund support targeted to these particular actions that violated federal and state criminal law—and the other Defendants' subsequent decision to execute it and create a highway obstruction.

121.     Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

122.     The underlying common law tort for foreseeable injury caused by intentional breach of duty is pleaded in Count II above.

123.     As a foreseeable, direct and proximate result of Defendants' conspiracy, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

     a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

     b.   Loss of time having to rearrange travel plans after missing his flight; and,

     c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

### Count VI: Conspiracy to Commit False Imprisonment

124.     Plaintiff reasserts and realleges paragraphs 1 through 123 as if fully set forth therein.

125.     To plead a civil conspiracy, Plaintiff must show an agreement between two or more persons "for the purpose of accomplishing by some concerted action either an unlawful purpose or a

lawful purpose by unlawful means," in which "one of the conspirators committed an overt tortious or unlawful act." *Madonis*, 2020 IL App (1st) 191657-U ¶ 28.

126. As described in these paragraphs, Defendants NSJP, JVP, Dissenters, Chehade, Murphy, Falaneh, and Tucker, knowingly and voluntarily agreed to unlawfully blockade I-190's offramp into O'Hare. As a result, Plaintiff and many others heading toward O'Hare during the blockade were stuck in traffic and—like any reasonable person—felt compelled to remain in their cars until the cops dealt with the issue ahead of them.

127. Defendant Tides Center also conspired to support Defendants' scheme. Its creating, managing, and advertising a bail fund for A15 Action activists incentivized their participation in blockading I-190 into O'Hare Airport. This is an unlawful act on its own which justifies conspiracy liability. *See United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (affirming the existence of a criminal conspiracy in part due to "paying bail … and attorney's fees"). But Tides Center is independently liable for agreeing to the blockade—as demonstrated by its organized and advertised bail fund support targeted to these particular actions that violated federal and state criminal law—and the other Defendants' subsequent decision to execute it and falsely imprison Plaintiff and many others.

128. Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

129. The underlying tort of false imprisonment is pleaded in Count I above.

130. As a foreseeable, direct and proximate result of Defendants' conspiracy, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

    a. Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

    b. Loss of time having to rearrange travel plans after missing his flight; and,

    c. The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

## Count VII: Aiding and Abetting Obstructing a Highway

131.    Plaintiff reasserts and realleges paragraphs 1 through 130 as if fully set forth therein.

132.    To be liable for aiding and abetting, the "party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Madonis*, 2020 IL App (1st) 191657-U ¶ 30.

133.    The underlying common law tort for foreseeable injury caused by intentional breach of duty is pleaded in Count II above. Defendants Chehade, Murphy, Falaneh, and Tucker performed the wrongful act of public nuisance by blockading the highway, and this act injured Plaintiff and others by causing them to miss flights and downstream activities, and depriving them of freedom of movement.

134.    Defendants NSJP, JVP, and Dissenters were aware of their role in supporting the blockade; they planned and/or advertised it beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts.

135.    Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

136.    Defendant Tides Center was aware of its role in support of the blockade; it created and advertised a bail fund for A15 Action activists *before* the blockade of I-190 into O'Hare Airport, in anticipation of arrests for violations of state and federal criminal law from that event. Tides Center knowingly and substantially assisted the blockade through its creation and management of the bail fund, because that fund incentivized participation in the event giving activists security against longer-term detainment if they were arrested. Moreover, the bail fund helped raise money in support of the blockade.

137.    As a foreseeable, direct and proximate result of Defendants' aiding and abetting, Plaintiff and others on the road at the same time suffered damages, including but not limited to:

     a.   Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);

     b.   Loss of time having to rearrange travel plans after missing his flight; and,

     c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

**Count VIII: Aiding and Abetting False Imprisonment**

138.    Plaintiff reasserts and realleges paragraphs 1 through 137 as if fully set forth therein.

139.    To be liable for aiding and abetting, (1) the "party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Madonis*, 2020 IL App (1st) 191657-U ¶ 30.

140.    The underlying tort of false imprisonment is pleaded in Count I above. Defendants Chehade, Murphy, Falaneh, and Tucker performed the wrongful act of false imprisonment by blockading the highway, and this act injured Plaintiff and others by causing them to miss flights and downstream activities, and depriving them of freedom of movement.

141.    Defendants NSJP, JVP, and Dissenters were aware of their role in supporting the blockade; they planned and/or advertised it beforehand and amplified the tortious conduct via social media, where they proudly announced their participation. They knowingly and substantially assisted the blockade by advertising it, organizing funds and personnel to participate, creating a bail fund for it, identifying the target, and amplifying the blockade's desired propaganda message through their social media accounts.

142.    Defendant WESPAC is liable for the acts of NSJP during the relevant timeframe.

143.     Defendant Tides Center was aware of its role in support of the blockade; it created and advertised a bail fund for A15 Action activists *before* the blockade of I-190 into O'Hare Airport, in anticipation of arrests from that event. Tides Center knowingly and substantially assisted the blockade through its creation and management of the bail fund, because that fund incentivized participation in the event giving activists security against longer-term detainment if they were arrested. Moreover, the bail fund helped raise money in support of the blockade.

144.     As a foreseeable, direct and proximate result of Defendants' aiding and abetting, Plaintiff suffered damages, including but not limited to:

> a.  Annoyance, inconvenience, physical discomfort, anxiety and emotional distress, by being confined in a stationary vehicle for an unreasonable period of time with absolute uncertainty about when he might be free to resume traveling (and retain his own agency);
>
> b.  Loss of time having to rearrange travel plans after missing his flight; and,
>
> c.   The inconvenience and anxiety from missing a business trip to Virginia, including an important business dinner and networking opportunity.

**Count IX in the Alternative: Negligence or Recklessness**

145.     Plaintiff reasserts and realleges paragraphs 1 through 144 as if fully set forth therein.

146.     As NSJP's fiscal sponsor during the relevant time, WESPAC had a legal duty to control and supervise the activities of NSJP, which had no independent corporate structure. WESPAC is thus liable for the acts of NSJP, whether it is because WESPAC is during the relevant times the alter ego of NSJP; because WESPAC controlled and supervised NSJP's activities; or, in the alternative, because WESPAC negligently or recklessly breached its duty to control and supervise the activities of NSJP, whose foreseeable illegal actions caused foreseeable injury to the Plaintiff and the Class, causing damages.

## REQUEST FOR RELIEF

Therefore, Plaintiff respectfully requests the following relief:

A.    Certify the proposed Class under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designate Plaintiff as representative of the proposed Class and designate his counsel as Class Counsel;

C.    Enter Judgment in favor of the Plaintiff and Class Members against the Defendants; and

D.    Award Plaintiff and the Class Members compensatory and punitive damages and attorneys' fees and costs, including pre-judgment interest and post-judgment interest; and

E.    Order injunctive relief prohibiting Defendants from further engaging in the unlawful conduct alleged in this Complaint; and,

F.    Any other legal or equitable relief that the Court deems appropriate, including but not limited to attorneys' fees and nominal damages.

Dated: January 22, 2025         Respectfully submitted,

*/s/ Neville S. Hedley*
Neville S. Hedley (IL Bar No. 6237279)
ned.hedley@hlli.org
(312) 342-6008

Theodore H. Frank (IL Bar. No. 6224948)
ted.frank@hlli.org
(703) 203-3848

M. Frank Bednarz (IL Bar No. 6299073)
frank.bednarz@hlli.org
(312) 801-2690

HAMILTON LINCOLN LAW INSTITUTE
1440 W. Taylor Street, #1487
Chicago, IL 60607

Max Schreiber (IN Bar No. 37357-45)
max.schreiber@hlli.org
(401) 408-9370

HAMILTON LINCOLN LAW INSTITUTE
5868 E. 71st Street, Suite E-709
Indianapolis, IN 46220

*Attorneys for Plaintiff Christopher Manhart*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Christopher Manhart have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.

Executed on January __, 2025

_____

Christopher Manhart[26]

_____

[26] Verification to be done prior to filing, which may result in minor edits to pleaded facts only.