**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MANHART, *individually and on behalf of all others similarly situated*, | |
| *Plaintiff,* | Case No. 24-cv-8209 |
| | Honorable Mary M. Rowland |
| v. | Magistrate Judge Keri L. Holleb Hotaling |
| NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, a project of WESPAC FOUNDATION, INC.; WESPAC FOUNDATION, INC.; DISSENTERS; A JEWISH VOICE FOR PEACE INC.; TIDES CENTER, d/b/a COMMUNITY JUSTICE EXCHANGE; JINAN CHEHADE; SUPERIOR MURPHY; RIFQA FALANEH; and SIMONE TUCKER, | |
| *Defendants.* | |

---

**MANHART'S OMNIBUS RESPONSE IN OPPOSITION
TO DEFENDANTS' RULE 12 MOTIONS
(ECF NOS. 73, 75, 78, 80, 82)**

---

## Table of Contents

Table of Contents ...........................................................................................................ii

Table of Authorities .....................................................................................................iv

Introduction ...................................................................................................................1

Background ....................................................................................................................3

Argument .......................................................................................................................7

I.     Manhart has Article III standing to seek damages for himself and the class. .............8

     A.    Defendants misunderstand injury-in-fact requirements for longstanding common-law causes of action and do not mention the correct legal standard. ...........8

     B.    Traceability requires a causal connection, and it's met for every defendant. ...............11

     C.    Defendants do not and cannot contest redressability. ...................................................13

     D.    Controversial Supreme Court precedent currently precludes Manhart from seeking injunctive relief in federal court, but Manhart preserves the argument for future review. ...................................................................................................13

II.    The Illinois Citizen Participation Act is not a defense to intentional torts, nor does it override the Federal Rules of Civil Procedure. ...................................................................14

     A.    Even if ICPA could trump federal procedure, it doesn't apply here. ..........................14

          1.   The First Amendment does not protect the conduct alleged here. ........................14

          2.   Manhart pursues legitimate redress for concrete injuries. .......................................16

          3.   Defendants' own words establish that petitioning the government was not the "sole" purpose of the traffic blockade—even if a traffic blockade of innocents could ever be considered petitioning. ........................................................18

     B.    A state law governing state civil procedure does not override federal procedure. .....20

III.   Manhart states a claim for false imprisonment. .........................................................22

IV.   Illinois recognizes that breaches of statutory duty support common-law torts......................26

     A.    Violation of public safety codes implies a common-law breach of duty and is *prima facie* evidence of negligence.........................................................................26

     B.    If no common law tort were available, the court may imply a cause of action to effect the purpose of the Vehicle Code.........................................................................28

     C.    Motorists' injury was a foreseeable, indeed deliberate, part of the scheme. ...............29

V.    Because Counts I and II state claims, the derivative claims in Counts III through VIII stand for each defendant.........................................................................................32

     A.    The complaint's allegations against the individual defendants are sufficient under Rule 8. ...................................................................................................37

B.     The complaint's allegations against NSJP are sufficient under Rule 8. ........................37

C.     WESPAC is liable for NSJP's actions...............................................................39

     1.  Because WESPAC is a direct fiscal sponsor of NSJP, which has no separate corporate entity or 501(c)(3) status, NSJP's liabilities are WESPAC's liabilities. .............................................................................................39

     2.  In the alternative, Count IX plausibly alleges WESPAC breached its duty to supervise NSJP, and is liable for NSJP's actions for that reason. ...........................41

D.     The complaint's allegations against JVP are sufficient under Rule 8. .........................43

E.     The complaint's allegations against Dissenters are sufficient under Rule 8...............44

F.     The complaint's allegations against CJE are sufficient under Rule 8; a fund established in advance to promote illegal action creates liability................................44

VI.     Illinois's long-arm personal jurisdiction applies to the acts alleged here. ...............50

VII.     To the extent that the Court believes Rule 8 is not met because of the absence of factual allegations, dismissal with leave to amend is appropriate................................53

Conclusion ...............................................................................................................54

Certificate of Service.................................................................................................56

**Table of Authorities**

<u>**Cases**</u>

*Adcock v. Brakegate Ltd.*,
    645 N.E.2d 888 (Ill. 1994).................................................................................................. 12, 34, 37

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
    499 F.3d 663 (7th Cir. 2007)......................................................................................................54

*Array Techs., Inc. v. Mitchell*,
    305 F. Supp. 3d 1256 (D. N.M. 2018) .......................................................................................46

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................................8, 35

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
    15 F.4th 831 (7th Cir. 2021)......................................................................................................34

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ................................................................................................35-36

*Bell Atl. Corp v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................................8, 21

*Blood v. VH-1 Music First*,
    668 F.3d 543 (7th Cir. 2012) .....................................................................................................32

*Boim v. Am. Muslims for Palestine*,
    No. 17-cv-3591 (N.D. Ill.)..........................................................................................................17

*Boim v. Quaranic Literacy Inst. & Holy Land Found.*,
    291 F.3d 1000 (2002) ................................................................................................................16

*Brendlin v. California*,
    551 U.S. 249 (2007)...................................................................................................................25

*Brown v. 1995 Tenet Paraamerica Bicycle Challenge*,
    931 F. Supp. 592 (N.D. Ill. 1996)..........................................................................................52-53

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................................50, 53

*C&K Coal Co. v. United Mine Workers*,
    704 F.2d 690 (3d Cir. 1983) ......................................................................................................46

*Calder v. Jones*,
  456 U.S. 783 (1984) .................................................................................... 53

*Carmichael v. Prof'l Transp., Inc.*,
  239 N.E.3d 512 (Ill. App. Ct. 2021) ........................................................... 28

*Cartwright v. Cooney*,
  No. 10-cv-1691, 2012 U.S. Dist. LEXIS 40393 (N.D. Ill. Mar. 26, 2012) .......................... 18-19

*Chemtreat Inc. v. Kinsman*,
  2006 U.S. Dist. LEXIS 108400 (C.D. Ill. Sept. 15, 2006) ............................. 48

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................................... 13

*Cooney v. Casady*,
  735 F.3d 514 (7th Cir. 2013) ...................................................................... 34

*Cox v. Louisiana*,
  379 U.S. 536 (1965) .................................................................................. 15

*Crenshaw v. Antokol*,
  206 Fed. App'x 560 (7th Cir. 2006) ............................................................. 55

*Erickson v. Pardus*,
  551 U.S. 89 (2007) .................................................................................. 7-8

*Ewing v. Med-1 Sols., LLC*,
  24 F.4th 1146 (7th Cir. 2022) ...................................................................... 11

*Felland v. Clifton*,
  682 F.3d 665 (7th Cir. 2012) ...................................................................... 50

*Flag Co. v. Maynard*,
  376 F. Supp. 2d 849 (N.D. Ill. 2005) ....................................................... 50-51

*Fortae v. Holland*,
  778 N.E.2d 159 (Ill. App. Ct. 2002) ............................................................. 35

*Fowler v. Valencourt*,
  435 S.E.2d 530 (N.C. 1993) ........................................................................ 10

*Frisby v. Schultz*,
  487 U.S. 474 (1988) .................................................................................. 15

*Fritz v. Johnson*,
  807 N.E.2d 461 (Ill. 2004) ......................................................................... 33

*Gable v. Universal Acceptance Corp.*,
  338 F. Supp. 3d 943 (E.D. Wis. 2018)................................................................26

*Gadelhak v. AT&T, Servs.*,
  950 F.3d 458 (7th Cir. 2020) .........................................................................9

*Gouge v. Cent. Ill. Pub. Serv. Co.*,
  582 N.E.2d 103 (Ill. 1991)...............................................................................30

*In re Grand Jury Proceedings (Pavlick)*,
  680 F.2d 1026 (5th Cir. 1982) ....................................................................45-46

*Hale v. Pace*,
  2011 WL 1303369 (N.D. Ill. Mar. 31, 2011)...................................................24

*Hampton v. Hanrahan*,
  600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754 (1980) ..................34

*Hanna v. Plumer*,
  380 U.S. 460 (1965) ...........................................................................14, 20-22

*Harper v. Epstein*,
  306 N.E.2d 690 (Ill. App. Ct. 1974) ...............................................................27

*Hefferman v. Bass*,
  467 F.3d 596 (7th Cir. 2006) ..........................................................................21

*Heimgaertner v. Benjamin Elec. Manuf. Co.*,
  128 N.E.2d 691 (Ill. 1955) ..............................................................................29

*Hutchinson v. Fitzgerald Equip. Co.*,
  819 F.3d 1016 (7th Cir. 2018) .........................................................................35

*Hytel Grp., Inc. v. Butler*,
  405 Ill. App. 3d 113 (2010) .............................................................................18

*Intercon Solutions, Inc. v. Basel Action Network*,
  791 F.3d 729 (7th Cir. 2015) ..............................................................14, 21-22

*Isr. Travel Advisory Serv. v. Isr. Identity Tours*,
  1993 U.S. Dist. LEXIS 8744 (N.D. Ill. June 24, 1993) .................................32

*Kacena v. George W. Bowers Co.*,
  211 N.E.2d 563 (Ill. App. Ct. 1965)................................................................27

*Kawaauhau v. Geiger*,
  523 U.S. 57 (1998) ......................................................................................24-25

*Keller v. LVNV Funding LLC,*
2022 WL 7501355 (N.D. Ill. Oct 13, 2022) .................................................................................10

*Kohn v. Laidlaw Transit, Inc.,*
808 N.E.2d 546 (Ill. App. Ct. 2004) ..........................................................................................26

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .................................................................................................................. 8-9

*Madsen v. Women's Health Ctr.,*
512 U.S. 753 (1994) ................................................................................................................14-15

*Mancavage v. City of Chicago,*
659 F.3d 626 (7th Cir. 2011) .......................................................................................................15

*Marcano v. Nw. Chrysler-Plymouth Sales, Inc.,*
550 F. Supp. 595 (N.D. Ill. 1982).........................................................................................24-25

*Mathias v. Accor Econ. Lodging, Inc.,*
347 F.3d 672 (7th Cir. 2003) .......................................................................................................17

*McClure v. Owens Corning Fiberglas Corp.,*
720 N.E.2d 242 (Ill. 1999).........................................................................................................32

*McCoy v. McCoy,*
591 N.E.2d 124 (Ill. App. Ct. 1992) ......................................................................................28, 30

*Miller v. Hwy v. Comm'r of N. Otter Tp. Rd. Dist.,*
801 N.E.2d 599 (Ill. App. Ct. 2003).............................................................................................30

*Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. Of Houston Metroplex, P.A.,*
623 F.3d 440 (7th Cir. 2010) .......................................................................................................50

*Morris v. Faulkner,*
361 N.E.2d 112 (Ill. App. Ct. 1977) ............................................................................................22

*M.U. v. Team Ill. Hockey Club, Inc.,*
215 N.E.3d 286 (Ill. App. Ct. 2022).............................................................................................48

*N.A.A.C.P. v. Claiborne Hardware Co.,*
458 U.S. 886 (1982) ....................................................................................................15-16, 19-20, 44

*Nat'l Org. for Women, Inc. v. Scheidler,*
267 F.3d 687 (7th Cir. 2001),
*rev'd on other grounds, Scheidler v. Nat'l Org. for Women, Inc.,* 537 US 393 (2003).......................15-16

*New York v. Operation Rescue Nat'l,*
80 F.3d 64 (2d Cir. 1996) ............................................................................................................52

*Ney v. Yellow Cab Co.*,
    117 N.E.2d 74 (Ill. 1954) .................................................................................26

*Noyola v. Bd. of Educ.*,
    688 N.E.2d 81 (Ill. 1999) ...........................................................................27-29

*Passarella v. NFI Interactive Logistics LLC*,
    2015 U.S. Dist. LEXIS 88995, 2015 WL 4148674 (N.D. Ill. July 9, 2105) ............................30

*Pechulis v. City of Chicago*,
    1997 U.S. Dist. LEXIS 11856, 1997 WL 461006 (N.D. Ill. Aug. 7, 1997) ............................22

*Pennell v. Global Trust Mgmt.*,
    990 F.3d 1041 (7th Cir. 2021) ................................................................. 10-11

*Pilotto v. Urban Outfitters W., LLC*,
    72 N.E.3d 772 (Ill. App. Ct. 2017) .................................................................29

*Pinkerton v. U.S.*,
    328 U.S. 640 (1946) .....................................................................................12

*Priddle v. Dean Malanis and Great Lakes Serv. II, Inc.*,
    2017 U.S. Dist. LEXIS 101599, 2017 WL 372302 (N.D. Ill. Jan. 25, 2107) ...........................27

*Protect our Parks, Inc. v. Chicago Park Dist.*,
    971 F.3d 722 (7th Cir. 2020) ...........................................................................9

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
    338 F.3d 773 (7th Cir. 2003) ..........................................................................52

*Richardson v. Kharbouch*,
    2020 U.S. Dist. LEXIS 52153, 2020 WL 1445629 (N.D. Ill. Mar. 25, 2020) ...........................52

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...............................................................................15-16

*Robinson v. Miller*,
    1985 Ill. App. LEXIS 2179 (Ill. App. Ct. May 14, 1985) ...........................................22

*Robinson v. Sabis Educ. Sys.*,
    No. 98 C 4251, 1999 WL 414262, 1999 U.S. Dist. LEXIS 9065
    (N.D. Ill. June 3, 1999) ................................................................................25

*Rodgers v. St. Mary's Hosp. of Decatur*,
    597 N.E.2d 661 (Ill. 1999) ............................................................................28

*Saenz v. Roe*,
    526 U.S. 489 (1999) .....................................................................................49

*Sandholm v. Kuecker,*
    962 N.E.2d 418 (Ill. 2012) ................................................................................ 2, 14, 16-20

*Satkar Hosp., Inc. v. Cook Cty. Bd. of Rev.,*
    2011 U.S. Dist. LEXIS 561554, 2011 WL 2182106 (N.D. Ill. June 2, 2011) ........................... 21

*Scherr v. Mariott Int'l, Inc.,*
    703 F.3d 1069 (7th Cir. 2013) ............................................................................................. 13

*Schultz v. Siddens,*
    548 N.E.2d 87 (Ill. App. Ct. 1989) ............................................................................. 27-28, 30

*Scott v. Aldi, Inc.,*
    703 N.E.2d 546 (Ill. App. Ct. 1998) ........................................................................... 29-30, 34

*Semitekol v. Monaco Coach Co.,*
    582 F. Supp. 2d 1009 (N.D. Ill. 2008) .................................................................................. 38

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) ........................................................................................................ 20-22

*Shank v. Fields,*
    869 N.E.2d 261 (Ill. App. Ct. 2007) ..................................................................................... 32

*Shaw v. Dow Brands, Inc.,*
    994 F.2d 364 (7th Cir. 1993) ............................................................................................... 18

*Sibbach v. Wilson & Co.,*
    312 U.S. 1 (1941) ............................................................................................................... 20

*Sierra v. City of Hallandale Beach,*
    996 F.3d 1110 (11th Cir. 2021) ........................................................................................... 13

*Simmons v. Homatas,*
    925 N.E.2d 1089 (Ill. 2010) ................................................................................. 35, 37, 48-49

*Simpkins v. CSX Transp. Inc.,*
    965 N.E.2d 1092 (Ill. 2012) ...................................................................................... 31, 42-43

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................................................ 8-10

*Stevens v. Shelton,*
    2019 WL 1239784 (N.D. Ill. Mar. 18, 2019) ........................................................................ 26

*Stone v. Chapman,*
    2012 Ill. Unpub. LEXIS 1786, 2012 WL 7006985 (Ill. App. Ct. 2012) .................................... 32

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................................ 9

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ........................................................................... 7-8, 36

*Tamburo v. Dworkin*,
   601 F.3d 693 (7th Cir. 2010) ................................................................................. 50

*Textor v. Bd. or Regents*,
   711 F.2d 1387 (7th Cir. 1983) ............................................................................... 50

*Thomas v. JBS Green Bay, Inc.*,
   120 F.4th 1335 (7th Cir. 2024) ............................................................ 36, 44, 53-54

*Ticketserve, Inc. v. Viagogo, Inc.*,
   656 F. Supp. 2d 775 (N.D. Ill. 2009) ..................................................................... 52

*Time Savers, Inc. v. LaSalle Bank, N.A.*,
   863 N.E.2d 1156 (Ill. App. Ct. 2007) ................................................. 35, 44-45, 47

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................................................... 8-11

*United States v. Applins*,
   637 F.3d 59 (2d Cir. 2011)..................................................................................... 45

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ................................................................................................. 40

*United States ex rel. Hanna v. City of Chicago*,
   834 F.3d 775 (7th Cir. 2016) ................................................................................. 53

*United States v. Gonzalez*,
   2018 U.S. Dist. LEXIS 217165, 2018 WL 6834315 (D. Nev. Dec. 28, 2018)............ 45

*United States v. Guest*,
   383 U.S. 745 (1966) ............................................................................................... 49

*United States v. Hodge & Zweig*,
   548 F.2d 1347 (9th Cir. 1977).............................................................................. 45

*United States v. Quilty*,
   741 F.2d 1031 (7th Cir. 1984)................................................................................. 2

*United States v. Schoon*,
   971 F.2d 193 (9th Cir. 1991)................................................................................... 2

*United States v. Wilson*,
    154 F.3d 658 (7th Cir. 1998) ..................................................................................15

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021) ..............................................................................................13

*Vance v. Chandler*,
    597 N.E.2d 233 (Ill. App. Ct. 1992) ....................................................................34

*Wadsworth v. Kross, Lieberman & Stone, Inc.*,
    12 F.4th 665 (7th Cir. 2021) .......................................................................... 10-11

*Walker v. City of Birmingham*,
    388 U.S. 307 (1967) ................................................................................................1

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
    536 F.3d 663 (7th Cir. 2008) ................................................................................21

*Widlowski v. Durkee Foods*,
    562 N.E.2d 967 (Ill. 1990) ...................................................................................31

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ........................................................................................3-4, 17

*Zivitz v. Greenburg*,
    1999 U.S. Dist. LEXIS 16646, 1999 WL 984397 (N.D. Ill. Oct. 22 1999) ..............51

## Constitutional Provisions, Rules, Statutes, and Regulations

18 U.S.C. § 241 ................................................................................... 11-12, 49-50

18 U.S.C. § 3142(c)(1)(B)(xii) .....................................................................................49

430 ILCS § 70/3..............................................................................................................31

625 ILCS § 5/4-201 ........................................................................................................24

625 ILCS § 5/11-1401 ....................................................................................................27

625 ILCS § 5/11-1416 ....................................................................................................27

625 ILCS § 5/11-1418 ....................................................................................................28

625 ILCS § 5/16-102 ......................................................................................................27

625 ILCS § 5/18c-1702 ..................................................................................................27

625 ILCS § 5/18d-155 ....................................................................................................27

815 ILCS § 505/2Z ............................................................................................27

EO 14188, 90 FR 8847 (Feb. 3, 2025).............................................................11-12, 50

Fair Credit Reporting Act ....................................................................................8-9

Fair Debt Collection Practices Act .........................................................................10

Fed. R. Civ. P. ..........................................................................................14, 20-21

Fed. R. Civ. P. 8 ................................................................2, 20, 35-37, 39, 43-44

Fed. R. Civ. P. 8(a)(2) .........................................................................................7

Fed. R. Civ. P. 11 ..............................................................................................49

Fed. R. Civ. P. 12 .........................................................................................20-21

Fed. R. Civ. P. 12(b)(6) .................................................................................2, 21

Fed. R. Civ. P. 12(g)(2) .......................................................................................21

Fed. R. Civ. P. 12(h) ...........................................................................................21

Fed. R. Civ. P. 23 ........................................................................................21, 23

Illinois Citizen Participation Act, 735 ILCS § 110/1 *et seq.* ..........................2, 14-22

Internal Revenue Code, 26 U.S.C. § 501(c)(3)...........................................39-41, 43

Rev. Rul. 68-489, 1968-2 C.B. 210 ......................................................................41

Rules Enabling Act, 28 U.S.C. § 2072 .............................................................20-21

U.S. Const. Amend. I .....................................................................3, 14-17, 47

U.S. Const. Art. III ...................................................................................2, 8-13

## **Other Authorities**

A15action, A15action website (Mar. 25, 2024)........................................................4

A15action, A15action website (Mar. 27, 2024)........................................................4

A15action, A15action website (Apr. 10, 2024)........................................................5

ACLU of Illinois,
*Can protestors block traffic or entrances to a building to draw attention to their cause?*,
(Mar. 15, 2012) ..................................................................................................15

*Alliance of Nonprofits for Ins. Risk Retention Grp. V. WESPAC Found., Inc.*, Complaint,
1:25-cv-1320 (S.D.N.Y. Feb. 13, 2025) .................................................................. 42-43

Blackstone, William,
*Commentaries on the Laws of England* (1768) ................................................. 10

Colvin, Gregory T. and Stephanie L Petit,
*Fiscal Sponsorship: 6 Ways to Do It Right*, (3d ed. 2019) ........................... 39-40, 43

Fortgang, Tal,
*The Rise of Civil Terrorism*, City J. (Winter 2025) ................................ 1, 6-7, 18

Herrick, F. Andrew,
*Cases, Controversies, and Diversity,* 109 Nw. U. L. Rev. 57 (2015) ................... 13

Keeton, W. Page,
*Prosser & Keeton on Torts* (5th ed. 1984) .................................................... 32

Kinney, Anita,
*The DOJ Should Prosecute Criminal Anit-Semites*, City J. (Mar. 3, 2025) ............ 13

NSJP,
"About," https://www.nationalsjp.org/about/ ............................................... 52

Oxford English Dictionary, "Blockade," www.oed.com .................................... 25

Restatement (Second) Torts § 36 ............................................................... 2, 22

Restatement (Second) Torts § 36, comment *a* ............................................ 24

Restatement (Second) Torts § 36, comment *d* ......................................... 22-23

Restatement (Second) Torts § 36, Illustration 4 .......................................... 24

Restatement (Second) Torts § 36, Illustration 11 ......................................... 23

Restatement (Second) Torts § 876 ............................................................... 35

Restatement (Second) Torts § 876, comment *d* ....................................... 35, 48

Seeds for Change,
*What is Direct Action?* (2022) ................................................................. 19

Trepel, Samantha,
*Prosecuting Color-of-Law Civil Rights Violations: A Legal Overview*,
70 DOJ J. of Fed. L. & Prac. 21 (Mar. 2022) ............................................. 49

## Introduction

Defendants cloak themselves in the mantle and tradition of "civil disobedience." *E.g.*, ECF 82 at 1-2.[1] But there's a big difference between what Defendants are doing and what Martin Luther King, Jr. did.[2] When King and his followers engaged in civil disobedience, they would violate unjust laws (say, by demanding service at a segregated Woolworth's lunch counter), and used the resulting arrests to publicize the injustice of those laws. *See generally* Tal Fortgang, *The Rise of Civil Terrorism*, City J. (Winter 2025) (comparing civil-rights movement with 21st century road blockade tactics) ("Fortgang"). They may have challenged the constitutionality of the laws, but the *actions* they took were never shielded on freedom-of-speech grounds. They were not "constitutionally free to ignore all the procedures of the law and carry their battle to the streets." *Walker v. City of Birmingham*, 388 U.S. 307, 321 (1967) (criminal contempt).

The "civil disobedience" here involved Defendants conspiring to organize (or aiding and abetting or participating in) a "direct action" designed and intended to "cause pain" by illegally blockading Interstate 190 (and many other chokepoints in major cities) during rush hour, and proudly snarling traffic. SAC ¶¶ 1-3, 7, 54, 56-58, 75. Defendants do not contend the laws prohibiting this are unconstitutional. They do not contend that citizens cannot generally bring false imprisonment torts against their victimizers if the elements of the tort are met. Now the victims whom Defendants caused pain to seek civil redress. The law permits this.

Defendants' arguments to the contrary over ninety pages of briefing consistently rest on propositions of law or fact that are not so.

---

[1] Citations to pleadings filed here will be designated "ECF" and the relevant docket number. The exception are references to the Second Amended Complaint (ECF 69) and is cited as "SAC" with the relevant paragraph or page number.

[2] More than one big difference. Another is the difference in the direction of the moral arc of justice between "End segregation laws" and "America should not support Israel trying, in response to the October 7 massacre of civilians, to remove Hamas from power and to rescue American hostages," but this is not the forum to adjudicate that dispute, as much as Defendants mysteriously seem to want to litigate that with citations to Edward Said. We'll leave that aside unless the Court asks otherwise.

Defendants assert (ECF 74 at 6-8, ECF 75 at 12-13) that there is no Article III standing to seek damages for the injuries historically recognized at the founding for the common-law tort of false imprisonment, but this is not so. Defendants' argument fundamentally misunderstands Supreme Court jurisprudence, and fails to apply or even mention the correct legal test. *See* Section I.

Defendants assert they are protected by the Illinois Citizen Participation Act, but this is not so. ICPA does not apply to intentional torts like false imprisonment. *Sandholm v. Kuecker*, 962 N.E.2d 418, 432 (Ill. 2012). That a prohibited act involves expressive activity, and even expressive intent, does not even entitle one to a necessity defense in a *criminal* case, much less a free pass at the 12(b)(6) stage to shield one from civil liability. *E.g.*, *United States v. Schoon*, 971 F.2d 193 (9th Cir. 1991); *United States v. Quilty*, 741 F.2d 1031 (7th Cir. 1984). The Illinois Citizen Participation Act does not say otherwise. Defendants can establish none of the three prongs required for its invocation. *See* Section II.

Defendants assert that it doesn't constitute false imprisonment when they intentionally trap people on an interstate highway with no exit for drivers other than abandoning their car, but this is not so. Their argument (and the cases they cite) assume the possibility of *reasonable* escape, but the Second Restatement shows that illegally abandoning one's car on a highway is not a reasonable escape that absolves a defendant's intentional acts. *See* Section III.

Defendants assert that there's no implied cause of action for violating Illinois statutes, but this is not so. The Illinois Supreme Court says otherwise, and the main cases Defendants rely on refer to different chapters of the code, some with an explicit statutory exclusion. The Illinois Supreme Court test for imposing duty (which Defendants never mention, and thus forfeit at this stage) imposes a duty on the Defendants to drivers like Manhart. *See* Section IV.

Defendants' arguments against derivative liability ignore Illinois law on conspiracy, Seventh Circuit law on Rule 8, specific allegations in the complaint, and corporate law. *See* Section V. The arguments against personal jurisdiction rely on similar omissions. *See* Section VI.

The motions to dismiss should be denied.

**Background**

This is a mass tort case. During rush hour on April 15, 2024, the four individual Defendants, along with three dozen compatriots, descended upon I-190 as it approaches the terminals at O'Hare International Airport. Several chained themselves together to block the road, covering the connecting chains with PVC tubing. This "sleeping dragon" has the intended effect of making it difficult and time-consuming for ethical law enforcement to remove activists from blocking a road without injuring participants. SAC ¶ 3. The result—an intended result that several defendants proudly contemporaneously trumpeted on their social media accounts—was a massive traffic jam that lasted over two hours, trapping thousands of commuters in their vehicles against their will and depriving them of their liberty and freedom of movement. *Id.* ¶¶ 6-7. Gridlocked drivers could not exit the freeway forwards, backwards, or sideways, and could not legally abandon their cars on the freeway. *Id.* ¶ 75. As Dissenters and NSJP contemporaneously described it in a post made at the scene of the blockade, "drivers are prevented from entering the drop-off site for all domestic terminals 1-3 at O'Hare" and they "stopp[ed] travelers from reaching their flights." ECF. 33-1 ¶¶ 46, 67 & Ex. 33. As JVP contemporaneously described it in a post made at the scene of the blockade, A15action "shut down traffic into three O'Hare international terminals for two hours this morning!" *Id.* ¶ 56 & Ex. 42.

This was not a spontaneous event. Getting dozens of people to participate in a sleeping dragon requires premeditated planning, money, and coordination. The O'Hare blockade was part of a global conspiracy planned for weeks and organized under the banner of A15action. SAC ¶ 56. The aim of the conspiracy was to engage in blockades at key economic choke points and to create economic harm to show solidarity with Hamas-ruled Gaza and the Palestinians there who started a war with Israel on October 7, 2023. And the organizational Defendants helped plan, promote and execute the O'Hare blockade as part of the A15action conspiracy.

No cause of action is based on First-Amendment-protected activity, as much as the Defendants try to shield themselves in the guise of free speech. The class seeks redress not for Defendants' speech, but for their conduct. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v.*

*Mitchell*, 508 U.S. 476, 489 (1993).

The A15action conspiracy, as early as March 25, 2024, identified Chicago as a target in the "multi-city economic blockade to block the arteries of capitalism and jam the wheels of production." https://archive.ph/OafaK (last accessed Mar. 27, 2025) (noting blockade would be "coordinated"). On March 27, the conspiracy stated that the "aim" of a "blockade [of] major choke points" was "causing the most economic impact." https://archive.ph/uZWfO (last accessed Mar. 27, 2025). Participants in the conspiracy agreed not to talk to the police "about our actions or our fellow organizers." *Id.* The reasonable inference is that participants in the conspiracy planned to do something illegal.

The four individual Defendants are Jinan Chehade, Rifqa Falaneh, Superior Murphy, and Simone Tucker. Chehade is an attorney in Chicago and was arrested for participating in the O'Hare blockade. SAC ¶ 18; ECF 33-1 ¶ 51 & Ex. 37 at 135. Chehade has held leadership roles in local chapters of Defendant National Students for Justice in Palestine ("SJP" or "NSJP"). Falaneh is also an attorney in Chicago working for Palestine Legal. Falaneh was present at the blockade and admitted in media reports that she was an organizer of the blockade. SAC ¶ 20; ECF 33-1 ¶¶ 49-50 & Ex. 35 at 128; Ex. 42 at 152). Murphy was arrested for participating in the blockade. Most notably she narrated on camera a video taken at 8:30 a.m. on April 15, 2024 during the height of the blockade. Defendant Dissenters posted on its social media accounts this video almost immediately after it was filmed. SAC ¶ 19; ECF 33-1 ¶ 69 & Ex. 20 at 84. Tucker is employed as an organizer for Defendant Jewish Voice for Peace ("JVP") since April 2024 and was present at the blockade. She too is quoted in media reports as participating in the blockade and bragging that the blockade "disrupted business as usual." SAC ¶ 21; ECF 33-1 ¶¶ 57-58 & Ex. 43 at 155-56.

JVP is a tax-exempt corporation with chapters across the United States, including one in Chicago. SAC ¶ 16. JVP has a history of organizing, promoting, and participating in blockades and disruptions in Chicago and other cities. SAC ¶¶ 16, 48; ECF 33-1 ¶ 60. JVP organized, promoted, and participated in this blockade on its own and through its agent and employee Tucker. A reasonable inference is that JVP either paid Tucker, or quickly rewarded her with a job, for helping organize the

blockade that JVP participated in.

Dissenters is an Illinois nonprofit corporation, and has chapters spread throughout the country, including a chapter in Chicago. SAC ¶ 15. Dissenters has organized and participated in other blockades in and around Chicago over the past several months, and it helped with planning, organizing, and executing the O'Hare blockade. SAC ¶¶ 48, 61.

Defendant WESPAC is a nonprofit corporation that, during April 15 and its planning process, was the fiscal sponsor for NSJP. SAC ¶¶ 13-24, 42. NSJP is an unincorporated association with no formal principal place of business and an intentionally opaque organizational structure; it was legally part of WESPAC during the relevant period. SAC ¶ 13. NSJP has chapters and affiliates throughout the United States, including one in Chicago, SJPChicago, and it acts as an "organizationally unified Student Movement" dedicated to Palestinian liberation. *Id.* NSJP, through its organizationally unified affiliate SJPChicago, participated in the planning, promoting and execution of O'Hare blockade, as well as other blockades and disruptions in and around Chicago. SAC ¶¶ 40, 45, 47-48. Because WESPAC is the direct fiscal sponsor of NSJP, and NSJP has no legally independent corporate structure, WESPAC is directly liable for NSJP's actions. *See* Section V.C. below.

Agents controlling the social media accounts of Dissenters and of NSJP and JVP chapters were present at the blockade and contemporaneously celebrated it. SAC ¶¶ 73-74; ECF 33-1 ¶¶ 44-46, 64-68 & Ex. 20, 32-33, 46. A reasonable inference is that Dissenters, NSJP, and JVP agreed to participate in or aid the blockade, which would have required them to participate in the planning of the blockade.

Tides Foundation is a tax-exempt organization that acts as a fiscal sponsor for multiple projects, including the Community Justice Exchange ("CJE"), which has no independent corporate structure. SAC ¶ 17. On or before April 10, Tides, through CJE, set up and promoted a bail and legal defense fund to provide "bail, legal defense and support" for participants in the A15action conspiracy and agreed with the conspiracy to have it promote the bail fund. SAC ¶¶ 63-64; ECF 33-1 ¶ 30 & Ex. 13 at 64; https://archive.ph/7PBND (last accessed Mar. 27, 2025). Because of the risk of federal prosecution for the blockade, this fund was intended to incentivize NSJP and JVP and Dissenters

members to participate in the illegal blockade at O'Hare and elsewhere. SAC ¶ 63. Because Tides is the direct fiscal sponsor of CJE, and CJE has no legally independent corporate structure, Tides is directly liable for CJE's actions, which no one disputes.

> Over the last few years, but especially since Hamas massacred Israeli civilians on October 7, 2023, this type of organized criminal mayhem has increasingly become part of American life. …

> A framework beyond protest politics and civil disobedience is needed to understand this phenomenon. Today's left-wing agitators deploy random acts of lawlessness designed to inconvenience and disrupt as many civilians as possible … This tactic is reasonably described as a form of terrorism, though the activists aren't murderous like al-Qaida or Hamas—they don't use guns, bombs, or threats of unpredictable bloodshed. Instead, they engage in civil terrorism.

> Though some of these groups, like Antifa, are loosely connected networks of the like-minded, the ascendant anti-Israel, and more broadly anti-Western, outfits come with brand names. Within Our Lifetime, Jewish Voice for Peace, Palestine Action, Samidoun, Students for Justice in Palestine, Party for Socialism and Liberation, Palestinian Youth Movement, IfNotNow, and more—the names signal that the chaos they sow is intentional. …

> ["Direct action" is] a euphemism for the sudden, disruptive, and sometimes dangerous maneuvers that are these groups' specialty. Over the last year, they have organized and carried out hundreds of such actions, routinely violating state and federal law. Anti-Israel demonstrators, for example, have blocked several of the busiest highways in Illinois, California, Washington, D.C., and other states, and have shut down the Brooklyn Bridge and the Golden Gate Bridge. All those "actions" are crimes. …

> Though the direct actions can seem like organic protests led by disparate radical organizations, they are best understood as part of a single movement, dedicated to the intentional deployment of mass criminality to achieve ideological goals. …

> Yet there seems to be little appetite for throwing the book at the activists, their organizers, or their funders. This might reflect the belief that the activists' tactics are counterproductive to their own ends, leading Americans to associate the anti-Israel movement with aggravating—even enraging—inconvenience. The movement would be self-defeating, on this view.

This assumes, however, that anti-Israel activists want to "persuade." In a democracy, after all, political movements aim to win support through argument, not by disrupting fellow citizens' lives … And one could consider the protesters' actions through the lens of civil disobedience, recalling the 1960s civil rights movement, which also involved minor lawbreaking and was organized by nonprofits, religious groups, and other NGOs. But the similarity stops there. Civil disobedience aimed to spotlight unjust laws through their nonviolent violation. Martin Luther King Jr. and the Student Nonviolent Coordinating Committee led sit-ins and other acts designed to provoke arrest, making the injustice of those laws visible to the public. The civil rights movement remained within democratic norms, in other words, persuading officials to amend laws by winning citizens to the side of reform. What today's organizations do is not civil disobedience. They seek to bring attention not to the injustice of the laws they violate but to a set of unrelated policies—above all, U.S. foreign policy. The goal is not to gain sympathy while detained but to return to lawlessness, over and over again. …

[T]hese groups are undeterred by public anger; their aim is to make life intolerable for Americans who support Israel, or the U.S. in its current form. Appeasement only emboldens them: if we refrain from arresting or prosecuting them, they believe, we might give in through political concessions. Their approach leverages our law-abiding nature against us. …

What, precisely, do these people have in mind? How directly, and to what extent, are their leaders coordinating with overseas terrorist groups? In July 2024, Director of National Intelligence Avril Haines confirmed that Iran is encouraging and funding some of these demonstrations, but the issue seemed to fall off the Biden administration's radar. For now, we have reason to suspect, based on their words and the trajectory of their actions, that Western sympathizers of hostile enemy regimes won't remain civil for long.

Because civil terrorism utilizes illegal activity, the beginning of a policy agenda to fight it must start with enforcing existing laws …

Fortgang, *supra*. This suit seeks redress against this civil terrorism where local prosecutors have refused to act to protect innocent civilians. And existing law permits that.

## Argument

A complaint must satisfy Fed. R. Civ. Proc. 8(a)(2), and provide "a short and plain statement of the claim showing that the pleader is entitled to relief." The "statement need only give the defendant

fair notice of what the ... claim is and the grounds upon which it rests." *Swanson v. Citibank, NA.*, 614

F.3d 400, 404 (7th Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). The

> plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen. For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.

*Swanson*, 614 F.3d at 404 (explaining *Twombly/Iqbal* "plausibility" standard).

I.      **Manhart has Article III standing to seek damages for himself and the class.**

Article III standing requires injury-in-fact, traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Manhart has each. Defendants' arguments otherwise rest on fundamental misunderstandings of standing jurisprudence and of Manhart's complaint.

A.      **Defendants misunderstand injury-in-fact requirements for longstanding common-law causes of action and do not mention the correct legal standard.**

Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. "Concrete" means that an injury must be real, rather than abstract. But "intangible injuries can nevertheless be concrete"—even if "difficult to prove"—provided that they bear a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016); *accord TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 433 (2021). Thus, for example, if a defendant maintains false credit reports in violation of the Fair Credit Reporting Act, a plaintiff whose false credit report is disseminated has standing to sue over the statutory violation, while one whose credit report remains internal does not. *TransUnion*, 594 U.S. at 436-37. Disseminated false reports resemble defamation—a common-law tort with historical roots—while the undisclosed errors do not; statutory claims for technical violations of the statute must piggyback on concrete, historically cognizable harms. *Id.* at 433-34.

The reason the Supreme Court draws this distinction is because of the separation of powers.

"Congress may enact legal prohibitions and obligations, but an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427. Congress cannot create jurisdiction by the fiat of a bare statutory violation. Otherwise, statutory claims risk turning courts into enforcers of abstract policy, exceeding Article III's bounds. *Lujan*, 504 U.S. at 577; *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 731 (7th Cir. 2020). In *TransUnion*, Congress's attempt to confer standing through the Fair Credit Reporting Act without linking it to a harm with a "close historical or common-law analogue" impermissibly stretched Article III beyond its original scope. 594 U.S. at 433-34.

This separation-of-powers concern does not arise when a plaintiff, using diversity jurisdiction, brings a cause of action that is not just a "close historical or common-law analogue," but **the actual common-law cause of action for particularized intangible harm itself**. Thus, common-law torts satisfy Article III scrutiny when injury is particularized because their harms were justiciable at the Founding. Common-law injuries reflect a historical judicial consensus about what counts as "real" harm, while statutory innovations face judicial skepticism unless tethered to that tradition. So in *Spokeo*, the Court cited defamation and privacy torts as examples of intangible yet concrete injuries: "[T]he law has long permitted recovery by certain tort victims even if their harms may be difficult to measure." 578 U.S. at 341 (citations omitted). Tides's claims that inconvenience is never concrete is simply false. In this circuit, the "irritati[on]" of unwanted phone calls is enough to establish a concrete injury because it is a "modern relative of a harm with long common law roots." *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.). "Many traditional remedies for private-rights causes of action—such as for trespass, infringement of intellectual property, and unjust enrichment— are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right." *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (comparing "placing [a] foot on another's property" with the Fair Credit Reporting Act's "regulatory duties").

In Defendants' ninety pages of motion briefing, the word "history" or "historical" never appears in the context of standing. Defendants never perform the historical analysis the Supreme Court requires. And for good reason: common-law intentional torts are among the easiest, longest-

standing, and most direct avenues to Article III standing. False imprisonment claims, such as Manhart's Count I, predate the Founding, and were discussed by Blackstone as a civil action to recover "the damage sustained by the loss of time and liberty." 3 William Blackstone, *Commentaries on the Laws of England* Ch. 8 at 137 (1768).[3] Before that, false imprisonment was subsumed in trespass *vi et armis*. *Cf. Fowler v. Valencourt*, 435 S.E.2d 530, 532 (N.C. 1993) (false imprisonment "under the ancient action of trespass"). Manhart was involuntarily trapped in his car, and the harms of lost time and liberty and dignity resulting from that intentional tort were historically cognizable at the Founding, as Blackstone demonstrates. Manhart's Count II for the tortious violation of a statutory duty is directly analogous to that common-law tort of false imprisonment and trespass, with the same historically cognizable injury. *See generally* Section IV below. Manhart's alleged injuries "track[] the common law," were "justiciable at the Founding," and are thus "concrete" for purposes of Article III.

Tides asserts (ECF 74 at 1) that it is "well established" that Manhart's injuries are not "concrete injuries in fact," but no Defendant cites any precedent curtailing a common-law tort for this reason; Tides and JVP never even cite *TransUnion*; nor discuss *Spokeo*'s distinction between concrete and tangible; nor mention the correct legal standard, much less applies the analysis of "historical" analogues that the Supreme Court requires. For example, Tides cites *Keller v. LVNV Funding, LLC*, but that case's analysis supports Manhart. Keller lost because the underlying statutory FDCPA allegations in his case did not "share a sufficiently close relationship with common law privacy torts to establish Article III standing." 2022 WL 7501335 (N.D. Ill. Oct. 13, 2022). One cannot claim with a straight face that a false imprisonment claim does not "share a sufficiently close relationship with common law [false imprisonment] torts," and Tides never tries. The only binding precedential cases Tides and JVP cite (ECF 74 at 6; ECF 75 at 12) are *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041 (7th Cir. 2021), and *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665 (7th Cir. 2021), both cases based on technical FDCPA violations. FDCPA violations do support standing when there is a "close

---

[3] *Contra* ECF 75 at 13; ECF 74 at 6 (asserting that the SAC claims "only" a "loss of time"). Unlike the Fair Debt Collection Practices Act ("FDCPA") cases discussed below, where plaintiffs could plead only inchoate stress, Manhart's lost time and liberty was concrete and involuntary.

historical or common law analogue" such as defamation. *Ewing v. Med-1 Sols., LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022). The duty Defendants violated in Count II is not merely "a bare procedural violation" (*Pennell*, 990 F.3d at 1044; *Wadsworth*, 12 F.4th at 666), but a duty not to harm third parties and the public. SAC ¶¶ 98-100; Section IV below.

Unlike in *TransUnion*, where plaintiffs had to analogize a statutory claim to defamation, Plaintiff here alleges false imprisonment—a claim with a direct common-law pedigree. No analogy is required for Count I; the tort is the same. The analogy in Count II satisfies the Supreme Court's historical test. Defendants cite no relevant precedent and fail to even mention the relevant legal test.

### B. Traceability requires a causal connection, and it's met for every defendant.

Tides is the only Defendant that asserts a lack of traceability, but its argument is frivolous for two reasons. *First*, there is a causal connection between the bail fund and the acts of the Chicago blockade because the fund offered protection against not only the possibility of state criminal liability, but federal criminal liability, which Tides never contests. *Second*, the complaint alleges a conspiracy making Tides jointly and severally liable for their co-conspirators' actions.

Manhart alleges that Tides, through its CJE project, conspired with other Defendants and the larger A15action conspiracy at least as early as April 10 to create a bail fund targeted at the future A15 blockades, including for O'Hare, to incentivize criminal "direct action." SAC ¶¶ 3, 60, 63-64, 120, 127. (As mentioned above, Chicago was targeted by the A15action conspiracy well before April 10.) Thus, CJE *did* enter into an agreement, which is a reasonable inference from pleaded facts, and directed these acts toward Illinois. *Contra* ECF 74 at 9, 14. This fund would provide *both* bail and attorneys' fees to tortious activists. Tides argues (*id.* at 7) that arrests in Illinois state court don't require cash bail and therefore their bail fund could not have incentivized the illegal actions in Chicago. But, as the complaint alleges, the A15action violated federal law, and federal courts *do* impose cash bail. SAC ¶ 63. Tides never mentions federal law, and does not dispute that federal courts impose cash bail or that the actions they incentivized in Chicago violate federal law. In fact, the O'Hare activists are still within the statute of limitations of 18 U.S.C. § 241, and the new administration has issued an executive order

to encourage the Attorney General to bring § 241 charges against destructive antisemitic activism. EO 14188, *Additional Measures to Combat Anti-Semitism* (Jan. 29, 2025), published at 90 FR 8847 (Feb. 3, 2025). Separate from bail, the fund's procurement of attorneys' fees for arrestees provided them with legal counsel that a defendant might prefer to a public defender—indeed, neither of the criminally charged defendants used a public defender to negotiate a plea for the least serious criminal count for community service. So the complaint's allegation that Tides incentivized criminal acts in Chicago, creating aiding-and-abetting liability, remains viable.

In addition, the complaint alleges Tides conspired to promote and incentivize A15action in general. SAC ¶ 120. In a hub-and-spoke conspiracy, conspiring with the hub in the broader conspiracy makes a conspirator jointly and severally liable for damages foreseeably caused by the other spokes of the conspiracy, even if the defendant did not participate in that particular spoke. *Pinkerton v. U.S.*, 328 U.S. 640 (1946). For example, if C conspired with the hub of the conspiracy for spoke A's tortious asbestos distribution, and spoke B's related actions foreseeably caused injury, C would be liable for the full harm, even if it did not participate in spoke B of the conspiracy. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994). "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives, however, is liable as a conspirator." *Id.* at 894. "[O]nce the conspiracy is formed, all of its members are liable for injuries caused by *any* unlawful acts performed pursuant to and in furtherance of the conspiracy." *Id.* at 895. Whether or not establishing a bail fund aimed at reducing the cost of particular future criminal acts was itself tortious, and even if the bail fund would never possibly spend a penny in Chicago (which wasn't the case here), Tides's agreement to "further the objectives" of the illegal A15action nationwide creates liability in Chicago under Illinois conspiracy law if it was foreseeable that a "direct action" to "cause pain" in Chicago would do so. The conspiracy claims create traceability by themselves.

And establishing the targeted bail fund is itself tortious for aiding and abetting the crimes the bail fund encourages. We discuss the merits of Tides's derivative aiding-and-abetting liability for the bail fund in Section V.F below.

**C.      Defendants do not and cannot contest redressability.**

There is no dispute that Manhart's past injury and that of the class can be redressed by damages. *See also Uzuegbunam v. Preczewski*, 592 U.S. 279, 285-289 (2021) (redressability through even nominal damages confers standing). Manhart's suit meets the redressability requirement.

**D.      Controversial Supreme Court precedent currently precludes Manhart from seeking injunctive relief in federal court, but Manhart preserves the argument for future review.**

Because Manhart does not travel often enough to Chicago, he agrees that current Supreme Court jurisprudence precludes him seeking injunctive relief for lack of standing in federal court. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). That said, that jurisprudence is widely criticized as inconsistent with the Supreme Court's general approach to constitutional law. *E.g.*, F. Andrew Herrick, *Cases, Controversies, and Diversity*, 109 Nw. U. L. Rev. 57 (2015); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115-40 (11th Cir. 2021) (Newsom, J., concurring). No separate count seeks only injunctive relief, but the Court can correctly hold it does not currently have jurisdiction to order injunctive relief. Manhart reserves the right to reopen the issue should the law change over the course of the litigation; or to seek Supreme Court review of its precedent.

Note, however, that other victims do regularly drive in Chicago and would have standing to seek injunctive relief under *Lyons*. There is a pattern and practice of road blockades by the Defendants (*e.g.*, SAC ¶¶ 43-48, 56-57, 63); and Defendants have been consistently unapologetic. It continues to this day: at least one individual Defendant and one organizational Defendant were allegedly involved in blocking streets as recently as February 6 to try to prevent Jews from attending an event at Anshe Emet Synagogue in Chicago's Lake View neighborhood. Anita Kinney, *The DOJ Should Prosecute Criminal Anti-Semites*, City J. (Mar. 3, 2025) ("Kinney"). On February 26, 2025, Falaneh posted on X (formerly Twitter) that she and her fellow co-conspirators "will never be deterred" by a "Zionist" lawsuit. This Court might be personally familiar with a March 11 road blockade outside the Federal Center across the street that Defendant Chehade posted videos from. Those who regularly drive on Chicago roads will thus have standing to seek injunctive redress in this Court or in state court. *Cf. e.g.*, *Scherr v. Mariott Int'l, Inc.*, 703 F.3d 1069, 1073-75 (7th Cir. 2013) (ADA claim for hotel regularly visited).

## II. The Illinois Citizen Participation Act is not a defense to intentional torts, nor does it override the Federal Rules of Civil Procedure.

While JVP cites *Sandholm v. Kuecker* (ECF 75 at 4), it never mentions how *Sandholm* establishes how narrow the scope of the Illinois Citizen Participation Act is. ICPA "*only* applies to *meritless* lawsuits that are based *solely* on the defendant's acts in furtherance of their rights of petition, speech, or association." 962 N.E.2d 418, 429 (Ill. 2012) (internal quotations and citations omitted) (emphasis added). *Sandholm* itself refused to apply ICPA to a *defamation* claim, based on the defendants' *speech to a governmental body*. *Id.* at 423, 430-32. *See also Intercon Solutions, Inc. v. Basel Action Network*, 791 F.3d 729, 731-33 (7th Cir. 2015) (defamation). If ICPA does not apply to actual speech to a government body so long as the plaintiff alleges the intentional tort of defamation, it certainly does not apply to the *conduct* of blockading an interstate highway, which lies far outside the rights of petition, speech, or association. Especially when that conduct was aimed not at the government but at innocent commuters. *See* Section II.A below. And ICPA is a law of state procedure, and does not apply to federal courts governed by the Federal Rules of Civil Procedure. *Hanna v. Plumer*, 380 U.S. 460 (1965). *See* Section II.B below.

### A. Even if ICPA could trump federal procedure, it doesn't apply here.

Defendants do not satisfy any of the three prongs of the *Sandholm v. Kessler* test. JVP's argument (ECF 75 at 4-17) invoking ICPA thus fails for three reasons, any one of which suffices to preclude an ICPA defense. *First*, Defendants' actions effected and were physical torts rather than an exercise of speech. *Second*, plaintiffs must establish that Manhart brought the suit *solely* for retaliation purposes, but his suit is meritorious and he seeks redress for injury rather than suppression of expression. And *third*, ICPA applies exclusively to acts *solely* in furtherance of petitioning rights, but the defendants proudly proclaimed they were engaged in "direct action," rather than petitioning: they pursued economic disruption as an objective at least in part, and arguably even as a primary objective.

#### 1. The First Amendment does not protect the conduct alleged here.

There is a distinction between speech and conduct. *Madsen v. Women's Health Ctr.* 512 U.S. 753, 773-74 (1994) (blockading abortion clinics). The "First Amendment does not extend to

joining with others for the purpose of depriving third parties of their lawful rights." *Id.* at 776. The First Amendment only extends to those who "engage in peaceful nontrespassory picketing which does not deprive others of their personal liberty." *United States v. Wilson*, 154 F.3d 658, 663 (7th Cir. 1998) (blockading abortion clinics). "[T]here is no constitutional protection for association for illegal purposes." *Id.* at 665.

The Supreme Court has long held that freedom of speech doesn't apply to blockades of public streets or buildings. "A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *Cox v. Louisiana*, 379 U.S. 536, 555 (1965). The Defendants here conspired to block a roadway, and would not even allow listeners to pass. The First Amendment does not protect such conduct. *Accord Frisby v. Schultz*, 487 U.S. 474, 487 (1988) (no First Amendment protection for speech directed at "captive" audience that cannot avoid the protest).

*Mancavage v. City of Chicago* provides a good example. 659 F.3d 626 (7th Cir. 2011). Religious proselytizers wished to preach to visitors to the Gay Games at Soldier Field and Wrigley Field. Though they were doing so on the sidewalks, a traditional public forum, it did not violate the First Amendment for police to order the plaintiffs not to impede the pedestrian traffic flow, and then arrest the plaintiffs when they refused to move. *Id.* at 630-31; *accord* ACLU of Illinois, *Can protestors block traffic or entrances to a building to draw attention to their cause?* (Mar. 15, 2012) ("Protesters do not have a First Amendment right to block pedestrian or vehicle traffic"). Accordingly, Defendants' attempts to shield their unlawful conduct via the First Amendment fails.

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), is not to the contrary. *See, e.g., Nat'l Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds, Scheidler v. Nat'l Org. for Women, Inc.*, 537 US 393 (2003). *Scheidler* rejected a First Amendment defense under *Claiborne* in a civil RICO case against activists orchestrating a nationwide campaign that included blockading clinic entrances. While peaceful picketing and economic pressure constitute protected speech, the act of "blocking access to clinics" is "illegal conduct unprotected by the First Amendment." *Id.* at 703. "As the Supreme Court has explained, 'violence or other types of potentially expressive activities that

produce special harms distinct from their communicative impact ... are entitled to no constitutional protection.'" *Id.* at 702 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984)). The Supreme Court reversed *Scheidler* on its interpretation of civil RICO, but its First Amendment analysis remains good law. *E.g.*, *Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1024 (7th Cir. 2002) ("That Hamas may also engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if [defendants] knew about Hamas's illegal operations."). *Claiborne*, by its own terms, applies only to "the nonviolent elements of petitioners' activities," not to the tortious blockade of a highway. 458 U.S. at 915. Such a blockade "produce[s] special harms distinct from their communicative impact." *Scheidler*, 267 F.3d at 702.

*Claiborne* is also distinguishable because the complainants did not prove that the organizations engaging in protected speech supported the violent aspects of the boycott. 458 U.S. at 916. It was thus inappropriate to hold them responsible only because of their association. *Id.* at 920. Here, however, A15action was from the beginning promised to be a direct action to commit a "blockade" and "cause pain," not through persuasive words to tell people to boycott America, but through tortious acts—much as previous actions had done. SAC ¶¶ 44-48. The Defendants joined the A15action conspiracy knowing that it intended to commit torts, and are not in the same shoes as the NAACP in *Claiborne*.

The ICPA protects petitioning activities and does not extend its aegis to such conduct as the blockade of I-190—Defendants' conduct is a tort, not speech insulated from liability.

### 2. Manhart pursues legitimate redress for concrete injuries.

Defendants must prove that Manhart's "lawsuit is *solely* 'based on, relate[d] to, or in response to' their" protected speech. *Sandholm*, 962 N.E.2d at 434. But as noted above, Manhart is suing for an intentional tort. He does not seek liability for speech, except as evidence of the intentional tort.[4]

---

[4] Defendants repeatedly conflate their speech with the conduct being sued upon to pretend that Manhart is suing over speech. *E.g.*, ECF 75 at 5-7, 10 n.5. Manhart's claim isn't that Defendants' support of Hamas is actionable. It's the *conduct* that is targeted. The complaint simply mentions additional evidence, including from the Biden Administration, that the Defendants were knowingly or inadvertently acting at the behest of or in coordination with Hamas and IRGC. *Compare*

Furthermore, if Manhart "demonstrate[s] that his lawsuit has a legitimate basis," ICPA does not apply. *Sandholm*, 962 N.E.2d at 430. He does so. *See* Sections I and III-VI.[5] In *Sandholm*, plausible defamation allegations suggested a genuine claim. Manhart and the class have a genuine claim for damages here for an intentional tort. "If a plaintiff's complaint genuinely seeks redress for damages from … intentional torts and, thus does not constitute a SLAPP, it is irrelevant whether the defendants' actions were 'genuinely aimed at procuring favorable government actions, result, or outcome." *Id.* at 433.

The millions of dollars mentioned in the complaint and (ECF 75 at 22) is not evidence of retaliation, but reflect the damages of the thousands of members of the class, combined with the likelihood of punitive damages, especially where conduct is intentional, unrepentant, and aimed at public harm—as alleged here. For example, the Seventh Circuit upheld $372,000 in punitive damages in a case when the defendant's conduct merely reflected reckless disregard, even though the two plaintiffs' damages were "modest": bug bites and emotional distress. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003). If $186,000 per plaintiff (in 2003 dollars!) is acceptable in a case of recklessness, it is reasonable for Manhart to allege in his complaint that the potential punitive damages of thousands of class members for an intentional tort meets the Class Action Fairness Act's $5 million jurisdictional minimum and reasonable to suggest in good faith in the initial status report that the class

---

SAC ¶¶ 37-40, 52 *et seq. with* ECF 75 at 9 (falsely claiming Manhart "provided no specific factual allegations connecting any of the other Defendants to Hamas or the IRGC").

Similarly, the complaint identifies publications or other speech by some defendants as evidence of complicity in the tortious conduct or of knowing participation in the conspiracy. *E.g.* SAC ¶¶ 21, 63. By JVP's argument (*e.g.*, ECF 75 at 8, 29), a wrongful-death complaint that includes the allegation "Mark Murderer admitted in a post on Facebook that he killed Vicky Victim" is an attempt to retaliate against Murderer for his speech. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. at 489.

[5] Manhart's decision to streamline his case in an amended complaint is not an "implicit acknowledgement" (ECF 75 at 11) of meritlessness, but reflects a litigation decision not to unduly complicate an already complicated case and waste limited resources on two effectively judgment-proof entities, one of which has other intentional tort victims with earlier claims. *Boim v. Am. Muslims for Palestine*, No. 17-cv-3591 (N.D. Ill.). ECF 92-1, Declaration of Theodore H. Frank ¶ 12.

would be entitled to $36 million. Indeed, even as defendants throw the kitchen sink at Manhart in ninety pages of motions to dismiss, they do not dispute that the jurisdictional minimum is met. *Compare Shaw v. Dow Brands, Inc.*, 994 F.2d 364 (7th Cir. 1993) (dismissing case because maximum damages could not plausibly satisfy jurisdictional requirement). JVP pretends as if the blockade did not tie up *thousands* of passengers, not just Manhart individually. ECF 75 at 15. This estimate is a small fraction of the 100,000 or so who depart from O'Hare Airport every day, almost all of them travelling out of state or country. This is unlike an employer implausibly seeking $4 million as retaliation for a $2,500 wage claim. *Hytel Grp., Inc. v. Butler*, 405 Ill. App. 3d 113, 114 (Ill. App. Ct. 2010).

Most egregiously, JVP misquotes (ECF 75 at 16) an earlier Manhart complaint and claims it is an admission of retaliation for speech. But the full paragraph reads "By their own admission, Defendants' activism that day sought to 'to identify and blockade major choke points in the economy … with the aim of causing the most economic impact.' This was not speech. Such **conduct** is punished without remorse or hesitation in a society that upholds the rule of law and respects its voters." ECF 33 ¶ 8 (emphasis added). This is a call for legal process against Defendants' intentional torts, not retaliation for speech—and demonstrates by itself that Manhart's suit seeking redress for intentional torts does not satisfy ICPA's second prong.[6]

### 3. Defendants' own words establish that petitioning the government was not the "sole" purpose of the traffic blockade—even if a traffic blockade of innocents could ever be considered petitioning.

As JVP acknowledges (ECF 75 at 16), the movant's acts must be aimed at *solely* procuring favorable government action. "It is clear from the express language of the Act that it was not intended to protect those who commit tortious acts and then seek refuge in the immunity conferred by the

---

[6] JVP also attacks Plaintiff's counsel, suggesting that "this suit was not motivated by Plaintiff's desire to be compensated for his alleged injuries but was rather part of a coordinated, nationwide strategy to inundate Palestine solidarity activists with expensive, time-consuming litigation." ECF 75 at 14. JVP cites no evidence for this, and for good reason: there is none. Neither Manhart nor his counsel coordinated with other plaintiffs' counsel in the filing of other lawsuits. That other victims have also filed suit against similar actors shows only a pattern of tortious conduct by the defendants (*cf.* Fortgang, *supra*)—not that this litigation is retaliatory or meritless. ICPA requires a case-by-case evaluation under *Sandholm*, not guilt by thematic association.

statute." *Cartwright v. Cooney*, No. 10-cv-1691, 2012 U.S. Dist. LEXIS 40393, at *17-18 (N.D. Ill. Mar. 26, 2012) (quoting *Sandholm*, 962 N.E.2d at 430). They weren't.

The Defendants' own promotion of the A15action said it was designed to "cause pain." SAC ¶¶ 1, 57. It was advertised as a "direct action." "*Unlike indirect methods like voting or lobbying politicians*, people taking direct action aim to meet their goals through their own activity, rather than the actions of others." Seeds for Change, *What is Direct Action?* (2022) (emphasis added). The entire point of direct action is that participants are taking power into their own hands, rather than petitioning others for support. It is the opposite of the "indirect" action ICPA protects. And it is confirmed by the words of the Defendants here.



As the blockade was happening, Defendant Dissenters proudly proclaimed in a since deleted tweet with a screenshot of a traffic map showing the miles-long backup they intentionally caused, "DIRECT ACTION WORKS!!" ECF 33-1 Ex. 46 at 166. Did the blockade persuade any government to change its policy? Did America cease arms sales to Israel? Did America stop demanding the return of the hostages Gaza was holding and refusing Red Cross access to?

No—yet Dissenters, with a screenshot of the traffic snarl they created, said their "direct action" "worked." This is true only if at least one purpose of the blockade was to snarl traffic and—as promised before the blockade started—inflict economic harm on innocent third parties. As Defendant Simone Tucker proudly told the media, "[W]e disrupted business as usual." SAC ¶ 21. Parties intend the natural and predictable consequences of their actions, and illegally blockading I-190 was meant to trap people in traffic.

If, as in *Claiborne*, the economic damage Defendants had sought to cause had come from

"persuasive appeals" (458 U.S. at 926)—*i.e.*, "indirect action"—this case would not be here. It is because Defendants cannot hope to persuade voters and politicians to their cause through reason that they resort to intentional torts of "direct action." All in all, this is "clear and convincing evidence" that the movant's acts were not *solely* aimed at procuring favorable government action. If anything, it's dispositive evidence of intentional tort. This is a third independent reason ICPA does not apply.

But to the extent that the Court disagrees that Defendants' words and actions meet the "clear and convincing" burden, ICPA is invalid in federal court. As the next section discusses, Rules 8 and 12 do not require a plaintiff to show "clear and convincing evidence" at the motion-to-dismiss stage.

### B.    A state law governing state civil procedure does not override federal procedure.

There's a fourth independent reason and fundamental principle why ICPA fails here: federal courts are governed by the Federal Rules of Civil Procedure (FRCP), not state procedural statutes. The ICPA, by its design and operation, is an Illinois procedural rule, tethered to the state's Code of Civil Procedure. The Illinois Supreme Court itself calls it a "procedural tool." *Sandholm*, 962 N.E.2d at 429. Under Supreme Court precedent, such state rules yield to the FRCP in federal court absent a clear congressional exception. *E.g.*, *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). No exception applies here.

The Supreme Court has long distinguished between substantive laws, which define rights and obligations, and procedural laws, which regulate the judicial process. "The test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law." *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941). ICPA's provisions are hallmarks of state civil procedure, not substantive law. They dictate *how* claims are adjudicated in Illinois courts, not the *rights or liabilities* underlying those claims.

The supremacy of the Federal Rules in federal courts is a bedrock principle of federal jurisdiction, rooted in the Rules Enabling Act, 28 U.S.C. § 2072, and decades of precedent. When a federal rule "is in direct collision" with a state procedural law, the federal rule controls unless it exceeds the scope of the Rules Enabling Act or congressional intent suggests otherwise. *Hanna v. Plumer*, 380

U.S. 460, 470-71 (1965). Here, the ICPA's procedural mandates—its evidentiary standards and fee-shifting provisions—collide with the Federal Rules' comprehensive framework for motions to dismiss, as embodied in Rule 12. Under *Hanna*, Rule 12 prevails.

*Shady Grove* demonstrates the proper standard. There, a New York law prohibited class actions for certain statutory penalties, conflicting with Fed. R. Civ. Proc. 23, which governs class certification. 559 U.S. at 396-97. The majority opinion articulated a two-step inquiry: (1) Does the federal rule "answer the question in dispute"? (2) If so, is the rule valid under the Rules Enabling Act? *Id.* at 398. Applying this test, the Court held that Rule 23 controlled because it directly addressed class certification, and no evidence suggested it abridged substantive rights. *Id.* at 408-10.

ICPA fails this test. Fed. R. Civ. Proc. 12(b)(6) governs motions to dismiss for failure to state a claim—the precise relief JVP seeks under ICPA. Under Rule 12(b)(6), a complaint survives if it plausibly states a claim, assessed solely on the pleadings. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus, "under Rules 12(g)(2) and 12(h), defendants may not assert their ICPA defense via a motion to dismiss in lieu of filing an answer." *Satkar Hosp., Inc. v. Cook Cty. Bd. of Rev.*, No. 10 C 6682, 2011 WL 2182106, 2011 U.S. Dist. LEXIS 61554, at *13 (N.D. Ill. June 2, 2011) (applying *Shady Grove* and concluding that to the extent that ICPA provides substantive defenses, "defendants may assert their ICPA defense if they wish to do so, via an appropriate procedural vehicle.").

JVP seeks (ECF 75 at 16) to shift the burden to Manhart to disprove protection by "clear and convincing evidence"—a threshold far exceeding Rule 12(b)(6)'s plausibility test. As Section II.A shows, Manhart meets even Illinois procedure's higher burden—but he shouldn't be asked to do so. Nothing in federal law undermines Rule 12's validity. Nor is ICPA "bound up" with a state-created substantive right. ICPA protects general First Amendment rights already cognizable under federal law. Thus, under *Shady Grove*, ICPA must give way.

The Seventh Circuit consistently prioritizes the Federal Rules over conflicting state procedural rules requiring more intensive pleading standards. *E.g.*, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 671-72 (7th Cir. 2008); *Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006). The Seventh has addressed ICPA specifically. *Intercon Solutions, Inc. v. Basel Action Network*,

791 F.3d 729 (7th Cir. 2015). The district court denied an ICPA motion on merits grounds—without addressing the *Hanna* question. The Seventh Circuit affirmed, noting that it need not decide whether ICPA applies in federal court because the motion failed substantively. *Id.* at 732. *Intercon* noted the circuit split on whether to recognize anti-SLAPP laws like ICPA, but strongly hinted its skepticism of its validity. No federal court has held that ICPA satisfies *Hanna v. Plumer* or *Shady Grove*. This one should not be the first. ICPA cannot be grounds to dismiss or for fee shifting if federal procedure would not permit it.

## III.    Manhart states a claim for false imprisonment.

Under Illinois law, "[f]alse imprisonment is the unlawful restraint of an individual's liberty or freedom of locomotion." *Morris v. Faulkner*, 361 N.E.2d 112, 114 (Ill. App. Ct. 1977). The unlawful restraint "may be effected by words alone, by acts alone or both; actual force is unnecessary to an action for false imprisonment." *Pechulis v. City of Chicago*, 1997 U.S. Dist. LEXIS 11856 at *9, 1997 WL 461006 (N.D. Ill. Aug. 7, 1997).

A false imprisonment claim is sustainable without total confinement. In *Robinson v. Miller*, the blockage of a public road did not nullify a claim for false imprisonment even though the plaintiffs were not trapped in their cars like Manhart. 1985 Ill. App. LEXIS 2179 at *8-*9 (Ill. App. Ct., May 14, 1985) (attached at ECF 65-1). Thus, the holding in *Robinson* supersedes the scenario in comment *d* of Restatement (Second) of Torts § 36 that Defendants rely on (ECF 74 at 12; ECF 75 at 19-20).

But comment *d* does not even apply here. By its own language (emphasis added):

> In order to make the actor liable for false imprisonment under the rule stated in § 35, it is necessary *that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor.* It is not enough that the other's freedom of movement has been improperly restricted. Thus, one who blocks off a highway, intending to prevent the public from passing along it, is not liable for false imprisonment *to one whose privilege to use the highway has been thus denied.*

This describes the scenario where, with the blockade already started, a commuter who wanted to travel by highway to the airport and instead has to take the CTA Blue Line to get there. That hypothetical

commuter does not have a false imprisonment claim, and the Court will note that such commuters are not included in the proposed class. It has *nothing* to say about the scenario of someone like Manhart who is *already on the highway* when the blockade begins and *cannot exit the highway* because of the Defendants constraining his movement. Illustration 11 (again, emphasis added) to comment *d* demonstrates this:

> A unlawfully encloses a part of the highway. B enters the enclosure, and A prevents him from passing out of it on the other side, *but puts no obstacle in the way of his leaving by the way in which he entered*. This is not an actionable confinement of B, though B has the right or privilege of an unobstructed passage along the highway.

Manhart *did* have an obstacle in the way of his leaving by the way he entered: there were thousands of cars similarly trapped by the Defendants on the highway behind him, preventing his vehicle from turning around. Defendants would have this Court read comment *d* to excise the critical limiting clause in Illustration 11, and hold that a party can unlawfully enclose a part of the highway, trap the driver on the highway so he cannot leave by the way he entered, and still have no liability. That's not a reasonable way to read comment *d*.

Another example: on March 11, 2025, Chehade, and perhaps other Defendants, briefly disobeyed police commands and blocked the streets around the Federal Center in Chicago in reaction to the proposed deportation of a Syrian-born Algerian alien. Someone trying to leave the Dirksen Building parking lot across the street who could not do so because the resulting traffic jam blocked the driveway exit would not have a false imprisonment claim under comment *d* if she could safely walk instead. But that's not Manhart's case either.

Defendants argue (ECF 74 at 12; ECF 75 at 2, 18-19, 18; ECF 82 at 5 n.7, 8) that Manhart was not confined to his vehicle and therefore not restrained because he could have abandoned his vehicle and joined the handful of travelers who left taxis or ride-share cars and walked to the terminal; drivers like Manhart did not have this choice. (JVP suggests (ECF 75 at 19) that "passengers" should not be included within the class definition, but Rule 23 question is irrelevant to whether Manhart pleads a legally sufficient claim.) Manhart's dilemma would have required him to abandon his vehicle,

exposing him to criminal penalties. *See* 625 ILCS § 5/4-201 (prohibiting abandonment of vehicles). The argument also contradicts the Restatement: a victim of false imprisonment "is not required to run any risk of harm to his person or to his chattels … to relieve the actor from a liability to which his intentional misconduct has subjected him." Restatement (Second) Torts § 36, comment *a*.

Illustration 4 demonstrates this: "A closes every exit except one, the use of which would involve material harm to B's clothing. A has confined B." If material harm to a piece of clothing precludes an exit from being a "reasonable means of escape," then it is the case that it is not "a reasonable means of escape" to break the law and abandon the car on the highway. This is not merely an "understandable choice" (ECF 75 at 18-19) but one involuntarily compelled by a physical barrier without lawful escape. JVP quoted *Hale v. Pace* for this proposition, which *denied* a motion to dismiss. 2011 WL 1303369, at *11 (N.D. Ill. Mar. 31, 2011). There, the plaintiff was entrapped in a moving vehicle, which was sufficient compulsion for the plaintiff to remain there without need of any further threat. *Id.* While irrational or subjective belief cannot support false imprisonment (for example, a plaintiff standing around her repossessed car for hours in hopes of getting inside),[7] compulsion need not rely on a direct threat. It can be inferred from the circumstances, as *Hale* demonstrates. Defendants do not dispute that Manhart would have broken the law to abandon a driverless car on the Interstate. It should be clear as a matter of law that doing so is not a "reasonable means of escape," but at a minimum, reasonableness is a question of fact on which Manhart could prevail before a jury, and not grounds for dismissal (much less an assertion of frivolousness).

Defendants assert that no part of the conspiracy intended the "consequences" of false imprisonment, but merely to "disrupt major economic centers." ECF 76 at 6. "Intentional torts [] generally require that the actor intend the consequences of an act, not simply the act itself." ECF 82 at 6 n.9 (purportedly quoting *Kawaauhau*). That quotes the syllabus rather than the opinion, but *Kawaauhau v. Geiger* does not apply because it concerned acts without "actual intent to cause

---

[7] *Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*, 550 F. Supp. 595, 603 (N.D. Ill. 1982), which Defendants rely on.

injury." 523 U.S. 57, 61 (1998). As Manhart pleaded, the blockade was intentionally malicious, a plan the conspirators announced in advance. SAC ¶¶ 3, 7, 54, 56-58, 75, 112. Defendants split hairs alleging their intent was not "restraint," but the means defendants used to achieve their disruption was a "blockade." False imprisonment is captured in a common definition of blockade as "an act or means of sealing off a place to prevent … people from entering or leaving," Oxford English Dict., www.oed.com/search/dictionary/?scope=Entries&q=blockade (last accessed Mar. 28, 2025). The conspirators vividly described their targets as "choke points": narrow passages that could bottleneck many people and achieve their aim of "causing the most economic impact." SAC ¶¶ 54, 57. This was not an incidental traffic jam. The conspiracy worked to spring a trap—confining travelers inside a bottleneck from which they could not legally or safely exit. It was not just foreseeable—it was the very purpose of the blockade—that drivers would be confined. And Dissenters celebrated this contemporaneously by posting a traffic map filled with dark red.

The cases Defendants cite do not change this analysis, because they are readily distinguishable from these facts. Defendants' cited cases uniformly involve plaintiffs who *voluntarily* left or remained in place—due to freely-entered contractual obligation (*Martin v. Lincoln Park W. Corp.*), to protect reputation (*Lopez v. Winchell's Donut House* and *Wilson ex rel. Adams v. Cahokia Sch. Dist. No. 187*), or as an attempt to retrieve property (*Marcano*). ECF 75 at 19; ECF 74 at 12; ECF 76 at 6. Defendants argue that these cases show the need to falsely imprison (not "disrupt"), but in each case plaintiffs were free to leave and indeed *did* leave without resistance by the defendants and without violating any laws. In *Robinson*, a plaintiff essentially alleged to be confined to "all of the world except" the place she desired to be. *Robinson v. Sabis Educ. Sys.*, No. 98 C 4251, 1999 WL 414262, 1999 U.S. Dist. LEXIS 9065, at *57 (N.D. Ill. June 3, 1999). Inapplicable: Manhart and other drivers were captive *inside* their cars, not *locked out* of a particular place. JVP's invocation of seizure law is even farther afield, because seizure depends on a different benchmark: whether a reasonable person would *perceive* a "show of authority was at least partly directed at him, and that he was thus not free to ignore the police presence…" *Brendlin v. California*, 551 U.S. 249, 261 (2007). In any event, the conspirators *were* directing their (unlawful) force toward motorists trapped on the interstate.

Other cases concern plaintiffs who chose to remain in place for fear of losing claims they had no legal entitlement to. A tow truck operator blocking a car in a driveway to legally repossess it did not falsely imprison a motorist. *Gable v. Universal Acceptance Corp.*, 338 F. Supp. 3d 943, 957 (E.D. Wis. 2018). Abandoning the car would have been safe and legal. Similarly, in *Stevens v. Shelton*, a teacher suspected of cheating had no legal entitlement to privacy of her filing cabinet, so voluntarily refusing to turn over the keys upon a school principal's request could not constitute false imprisonment. 2019 WL 1239784, at *9 (N.D. Ill. Mar. 18, 2019). Plaintiffs cannot deny that Manhart had every right to be on the Interstate. He was compelled to remain in his car for no other reason than the misfortune of driving into a "choke point" intentionally blockaded by the conspiracy.

## IV. Illinois recognizes that breaches of statutory duty support common-law torts.

JVP fundamentally mischaracterizes Count II as asserting a private right of action directly under the Illinois Vehicle Code. ECF 75 at 20-21. It does not.

Count II is, as it says, a tort claim—rooted in common law—where the defendants' violation of public-safety provisions of the Illinois Vehicle Code serves as the basis for a breach of duty. This is a standard and well-established theory of tort liability under Illinois law. Most of Defendants' arguments shadowbox with an earlier version of the complaint that did not make this clear.

### A. Violation of public safety codes implies a common-law breach of duty and is *prima facie* evidence of negligence.

Illinois recognizes that where a statute is enacted for protecting human life or public safety, its violation may give rise to tort liability—not because the statute creates a private right of action, nor that courts need imply a cause of action. Instead, safety-directed statutes supply the standard of care owed to others, which supports the underlying tort. "A violation of a statute designed for the protection of human life or public safety is *prima facie* evidence of negligence and creates a cause of action if the violation has a direct and proximate connection with the injury." *Kohn v. Laidlaw Transit, Inc.*, 808 N.E.2d 564, 573 (Ill. App. Ct. 2004). Violation of the statute itself does not cause the liability, but it does show a common-law tort if the violation was "proximate cause of the damage that followed." *Ney v. Yellow Cab Co.*, 117 N.E.2d 74, 80 (Ill. 1954).

Thus, Manhart pleads a common-law tort claim, in which the defendants' willful violation of Chapter 11 of the Vehicle Code—the "Rules of the Road"—constitutes breach of a duty designed to protect motorists. Most precedent statutorily implied breaches of duty concern negligence, but the same theory is available to intentional torts as well. *Noyola v. Bd. of Educ.*, 688 N.E.2d 81, 85 (Ill. 1997).

Defendants rely heavily on *Priddle v. Malanis*, 2017 WL 372302 (N.D. Ill. Jan. 25, 2017), and related cases to argue that the Vehicle Code does not create a private right of action. But that's irrelevant. Priddle involved a claim brought directly under the Illinois Commercial Transportation Law and the Illinois Commercial Safety Towing Law, which are Chapters 18c and 18d of the Vehicle Code—and contain provisions that expressly disclaim any private right of action. *See* 625 ILCS §§ 5/18c-1702, 5/18d-155; *Phillips Elec. Co. v. Seko Messenger Serv.*, 602 N.E.2d 62 (Ill. App. Ct. 1992). Defendants' reliance (ECF 75 at 21) on 625 ILCS § 5/16-102 is similarly misplaced. That provision is in Chapter 16 of the Code, which specifically deals with criminal investigations and enforcement of violations of the Code and allocates responsibility for criminal prosecutions between county State's Attorneys and municipal attorneys. Other sections of the Vehicle Code are expressly enforceable by private parties. *See e.g.,* 815 ILCS 505/2Z. While 625 ILCS § 5/11-1416 does not appear to have an express private cause of action, it does not need one because Manhart **does not plead an implied cause of action**.

Manhart alleges a violation of Chapter 11, which contains no such restriction and, as courts have repeatedly held, is a public-safety statute whose provisions may establish the duty in tort claims. For example, in *Kacena v. George W. Bowers Co.*, the court found that the defendant breached duty in personal injury action by failing to follow the Vehicle Code's prohibition against leaving running cars unattended. 211 N.E.2d 563, 567 (Ill. App. Ct. 1965). This holding was applied in *Harper v. Epstein*, which found that § 5/11-1401, just 13 paragraphs earlier in the same subchapter that Manhart pleaded, is indeed a public safety statue. 306 N.E.2d 690, 692 (Ill. App. Ct. 1974).

Illinois courts repeatedly hold that the provisions of Chapter 11 are concerned with the safe movement of traffic. For instance, in *Schultz v. Siddens*, the court held that the statute was a public safety statute, rather than simply a regulatory statute, and therefore trial court erred in striking from

the complaint the alleged violation of § 5/11-1418 (restriction of tractors on highways). *Schultz* noted the statute's placement in the Rules of the Road chapter of the Vehicle Code supported the finding that the statute "was designed for the protection of human life and property" because "[t]he majority of the subsections in this portion of the Illinois Vehicle Code are concerned with the *safe movement of traffic.*" 548 N.E.2d 87, 89 (Ill. App. Ct. 1989) (emphasis added); *accord McCoy v. McCoy*, 591 N.E.2d 124, 127 (Ill. App. Ct. 1992) ("the safe movement of traffic … was designed for the protection of human life or property"). Here the injury is Manhart's loss of liberty and freedom of movement, as well as emotional distress, and Defendants' blockade conspiracy was a direct and proximate cause of that injury. This distinguishes Manhart's complaint from the one in *Carmichael*, where the plaintiff pleaded only an implied cause of action rather than a tort whose duty was breached prima facie due to a statutory violation. *Carmichael v. Prof'l Transp., Inc.*, 239 N.E.3d 512, 519 (Ill. App. Ct. 2021).

Count II does not require an express or implied statutory cause of action. It pleads a tort—supported by the general duty to act with ordinary care and avoid foreseeable harm, and by the duty reflected in the Vehicle Code's highway obstruction provisions. This suffices.

### B.     If no common law tort were available, the court may imply a cause of action to effect the purpose of the Vehicle Code.

Alternatively, if a common law tort were unavailable for some reason, Illinois sometimes recognizes implied private causes of action. While federal courts this century are reluctant to create implied private rights of action for federal statutes, this is not true for Illinois state law. "Implied private rights of action are an established feature of our jurisprudence." *Noyola v. Bd. of Educ.*, 688 N.E.2d 81, 84 (Ill. 1997).  Illinois courts use a four factor test to determine whether there is an implied private right of action: (1) the plaintiff is within the class of persons that statute was aimed to protect; (2) implying a cause of action is consistent with the statute; (3) the plaintiff's injury is one the statute is intended to prevent; and (4) allowing a private right of action is necessary to provide an adequate remedy for violating the statute. *Rodgers v. St. Mary's Hosp. of Decatur*, 597 N.E.2d 616, 619 (Ill. 1999).

All four factors point to giving Manhart a right to sue for breach of duty implied by the statute. Manhart was a motorist on April 15 when Defendants and other co-conspirators willfully,

intentionally, and recklessly blocked highway traffic. The statute was designed to protect motorists like Manhart from being impeded from traveling freely on Illinois roads and highways. Implying a cause of action is consistent with the statute because it acts as a deterrence to the willful, intentional, and reckless conduct at which the statute is aimed, and permitting Manhart's claim **serves** the purpose of statute for similar reasons. Manhart's claim satisfies the fourth prong: a private cause of action is not precluded under the fourth prong even if the statute includes statutory fines or penalties. "[W]hen a statute is enacted for the protection of a particular class of individuals, a violation of its terms may result in civil as well as criminal liability, even though the former remedy is not specifically mentioned therein." *Heimgaertner v. Benjamin Elec. Manuf. Co.*, 128 N.E. 2d 691, 693 (Ill. 1955); s*ee also Pilotto v. Urban Outfitters W., LLC*, 72 N.E.3d 772, 783-84 (Ill. App. Ct. 2017) (allowing private cause of action even though ordinance incorporated $100 fine for violations).[8]

That said, Illinois courts often do not reach the issue because a common law tort pleading both a breach and proximate cause for injury suffices to make many criminal and regulatory violations actionable. For example, in *Scott v. Aldi, Inc.*, the court assumed without deciding that no implied cause of action for provisions in Chapter 8 of the Vehicle Code exist, but found the violations showed prima facie evidence of negligence because defendants violated a public safety statute. 703 N.E.2d 526, 529-30 (Ill. App. Ct. 1998). Note that plaintiff in *Aldi* alleged a quite deliberate-sounding scheme to operate an unlicensed taxi business, but proceeded with the claim as "negligence" because, as *Noyola* observed, most statutory duty of care precedents are for negligence.[9]

### C.    Motorists' injury was a foreseeable, indeed deliberate, part of the scheme.

Tides asserts (ECF 74 at 11) that Manhart's injury was not the type that the statute was

---

[8] All the more so if one accepts Defendants' argument (Section III above) that Manhart does not have a false-imprisonment cause of action. Note also that Defendants' argument would preclude many passengers from making a false-imprisonment claim; if so, they would need the ability to make a statutory claim to collect damages.

[9] To the extent that Defendants simply quibble (ECF 75 at 21) with Count II styling, they may consider the common law tort to be negligence insofar that there was a breach of duty (implied by the Vehicle Code safety rules), which was proximate cause of Plaintiff's damages.

designed to protect, but this is inaccurate. The highway obstruction statute is a public safety statute designed to facilitate the safe *movement* of traffic on roads and highways. *Schultz*, 548 N.E.2d at 89; *McCoy*, 591 N.E.2d at 127. Willfully blockading traffic such that motorists no longer have freedom of locomotion and are trapped in their vehicles creates a hazard. It also created a risk to the public generally because blockades prevent emergency vehicles from responding to fire, police, or medical emergencies. The statute *exists* to promote the safe movement of traffic, and this is enough. Consider *Aldi*, where plaintiffs was the passenger of an unlicensed taxi that got into a collision. 703 N.E.2d at 528. The court found that the purpose of the relevant section of the Vehicle Code was to "protect any of the public who may sue to recover damages for injuries." *Id.* at 530. The purpose was not to reduce automobile accidents, yet the court found this sufficient to conclude the statute was based on "public safety" and that the personal injury a was foreseeable consequence of the breach. *Id.* Defendant alleged that the negligence that caused the accident was different from the "negligence" of (intentionally) running an unlicensed taxi service, but the appellate court found that proximate cause had been pleaded, and it was ultimately a question of fact, reversing and remanding the trial court's dismissal. *Id.* at 531. Defendants could not raise such a colorable question of fact here. Blockaders who bind themselves together to halt the safe free flow of traffic are in fact the proximate cause for halting the free flow of traffic, thus damaging motorists.

The cases Tides cites are irrelevant. In both *Gouge* and *Miller*, it was a private guideline, rather than a statute or ordinance, that was at issue—and the guidelines' purpose was for power-line stability and unrelated to the safety of motorists like the plaintiff. *Gouge v. Cent. Ill. Pub. Serv. Co.* 582 N.E.2d 108, 112 (Ill. 1991); *Miller v. Hwy Comm'r of N. Otter Tp. Rd. Dist.*, 801 N.E.2d 599, 610 (Ill. App. Ct. 2003). And *Passarella* rejected defendants' summary judgment motion because the record did not permit the court to conclude "that no reasonable jury could find that alleged violations of OSHA and the Illinois Vehicle Code were the proximate cause" of plaintiff's injury. *Passarella v. NFI Interactive Logistics LLC*, 2015 U.S. Dist. LEXIS 88995 at *27-*28, 2015 WL 4148674 (N.D. Ill., July 9, 2015).

Tides offers a parade of horrors about the effect on parades, falsely claiming (ECF 72 at 12) that allowing Manhart's tort claim would allow any irate motorist to sue organizers of any major event

that increased traffic. Not so. If the organizers of an event are "acting under authority of a duly issued municipal or county parade or demonstration permit," they are not violating the law. 430 ILCS § 70/3. As discussed above in Section III, the purpose of the blockade was *to create a blockade*. Speech or protests that might have incidental effects on traffic do not violate the statute, so do not suggest any breach of duty.

JVP incorrectly asserts (ECF 75 at 22-23) that there is no cognizable duty Defendants owed to Manhart. Illinois "has long recognized that 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of the relationship, but extends to remote and unknown persons.'" *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (quoting *Widlowski v. Durkee Foods*, 562 N.E.2d 967, 968 (Ill. 1990) (collecting cases)). "Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Id.* (quotation and citations omitted) (collecting cases). Whether that duty exists involves a four-part test in Illinois: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Id.* at 1098. And all four factors support Defendants' duty to the class here.

a. **Foreseeability of injury**. Defendants' causing injury through blockades was not just foreseeable but intended. The A15action website stated that the aim was to "blockade major choke points in the economy [to cause] the most economic impact" and to "cause pain to the economy." SAC ¶¶ 7, 57.

b. **Likelihood of injury**. The A15action promised "maximum economic impact." SAC ¶¶ 1-2, 7. The injury was not just foreseeable and intended, but likely if Defendants broke the law for more than a few minutes.

c. **Magnitude of the burden**. The burden on Defendants to follow the law and not intentionally violate it is modest. It took much planning and effort (and equipment) to blockade the road for so long. It's easier *not* to organize a group to handcuff themselves with several feet of PVC

tube to blockade a road for hours than to do so.

**d. Public policy consequences of placing that burden on the defendant**. The only public policy consequences are that there might be fewer road blockades if Defendants bear the cost of their anti-social actions. That's a feature, not a bug.

Illinois courts would impose a duty to Manhart and the class.

The cases JVP cites (ECF 75 at 24-25) are not on point. *Shank v. Fields* is a case about an "independent intervening act"—a truck driver's speeding—that was the proximate cause of Shank's physical injury and broke the causal chain. 869 N.E.2d 261, 269-70 (Ill. App. Ct. 2007). Similarly, in both of JVP's other cases, it was the intervening negligence of another motorist that proximately caused the plaintiff's injury, rather than the remote-in-time earlier accident that caused a road blockage. *Stone v. Chapman*, 2012 Ill. Unpub. LEXIS 1786 at **8, 2012 WL 7006985 (Ill. App. Ct. 2012); *Blood v. VH-1 Music First*, 668 F.3d 543, 548-49 (7th Cir. 2012). The Defendants here identify no intervening negligence; the intentional and unlawful conduct of the Defendants is the direct and proximate cause of Manhart's injury—his loss of liberty.

Count II states a claim on which relief may be granted.

## V.     Because Counts I and II state claims, the derivative claims in Counts III through VIII stand for each defendant.

> All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable.

*Isr. Travel Advisory Serv. v. Isr. Identity Tours*, 1993 U.S. Dist. LEXIS 8744 at *14 (N.D. Ill. June 24, 1993) (quoting W. Page Keeton, *Prosser & Keeton on Torts* 322-24 (5th ed. 1984)). "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives is liable as a conspirator." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).

A15action and the O'Hare blockade fall within the definition of a conspiracy under Illinois law, the elements of which are: (1) a combination of two or more persons; (2) for the purpose of

accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; and (3) in furtherance of which, one of the conspirators commits an overt tortious or unlawful act. *Fritz v. Johnson*, 807 N.E.2d 461, 470 (Ill. 2004). A15action and the O'Hare blockade check all three boxes. There was a combination of two or more persons organizing A15action, including the unknown person(s) creating the website and the different organizers and participants at the various locations across the globe, including Chicago. And CJE admits as much, acknowledging that the a15action.com website was "created as part of a worldwide civil disobedience effort." ECF 74 at 3. This also would include CJE once it agreed to sponsor the bail and legal defense fund before April 15. Next, the stated purpose of A15action was to engage in unlawful blockades of "major choke points in the economy" and "to cause pain to the economy." Finally, it is without question that up to forty co-conspirators committed overt unlawful acts in furtherance of the conspiracy by participating in the physical blockade of I-190 at O'Hare. Indeed, two of the individual defendants, Chehade and Murphy, were two of the blockaders arrested by police on April 15, 2024. SAC ¶¶ 18-19.

Counts I-II are the direct claims against the individual defendants, who participated in the blockade, and these support the other claims. Counts III–VIII plead liability on **civil conspiracy** (Counts III–IV), **aiding and abetting** (Counts V–VI), and **in-concert liability** (Counts VII–VIII), tracking the same underlying torts alleged in Counts I–II. Each count applies specific subsets of defendants and mirrors the direct torts they are alleged to have supported, and each is supported by facts in the SAC and reasonable inferences from them.

While certain Defendants protest that they were not at the scene or did not personally obstruct the highway, Illinois law does not require that. Their liability arises from their knowing participation in or substantial encouragement of a conspiracy or tortious scheme to unlawfully obstruct traffic— whether through planning, promotion, or material support.

As to **civil conspiracy**, Tides, JVP, and NSJP incorrectly assert (ECF 74 at 8-9; ECF 75 at 27; ECF 80 at 12) that there is no allegation they entered any agreement with the blockaders at O'Hare, or that there was an agreement to commit tortious conduct (ECF 82 at 5, 10). But Manhart *did* allege such agreements. SAC ¶¶ 119-20, 126-27. Defendants' arguments mischaracterize conspiracy law. The

explicit purpose of the A15action conspiracy was to engage in unlawful blockades. Moreover, "[a]n express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result." *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754 (1980); *accord Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). A defendant cannot escape liability simply because its agreement was not with the actual O'Hare blockaders. "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's acts." *Scott v. Aldi, Inc.*, 703 N.E.2d 526, 520 (Ill. App. Ct. 1998) (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1994)). "[A] conspirator need not participate actively in or benefit from the wrongful action to be found liable." *Adcock*, 645 N.E.2d at 895.

Moreover, all members of the conspiracy "are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy," even if the conspirator neither planned nor knew about the wrongful act. *Id.* "The gist of a civil conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Scott*, 703 N.E.2d at 529. Moreover, the overt act triggering conspiracy liability only needs to be unlawful. *Vance v. Chandler*, 597 N.E.2d 233, 236 (Ill. App. Ct. 1992). Here, intentionally blockading the highway to O'Hare is unlawful. Thus, in this case, the Defendants' liability is triggered by the co-conspirators who engaged in the intended, and therefore foreseeable, blockade, even if they did not directly participate in the blockade.

Defendants' reliance (ECF 82 at 7) on antitrust dismissals does not apply. Allegations of conspiracy in an antitrust case require heightened pleading because many alleged conspiracies in antitrust cases represent behavior equally consistent with legal "parallel conduct," and are thus implausible. *E.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021). But here, it is coincidental parallel conduct that is implausible. The blockade required planning, expenditure, and coordination; a conspiracy is the most plausible inference. The unlawful goals were stated weeks in advance; knowledge of where to show up for the blockade required

participation in the conspiracy; the complaint alleges Dissenters, JVP, and NSJP were at the blockade and ratified it with contemporaneous social media posts (rather than condemning it); all three have participated in similar blockades before or after. It is a plausible inference from these alleged facts that the defendants participated in the A15action conspiracy, rather than mere conclusory claims.

**Aiding and abetting** liability is also viably pled. "A claim for aiding and abetting requires the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Time Savers, Inc. v. LaSalle Bank, N.A.,* 863 N.E.2d 1156, 1168 (Ill. 2007). "The question of whether a defendant has substantially assisted or encouraged another person in his tortious conduct … is a question for the jury." *Simmons v. Homatas*, 925 N.E.2d 1089, 1100 (Ill. 2010).

Illinois also recognizes **in-concert liability** under Restatement (Second) Torts § 876. *See Hutchinson v. Fitzgerald Equip. Co.*, 819 F.3d 1016, 1025 (7th Cir. 2018). A defendant is subject to in-concert liability for tortious conduct of another if it "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Fortae v. Holland*, 778 N.E.2d at 170-71. "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." Restatement (Second) Torts § 876, *comment d.* And, as noted above, whether a defendant's actions amounted to substantial assistance is a question of fact reserved for the jury.

The complaint satisfies Rule 8, which does not require evidentiary detail or proof of intent at the pleading stage. *Ashcroft v. Iqbal* requires only "factual content that allows the court to draw the reasonable inference that the defendant is liable." 556 U.S. 662, 678 (2009). *Bank of Am., N.A. v. Knight* involved vague collective allegations that became "mush." 725 F.3d 815, 818 (7th Cir. 2013). (The

defect in *Knight* was not "group pleading" (ECF 80 at 12; 82 at 6 n.9), but that the defendant accountant could not possibly have intent to mislead the plaintiff lender with an audit *after* the loan. 725 F.3d at 817. Plaintiff was attempting to end-run bankruptcy proceedings. *Id.*) Defendants stretch this precedent beyond what the law requires. Yes, each individual defendant's conduct must be pleaded, but Manhart does that. All a plaintiff must do to satisfy Rule 8 is provide "enough detail" to give notice and make liability plausible; there is no requirement of exhaustive proof (or even of at the pleading stage. *Swanson*, 614 F.3d at 404; *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337-38 (7th Cir. 2024). "Lists of things that plaintiffs need to prove concern evidence (at summary judgment and trial); they must not be treated as demands for longer and more detailed pleadings." *Thomas*, 120 F.4th at 1338.

The complaint's specifics provide Defendants clear notice with a narrative that renders their liability a reasonable inference. The individual Defendants executed the physical blockade, which resulted in the arrest of two of them, Chehade and Murphy SAC ¶¶ 62, 77. One of the individual Defendants, Tucker, acted as an agent of JVP, an organization with a history of unlawful blockades in Chicago and elsewhere. SAC ¶¶ 16, 21, 68. (On April 22, 2024, Tucker posted on LinkedIn that she had taken a job with JVP as an organizer. It could be that Tucker did not start formal employment with JVP until after the April 15 blockade, but given JVP's participation in the blockade, it remains a reasonable inference that JVP rewarded Tucker's work on the blockade with paid employment.) And contemporaneous media reports identify Falaneh as an organizer of the blockade. SAC ¶ 20; ECF 33-1 ¶ 49 & Ex. 35 at 128; Ex. 42 at 152. JVP, NSJP, and Dissenters planned, funded, and promoted the blockade. SAC ¶¶ 60-61. Tides, through its CJE project, joined the conspiracy and aided and abetted it by agreeing before the A15 action to create a targeted bail fund to incentivize future participation in A15's illegal activity. SAC ¶ 63. And just as Tides is concededly liable for the actions of its CJE project, WESPAC is liable for the actions of its NSJP project; at a minimum, WESPAC had a duty to supervise NSJP to ensure it wasn't acting illegally, and breached that duty, causing injury. SAC ¶¶ 14, 42, 145-46; *see* Section V.C below.

**A.**     **The complaint's allegations against the individual defendants are sufficient under Rule 8.**

The individual defendants' assertion (ECF 82 at 10) that their participation in the blockade was either accidental or inadvertent is nonsense. They would have the court infer that they and a group of 30 or more strangers randomly met at a strategic location along I-190 as it enters O'Hare the morning of April 15 and inadvertently linked themselves together with PVC piping and then filmed and broadcast the "accidental" blockade on the social media accounts of organizational defendants. And did so at the time announced for a blockade at a chokepoint weeks earlier. They also incorrectly state that the SAC does not allege that any of the individual defendants physically blocked the road (ECF 82 at 5), or that the SAC alleged that any physical barrier was used in the blockade. Both assertions are plainly false. The SAC alleges that the blockaders, including specifically Chehade and Murphy, used PVC piping to create a "sleeping dragon" blockade. SAC ¶¶ 3, 70. Exhibits in the Hedley Declaration show the physical barrier, including a social media post by Defendant Chehade bragging about her arrest with a picture of police removing her from the "sleeping-dragon" blockade. SAC ¶ 67; ECF 33-1 ¶ 51 & Ex. 37. And the other individual defendant arrested, Murphy, narrated on camera a video that proudly broadcast the blockade as it was happening. SAC ¶ 19; ECF 33-1 ¶ 69 & Ex. 20 at 84.

Finally, Illinois conspiracy and aiding-and-abetting law do not require that each defendant directly blocked the road. It is enough that they knowingly joined a plan whose purpose was to cause unlawful blockades and that they provided substantial support or encouragement. See *Adcock*, 645 N.E.2d at 895; *Simmons*, 925 N.E.2d at 1100. Press coverage quotes both Tucker and Falaneh as either organizing or participating in the blockade and touting the disruption caused. SAC ¶¶ 20-21; ECF 33-1 ¶ 49 & Ex. 35 at 128; Ex. 42 at 152. Thus, the allegations in the SAC are more than enough to demonstrate that the individual defendants engaged in the unlawful blockade as either direct participants, aiders and abettors, or co-conspirators.

**B.**     **The complaint's allegations against NSJP are sufficient under Rule 8.**

The Second Amended Complaint alleges that NSJP helped plan, organize and promote the

O'Hare blockade. NSJP contests this (ECF 80 at 9-12) by arguing that the Chicago chapter of SJP is distinct from NSJP.[10] As discussed in Section VI below, it is reasonable to infer that NSJP is legally indistinguishable from its chapters including SJP Chicago. NSJP also disputes the SAC's reference to the pro-Hamas toolkit (ECF 80 at 8), arguing that it had nothing to do with the April 15 O'Hare blockade. But the SAC referenced the toolkit (SAC ¶¶ 38-40) and NSJP's distribution of it to SJP chapters and affiliates—which NSJP does not dispute—as a factual allegation demonstrating the unity of purpose and mission of NSJP and its chapters and affiliates. This supports the SAC's plausible allegation that NSJP coordinates in the broader conspiracy and offered substantial means and encouragement A15action's tortious ends. NSJP also mischaracterizes (ECF 80 at 7) the SJP Chicago social media posts as after-the-fact videos and thereby cannot be grounds for liability. Several of the posts, however, were real-time videos of the protest with accompanying "Happening Now" text and were done in conjunction with other Defendants and the @a15actions Instagram account. SAC ¶¶ 73-74; ECF 33-1 ¶¶ 44-47 & Ex. 20, 32-33. This is ample evidence to reasonably infer that NSJP participated in the A15action conspiracy, which it knew about in advance, and aided and abetted the blockade of traffic at O'Hare on April 15.

NSJP argues that the Second Amended Complaint improperly relies on "group pleading" and fails to allege specific facts tying NSJP to the O'Hare blockade. ECF 80 at 8-10. This misstates the governing standard and ignores the detail pleaded. Rule 8 does not require exhaustive evidentiary proof at the pleading stage, but factual content to show liability plausible. The SAC alleges that NSJP promoted and organized the blockade through the dissemination of real-time video on social media, used coordinated messaging with other Defendants including the @a15actions account, and shared the conspiratorial objective of blocking "major choke points" to "cause pain." SAC ¶¶ 60-61, 73-74.

---

[10] In so arguing, NSJP resorts to arguing (ECF 80 at 12), that SJP Chicago is not an agent of NJSP. Plaintiff never alleged a principal-agent relationship. Rather, Plaintiff argues that NSJP is legally indistinguishable from its chapters because it holds itself out as an unincorporated association with a unity of purpose and mission. At any rate, the question of "whether an agency relationship has been established between parties is [an issue] of fact which is not properly resolved on a motion to dismiss." *Semitekol v. Monaco Coach Co.*, 582 F. Supp. 2d 1009, 1024 (N.D. Ill. 2008).

These allegations are not group pleading—they are specific factual assertions showing NSJP's participation in and support of the A15action conspiracy.

### C. WESPAC is liable for NSJP's actions.

Because WESPAC is liable for NSJP's actions, the complaint's allegations against WESPAC are sufficient under Rule 8. Section V.C.1 below. In the alternative, WESPAC is liable because it breached its legal duty to supervise NSJP, causing injury to the class. Section V.C.2 below.

### 1. Because WESPAC is a direct fiscal sponsor of NSJP, which has no separate corporate entity or 501(c)(3) status, NSJP's liabilities are WESPAC's liabilities.

The SAC alleges that NSJP was an integrated part of WESPAC. SAC ¶ 49. This is not "unsupported" (ECF 79 at 10): Manhart alleges that NSJP has no separate corporate structure or 501(c)(3) status (SAC ¶ 13), which WESPAC does not deny. (At no point does WESPAC describe its relationship with NSJP—even as the SAC makes clear that this relationship is the basis of its claims against WESPAC.) This ends the matter under Rule 8, which is why WESPAC spends so much time parsing the language of the original complaint and first amended complaint rather than addressing the allegations of the SAC. But the allegation is not just plausible, but true as a matter of law.

Direct fiscal sponsorship represents a structured legal and financial relationship where a tax-exempt organization, typically a 501(c)(3) entity, assumes responsibility for the activities of a non-exempt group lacking its own IRS tax-exempt status. This arrangement enables the non-exempt entity to operate under the sponsor's tax-exempt umbrella, receiving tax-deductible donations and pursuing charitable purposes without securing independent 501(c)(3) recognition. (There are many other types of fiscal sponsorship where the sponsored entity is a legally separate 501(c)(3) organization, but if the sponsored entity does not have 501(c)(3) status, the only legal way to fiscally sponsor it is through a direct fiscal sponsorship. Gregory T. Colvin and Stephanie L. Petit, *Fiscal Sponsorship: 6 Ways to Do It Right* 14-17 (3d ed. 2019) ("Colvin").)

The sponsored group—here, NSJP—lacks independent tax-exempt status and relies on the 501(c)(3) designation of the sponsor—here, WESPAC—to receive tax-deductible contributions

and operate within IRS guidelines. Under direct fiscal sponsorship, "the sponsor takes the project in-house," treating it as an internal program rather than a separate legal entity. Colvin 19. "The project has no separate legal existence." *Id.* The sponsored group operates as an extension of the sponsor, lacking a separate legal identity—its actions are legally attributable to the sponsor. *Id.* at 16-17, 23, 109. "Legally, [the] project is no different than any other activity carried out by the sponsor directly." *Id.* at 17. This liability stems from the sponsor's legal identity encompassing the sponsored group—because the group lacks separate incorporation or tax-exempt status, its acts are not merely supported but owned by the sponsor.

This is not hypothetical: it's the same relationship between Tides and Community Justice Exchange. CJE, like NSJP, has no separate corporate entity or 501(c)(3) status. Tides has not hesitated to raise even the most implausible legal defenses to try to seek dismissal. *E.g.*, Sections I.B and III above. But Tides never has the *chutzpah* to assert that its direct fiscal sponsorship of CJE does not create liability to Tides for CJE's torts. WESPAC complains (ECF 79 at 9, 13) that Manhart would hold every fiscal sponsor liable for its sponsored entity's acts, but that's not so. A fiscal sponsor can insist on a separate corporate structure and 501(c)(3) status for the sponsored entity (*e.g.*, Colvin 19, 82), and then it would not be (or be treated as) the same entity. *See also* ECF 92-1 ¶ 21.

WESPAC complains (ECF 79 at 1) that's there's no caselaw holding a fiscal sponsor liable; Manhart concedes there's no precedent discussing the corporate relationship between a direct fiscal sponsor and its project one way or the other. This is because it's also unprecedented for a direct fiscal sponsor to disclaim liability in a court. And it's separately unprecedented for a direct fiscal sponsor to exercise so little responsible oversight that its beneficiary risks the sponsor's tax-exempt status and fiscal solvency by committing a mass tort. But corporate structure matters. And WESPAC chose not to structure its fiscal sponsorship with an independent corporate entity. But now, citing no case law or statute, WESPAC asks this Court to treat it as if it did. It would be one thing if Manhart was taking on the immense legal burden of asking to "pierce the veil" of a wholly owned subsidiary with separate corporate structure (*cf. United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998)), but there's no veil to pierce here. WESPAC and NSJP, in March-April 2024, were the same legal entity, and NSJP's liabilities then

are WESPAC's liabilities.

WESPAC acts surprised at this consequence and premises its entire argument on the fiction that this legal relationship under the same corporate umbrella has no legal consequences. Perhaps discovery will reveal that WESPAC is sincere in its surprise, and did not know what it was getting into with its fiscal sponsorships. If so, WESPAC might have causes of action against its officers, directors, or attorneys for getting it into a direct fiscal sponsorship without adequate contractual protection for or understanding of what it was undertaking (or for failing to get appropriate insurance coverage, *cf.* Section V.C.2.c below). Perhaps NSJP had breached agreements it made with WESPAC, and WESPAC has a cause of action against it for that or for contractual indemnity. But as to third parties, WESPAC is liable to the extent that NSJP is. NSJP's liabilities are WESPAC's liabilities.

### 2. In the alternative, Count IX plausibly alleges WESPAC breached its duty to supervise NSJP, and is liable for NSJP's actions for that reason.

NSJP's liabilities are WESPAC's liabilities, and that should end the matter. But for belt-and-suspenders reasons, Manhart pleads Count IX, holding WESPAC liable for failing to supervise NSJP. Unless WESPAC will contend in this Court that it violated tax law, the IRS imposes on it a legal duty to supervise the spending of its NSJP project to ensure compliance with tax law, and it is plausible that WESPAC complied with tax law. The IRS permits a 501(c)(3) entity to fund non-exempt activities if they further its exempt purposes, provided the sponsor retains "control and discretion" over the funds. Rev. Rul. 68-489, 1968-2 C.B. 210. This control is not merely administrative; it extends to oversight of the sponsored group's activities to ensure compliance with the sponsor's charitable mission and federal tax law. *Compare id. with* ECF 79 at 4 (claiming no such duty exists). WESPAC's breach of that duty permitted NSJP to engage in illegal blockades and injure countless innocent people. NSJP's promotion of the A15 action promised illegal blockades, and it then executing on those promises was foreseeable.

WESPAC asserts (ECF 79 at 4) that this does not create a duty to Manhart, but disregards Illinois law. In Illinois, as discussed in Section IV, "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable

consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (quotation and citations omitted) (collecting cases). "Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Id.* Whether that duty exists involves a four-part test in Illinois: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins*, 965 N.E.2d at 1098. WESPAC's apparent failure to supervise NSJP's spending allowed NSJP to organize the illegal aspects of the A15action in violation of tax law. And all four factors point to WESPAC's duty to the class here.

**a. Foreseeability of injury**. NSJP causing injury through blockades was foreseeable. NSJP had previously engaged in illegal blockades. SAC at ¶¶ 45, 47-48. The April 15 blockade did not come out of nowhere, but was something the A15action conspiracy had promised would happen weeks in advance. *Id.* ¶ 54-57. The injury to the class was a predictable outcome.

**b. Likelihood of injury**. The A15action promised "maximum economic impact." SAC ¶¶ 1-2. The injury was not just foreseeable, but certain to happen unless interrupted by action by WESPAC to stop the illegal activity.

**c. Magnitude of the burden**. The burden on WESPAC is modest. They already had a legal duty to supervise NSJP's activities, and had legal "control and discretion" over NSJP's funds. It is plausible that it was easy to demand NSJP comply with the law, and cut NSJP off if they refused. Indeed, WESPAC *did* eventually cut NSJP off. SAC ¶¶ 13-14. Discovery is likely to reveal the reasons for the dissolution of the WESPAC fiscal sponsorship of NSJP, the degree to which WESPAC negligently failed to act sooner, and how easy it is to disassociate with a reckless beneficiary of a fiscal sponsorship. (Discovery is also likely to show communications between WESPAC and its insurer where WESPAC's demand for insurance coverage shows it had or represented to third parties that it had control over NSJP. *Cf. Alliance of Nonprofits for Ins. Risk Retention Grp. v. WESPAC Found., Inc.*, ECF 1, 1:25-cv-1320 (S.D.N.Y. Feb. 13, 2025) (insurance declaratory action against WESPAC over

this litigation; insurer disclaims coverage because WESPAC allegedly did not disclose its fiscal sponsorship to the insurer).)

**d. Public policy consequences of placing that burden on the defendant**. The only public policy consequences are that direct fiscal sponsorships would require control and supervision of the beneficiaries of the fiscal sponsorship if they do not seek independent 501(c)(3) status. But that is already standard boilerplate in direct fiscal sponsorship agreements drafted by competent counsel. Colvin 104-05. And fiscal sponsors are already required by the IRS to comply with tax law, which require the same sort of control and supervision.

In capsule form, Manhart has plausibly alleged that NSJP's liabilities are WESPAC's liabilities as a matter of law. WESPAC is arguing for the Court to infer a separate corporate entity that it never even claims existed. Even if that were *ever* appropriate (and WESPAC cites no authority that it is), it is not appropriate at the procedural stage where reasonable inferences are drawn in favor of the plaintiff. But even if the Court were to disregard corporate law and refuse to hold WESPAC liable as a matter of law for a WESPAC project's actions, under the four-part *Simpkins* test, WESPAC duty to supervise NSJP's acts in Illinois extended to the class, and Manhart has plausibly alleged a breach of that duty. WESPAC's repeated denials of control is simply an admission of the tort.

### D. The complaint's allegations against JVP are sufficient under Rule 8.

The Second Amended Complaint alleges that JVP planned and organized the A15action blockade of O'Hare (SAC ¶ 60) and had planned and participated in similar blockades in the Chicago area. SAC ¶¶ 44, 46, 48. It also alleges that Tucker, an agent of JVP at the time of the blockade, participated in and publicly bragged that the blockade accomplished the goal of disrupting "business as usual." SAC ¶¶ 21, 62, 67-68; ECF 33-1 ¶ 58 & Ex. 43; Ex. 44 at 160.

Likewise, JVP contemporaneously posted on social media accounts original content from the blockade, which referenced the hashtags #A15Actions or #A15ForPalestine. SAC ¶¶ 73-74; ECF 33-1 ¶ 56 & Ex. 42. JVP not only celebrated the blockade, but employed its organizer. JVP argues (ECF 75 at 30 n.10) that Manhart has not pleaded that Tucker "participated in the protest on behalf

of the organization or in their capacity as a JVP organizer." But even if, as discussed above, Tucker did not begin formal employment with JVP until after the blockade, a reasonable inference is that JVP rewarded Tucker for her work on the blockade, and perhaps paid her before then. JVP's postings are evidence that JVP, unlike the NAACP in *Claiborne Hardware*, was present at and ratified the illegal actions, and thus it is reasonable to infer that JVP and its agent or agents planned, organized, and participated in the O'Hare blockade.

Again, Rule 8 requires the pleading of claims, not of facts. *Thomas*, 120 F.4th at 1338. JVP's argument is that Manhart is requesting reasonable inferences. Yes, he is, and he's entitled to. JVP's presence at this blockade, which required premeditated knowledge and planning, combined with its presence and participation at other blockades, leads to the reasonable inference that it participated in the A15action conspiracy

### E. The complaint's allegations against Dissenters are sufficient under Rule 8.

Dissenters and its officers have a history of illegal blockades. *E.g.*, ECF 33-1 ¶ 72 & Ex. 49. The SAC alleges that Dissenters planned and organized the illegal April 15 blockade. SAC ¶ 61. Dissenters posted original content from the blockade to one or more of its social media accounts. *Id.* ¶ 72; ECF 33-1 ¶ 66. One such post is the video narrated by Murphy at 8:30 a.m. during the height of the blockade. SAC ¶ 19; ECF 33-1 ¶ 69 & Ex. 20 at 84. The posting is protected free speech, but Manhart is not suing over the posting. Rather, the posting is evidence that "(a) they had on-the-ground agents participating in the blockade on their behalf; and (b) they played a role in coordinating the stoppage by ensuring they had members there to participate." *Id.* Dissenters' presence at this blockade, which required premeditated knowledge and planning, combined with its presence and participation at other blockades, leads to the reasonable inference that it participated in the A15action conspiracy.

### F. The complaint's allegations against CJE are sufficient under Rule 8; a fund established in advance to promote illegal action creates liability.

Tides wrongly argues (ECF 74 at 9) that the SAC fails to allege that CJE entered into a conspiracy to commit tortious conduct, incorrectly stating that the SAC only alleged "the CJE created, advertised, and managed the Bail Fund." "Conspiracies are often intentionally 'shrouded in mystery,'

which by nature makes it difficult for the plaintiff to allege with complete specificity all the details of the conspiracy." *Time Savers Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1167 (Ill. App. Ct. 2007). This is true for the A15action conspiracy, but fortunately there are enough details to demonstrate CJE knowingly and willingly joined a conspiracy whose object was to engage in unlawful blockades like the one at O'Hare on April 15.

A15action announced its intent to engage in coordinated illegal and tortious behavior in March 2024. *See* pages 3-4 above. *After* the announcement of the intended illegal aims of the conspiracy, but *before* April 15 itself, CJE, as part of the A15action conspiracy, established the A15action bail and legal defense fund. This was apparently in response to a specific request by the A15action organizers for a bail and legal defense fund to aid demonstrators and activists who, according to the very explicit purpose of A15action, were planning to engage in illegal blockade conduct. SAC ¶¶ 54, 56-57, 63-64.

Thus, CJE's bail and legal defense fund was part of the A15action conspiracy and, contrary to Tides's assertion, A15action was a conspiracy which the complaint plausibly alleges it willingly joined.

The conspiracy claims against CJE are appropriate. Agreements to pay bail and legal expenses have long been a feature of conspiracies. In *United States v. Applins*, the Second Circuit affirmed conspiracy convictions, noting that evidence of defendants' conspiracy included arrangements for "paying bail … and attorney's fees when a member was criminally charged." 637 F.3d 59, 78 (2d Cir. 2011). Likewise, in *United States v. Gonzalez,* the district court declined to strike language from an indictment because "evidence of a legal defense fund is clearly probative of an enterprise." 2018 U.S. Dist. LEXIS 217165 at *13. 2018 WL 6834315 (D. Nev. Dec. 28, 2018). In *United States v. Hodge & Zweig,* the court held that the government satisfied the crime-fraud exception to the attorney-client privilege and enforced an IRS summons issued as part of an investigation into a drug conspiracy. The court noted that "an integral part of the conspiracy [was an agreement] to furnish bail and legal expenses for conspirators. … [A]s such, the agreement constituted part of the consideration for engaging in the conspiratorial activity." 548 F.2d 1347, 1354-55 (9th Cir. 1977) (Kennedy, J.). The Fifth Circuit, sitting en banc, followed *Hodge & Zweig* when it held that an attorney must disclose who

was paying him for representing three drug smugglers who had been told they would be "taken care of" if arrested. *In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026, 1028 (5th Cir. 1982) (en banc). There the court "decline[d] to permit the promise of legal services to be made a fringe benefit for use in recruiting criminal conspirators[,]" and further noted that "the act of furnishing bail and counsel was an act done in furtherance of the illegal scheme itself." *Id.*

Ex ante agreements to pay bail or legal expenses also expose entities to civil liability. For instance, in *C&K Coal Co. v. United Mine Workers*, union locals set up a payment voucher system and "in anticipation of illegal secondary activity created legal defense funds which would pay attorneys' fees and fines for picketing members who were arrested." This triggered liability because it was "an encouragement for illegal activity." 704 F.2d 690, 696 (3d Cir. 1983). Similarly, in *Array Techs., Inc. v. Mitchell*, a defendant's ex ante promises to pay an alleged co-conspirator's legal expenses, thereby inducing the co-conspirator to breach a fiduciary duty, amounted to a plausible conspiracy claim sufficient to survive a motion to dismiss. 305 F. Supp. 3d 1256, 1274 (D. N.M. 2018). CJE's A15action bail and legal defense fund similarly encouraged and induced individuals to conduct unlawful actions on April 15, 2024, and Tides should not escape liability for providing such a "fringe benefit."

Before explaining why CJE is liable for the April 15, 2024 blockade at O'Hare it is important to explain what the CJE A15action bail and legal defense fund is not. Bail and legal defense funds typically are of one of two flavors. There are community bail funds like the Chicago Community Bond Fund, the North Carolina Community Bail Fund of Durham, the Minnesota Freedom Fund, or the Northwest Community Bail Fund. Those bail funds provide bail money to indigent criminal defendants who cannot otherwise afford bail. These bail funds typically are devoted to a specific jurisdiction, and they also often advocate for bail reform or the outright elimination of cash bail. Indeed, the Chicago Community Bond Fund has sunset because of the elimination of cash bail in Illinois state courts.

Another flavor of bail and legal defense funds are ones set up in the immediate aftermath of a specific, large-scale criminal episode involving multiple defendants. Examples of such funds include the PDX Protest Bail fund, established by a Portland community group to cover bail and legal

expenses of individuals arrested in Portland, Oregon for demonstrating against police brutality in the wake of George Floyd's death. Other examples are the Patriot Freedom Project and the J6 Legal Fund, both set up to provide financial and legal support for individuals arrested for their participation in the January 6, 2021 riot at the United States Capital.

Neither type of bail or legal defense fund could be liable for conspiracy or aiding and abetting, as alleged in the SAC. In neither scenario is there an ex ante agreement between two or more parties, including the bail fund, to pursue unlawful conduct. In the first instance, the bail fund already exists and is blissfully ignorant of any planned illegal conduct by an individual or conspirators. In the second instance, unlawful conduct has already occurred, and only afterward is the bail and legal defense fund created to assist those now entangled in the legal system. By contrast, the A15action bail and legal defense fund was neither a preexisting community bail fund, nor a fund set up ex post to assist defendants who had participated in alleged unlawful conduct. It was a targeted fund of limited duration, specifically aimed at assisting individuals who were colluding to participate in unlawful actions on a specific date, April 15, 2024.[11]

CJE is similarly liable for aiding and abetting the unlawful conduct. "A claim for aiding and abetting requires the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Time Savers,* 863 N.E.2d at 1168. CJE checks all three boxes. The O'Hare blockaders participated in the planned A15action blockades—the unlawful act that caused the injury to Manhart. The goals and objectives of A15action were not a mystery to CJE; the website explicitly stated that A15action and participating groups and individuals intended to blockade

---

[11] Tides also wrongly asserts that Manhart seeks an injunction against CJE's First Amendment-protected activity of soliciting charitable contributions. The allegations in Plaintiff's SAC simply seek to hold Tides/CJE accountable for participating in a conspiracy that injured him and other class members. Tides/CJE remain free to set up and solicit funds for bail funds that are either general community bail funds set up to assist indigent defendants who may become entangled in the criminal justice system, or even *ex post* bail and legal defense funds. And nowhere in the SAC does Manhart seek to prohibit Tides/CJE from its continued advocacy for bail and criminal justice reform.

highways and critical economic choke points. SAC ¶¶ 54, 57. CJE willingly undertook the role of providing bail, legal defense and financial "support for defendants" and this was readily apparent before April 15, 2024. Finally, it is reasonable to infer that the fund provided substantial assistance to the blockaders by acting as a legal and financial safety net for individuals who expected to be arrested. *Cf. M.U. v. Team Ill. Hockey Club, Inc.*, 215 N.E.3d 286, 302 (Ill. App. Ct. 2022) (decision to join others to violate the law sufficient to demonstrate knowledge and substantial assistance); *see also Chemtreat Inc. v. Kinsman*, 2006 U.S. Dist. LEXIS 108400 at *32 (C.D. Ill. Sept. 15, 2006) ("parties working in concert to advance" a common goal are liable under aiding and abetting claim).

"The question of whether a defendant has substantially assisted or encouraged another person in his tortious conduct … is a question for the jury." *Simmons v. Homatas*, 925 N.E.2d 1089, 1100 (Ill. 2010). The factors to consider are: (1) the nature of the act encouraged; (2) the amount of assistance provided by the defendant; (3) the defendant's presence or absence at the time of the tort; (4) the defendant's relation to those encouraged; and (5) the defendant's state of mind. *Id.* (citing Restatement (Second) Torts § 876, comment *d*). The A15action social media accounts promoted the bail fund before April 15 and prominently promoted the fund on its website. Indeed, the organizers of A15action thought providing "Anti-Repression Resources" was important enough that they added a section dedicated to it on the website and specifically solicited bail funds to participate. It is reasonable to infer those participants in the blockades, including the one at O'Hare, knew that there was a fund set up to provide legal assistance and financial support for them as they prepared to engage in what they knew would be unlawful conduct. CJE's actions of sponsoring and managing the bail and legal defense fund was not benign. CJE willingly established the fund immediately after the call went out by A15action, but before April 15. By setting up the bail fund at A15action's invitation, CJE actively encouraged the proposed April 15 blockades.

Tides argues that the bail fund could not possibly be construed as substantial assistance because bail has been eliminated in Illinois and that those arrested at O'Hare would not need paid legal assistance because of the existence of the Cook County Public Defender's office. But this ignores that the fund was for "bail, legal defense, *and support for defendants*." ECF. 33-1 ¶ 26 & Ex. 13 at 64

(emphasis added). It is reasonable to infer that such additional support for defendants could have also included temporary financial support for basic living expenses for blockaders who may have lost a job because of their participation in the blockade. At the very least, the language suggests that the fund was available to provide financial assistance beyond just bail or legal defense. Moreover, Tides's assertion presumes that those participating in the blockade knew that cash bail had been eliminated, and that free legal service was available from the public defender. As noted above, whether the bail and legal defense fund amounted to substantial assistance or encouragement "is a question for the jury." *Homatas*, 925 N.E.2d at 1101.

Moreover, the federal criminal justice system still allows for the imposition of bail as a component of pretrial release. 18 U.S.C. § 3142(c)(1)(B)(xii). Tides scoffs at the fact that the defendants, including Tides, are vulnerable to a federal criminal prosecution under 18 U.S.C. § 241. In *United States v. Guest*, the Supreme Court stated that "if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel … then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law [18 U.S.C. § 241]." 383 U.S. 745, 760 (1966); *see also Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he constitutional right to travel from one State to another is firmly embedded in our constitution."); Samantha Trepel, Special Litig. Counsel, Criminal Section, Civil Rights Division, *Prosecuting Color-of-Law Civil Rights Violations: A Legal Overview*, 70 DOJ J. of Fed. L. & Prac., 21, 32 n.54 (Mar. 2022) ("Section 241 can also be used to prosecute private individuals for conspiring to violate rights protected from interference by private— rather than state—actors. These rights commonly include … traveling.").[12] Here, the Defendants conspired to block a federal Interstate highway that serves as the primary artery into one of the busiest

---

[12] In October 2024, Ms. Jacobs-Perry, counsel for Tides, called counsel for Mr. Manhart to flag the statutory elimination of bail in Illinois as a potential Rule 11 claim that Tides might assert. Soon after, counsel for Mr. Manhart called Ms. Jacobs-Perry and noted that a federal prosecution under 18 U.S.C. § 241 was a viable charge against the defendants and specifically cited *United States v. Guest*, a case directly on-point. Despite this notice, Tides has persisted in ignoring or dismissing the potential for federal prosecution and has made the statutory elimination of bail in Illinois along with the availability of free public defenders for state offenses a key pillar in its baseless Rule 11 claims against Manhart's counsel. ECF 72 at 8-10.

airports in the United States, and which serves as a hub for two major airlines. Manhart lives in Indiana and was traveling to Illinois to fly to Virginia. Most motorists trapped in traffic by the Defendants' blockade were on their way to O'Hare to travel to a state outside Illinois. Accordingly, a federal prosecution for violating 18 U.S.C. § 241 was and remains a real possibility. And that possibility climbed this year after the president issued Executive Order 14188 (directing attorney general to "employ appropriate civil rights enforcement authorities, such as 18 U.S.C. § 241").

## VI. Illinois's long-arm personal jurisdiction applies to the acts alleged here.

There is specific personal jurisdiction here. The Illinois long-arm statute permits personal jurisdiction "to the full extent permitted by the United States Constitution." *Tamburo v. Dworkin*, 601 F.3d 693, 679 (7th Cir. 2010). "Specific personal jurisdiction is appropriate when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). The three requirements to establish specific jurisdiction are: "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state, (2) the alleged injury must have arisen from the defendant's forum-related activities, and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Here, specific personal jurisdiction is appropriate because the claims in the complaint arise out of actions by defendants in Illinois—the O'Hare blockade. In the context of intentional torts, the inquiry focuses on whether the plaintiff has shown: "(1) intentional conduct (or intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (cleaned up). Conspiracy allegations, like those alleged in the complaint, are also attributable to members of the conspiracy and sufficient to demonstrate minimum contacts to establish personal jurisdiction. *See Textor v. Bd. of Regents*, 711 F.2d 1387, 1392-93 (7th Cir. 1983); *Flag*

*Co. v. Maynard*, 376 F. Supp. 2d 849, 854-55 (N.D. Ill. 2005) (alleged conspiracy and a substantial act in furtherance within the forum state needed for personal jurisdiction). The A15action was targeted at several cities, including Chicago. SAC ¶ 56. Specific jurisdiction rests over all three defendants challenging personal jurisdiction.

Tides willingly joined a conspiracy to blockade traffic and one of the intended targets of the A15action conspiracy was Chicago. SAC ¶¶ 56, 58, 63-64. They are thus incorrect to argue that the complaint "only alleges the formation of a nationwide bail fund" and that this "is not sufficient to confer personal jurisdiction over CJE." ECF 74 at 13-14. The "conspiracy theory" of personal jurisdiction is enough to demonstrate the minimum contact necessary for personal jurisdiction. *Textor*, 711 F.2d at 1392. "Under the theory, a non-resident defendant can be subject to jurisdiction in Illinois if: (1) the defendant participated in an actionable conspiracy, and (2) at least one of the co-conspirators performed a substantial act in furtherance of the conspiracy in Illinois." *Zivitz v. Greenburg*, 1999 U.S. Dist. LEXIS 16646 at *16, 1999 WL 984397 (N.D. Ill. Oct. 22, 1999). In this case, the four individual defendants and Dissenters are citizens of Illinois and participated in the O'Hare blockade, a stated objective of the A15action conspiracy. This is enough to establish personal jurisdiction for all non-Illinois defendants, including CJE/Tides. *Id.* at *18-*19.

NSJP asserts that it is a separate entity from SJPChicago and that any SJP campus chapter or affiliate is separate and independent from NSJP. But under NSJP's theory, it is never subject to personal jurisdiction, general or specific, anywhere. NSJP does not dispute that it is an unincorporated association with no formal principal place of business, and an opaque, anonymous leadership structure. SAC ¶ 13; ECF 33-1 ¶ 13. NSJP incorrectly asserts that Manhart alleges that SJPChicago is an agent of NSJP, and that he has invented an organizational structure "out of whole cloth." ECF 80 at 3. Not so.

What Manhart has alleged is that NSJP and its chapters and affiliates, including SJPChicago, are a unified, unincorporated association of multiple chapters and affiliates spread throughout the country. SAC ¶ 13; ECF 33-1 ¶ 13. And NSJP's own website, as well as the fiscal sponsorship agreement it signed with WESPAC supports this. WESPAC's fiscal sponsorship agreement with NSJP

describes NSJP as "a collective … that supports over 200 Palestinian solidarity organizations on college campuses." The NSJP website is other evidence of the unity of purpose and mission of NSJP and its chapters and affiliates, which it describes as a "movement" and a "Network." The NSJP website states that it "aims to craft an ideologically, politically, and *organizationally unified* Student Movement." https://www.nationalsjp.org/about/ (emphasis added) (last accessed March 6, 2025).

The situation is analogous to *New York v. Operation Rescue National*, which addressed whether a newly constituted unincorporated anti-abortion protest group was subject to an earlier injunction against an allegedly affiliated group. 80 F.3d 64 (2d Cir. 1996). The Second Circuit concluded that the district court did not err in its finding of contempt for "similarly constituted groups of individuals mov[ing] fluidly between multiple unincorporated associations that share the same basic leadership and goals." *Id.* at 70-71. The NSJP website establishes a unity of purpose, mission, support, and organization between NSJP and its campus affiliates and chapters, including SJPChicago. This amounts to the minimal prima facie showing of personal jurisdiction a plaintiff must demonstrate. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (all factual disputes are resolved in the plaintiff's favor).[13] The SAC and the supporting Declaration allege that SJPChicago joined the A15action conspiracy and played an active role in organizing, promoting and participating in the O'Hare blockade. SAC ¶¶ 72-74; ECF 33-1 ¶¶ 44-47. This includes real-time social media posts of the blockade done along with @a15action. Thus, it is reasonable to infer that SJPChicago, and by extension NSJP, participated in the conspiracy to blockade O'Hare, and SJPChicago's ties to Illinois are not in doubt. Accordingly, Manhart has properly asserted personal jurisdiction over NSJP.

To the extent that NSJP is a WESPAC project and thus legally indistinguishable from WESPAC, Section V.C.1 above, specific personal jurisdiction exists over WESPAC, too. NSJP's actions were WESPAC's actions, and NSJP's connections with the state are WESPAC's. *Cf. also Brown*

---

[13] At a minimum, NSJP's disavowal of SJPChicago should trigger jurisdictional discovery. "Generally, courts grant jurisdictional discovery if the plaintiff can show that the factual records is at least ambiguous or unclear on the jurisdiction issue." *Ticketserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 782 (N.D. Ill. 2009); *see also Richardson v. Kharbouch*, 2020 U.S. Dist. LEXIS 52153 at *11, 2020 WL 1445629 (N.D. Ill. Mar. 25, 2020) (granting jurisdictional discovery).

*v. 1995 Tenet Paraamerica Bicycle Challenge*, 931 F. Supp. 592, 594 (N.D. Ill. 1996) (joint ventures and partnerships).

So to with respect to WESPAC's breach of its duty to supervise NSJP. NSJP has Illinois chapters, NSJP announced its intent to commit a tort in Illinois (making it foreseeable to WESPAC), and NSJP then committed that tort. These facts tie WESPAC's conduct to Illinois. Even if WESPAC only funded NSJP in New York, NSJP's Illinois presence and WESPAC's supervisory duty amplify this contact beyond mere funding. For example, in *Calder v. Jones*, a Florida tabloid and its editor faced California jurisdiction for a defamatory article targeting a Californian; their "intentional, and allegedly tortious, actions were expressly aimed at California." 465 U.S. 783, 789-90 (1984). The A15action's announced plans to blockade in Chicago means that it satisfies *Calder*'s "effects test" to impose specific personal jurisdiction on WESPAC for its failure to supervise NSJP's activities there. WESPAC's duty to supervise NSJP extends its reach to NSJP's activities in Illinois.

Jurisdiction over WESPAC is fair under *Burger King*. The "fair play" factors are burden on the defendant; the forum's interest; the plaintiff's interest; judicial efficiency; and interstate policy. 471 U.S. at 477. WESPAC, a New York nonprofit, faces a manageable burden litigating in Illinois, given modern travel and the nationwide scope of its sponsorship of NSJP. SAC ¶ 14. Illinois has a strong interest in remedying torts on its highways. Manhart seeks local redress. And efficiency favors one forum for related claims. Policy supports holding sponsors accountable for supervised torts, aligning with IRS oversight duties. All of the *Burger King* factors favor personal jurisdiction. WESPAC never even mentions *Burger King*.

## VII. To the extent that the Court believes Rule 8 is not met because of the absence of factual allegations, dismissal with leave to amend is appropriate.

Rule 8 simply requires a short and plain statement of relief. Several Defendants incorrectly allege lack of specificity. ECF 74 at 5; ECF 76 at 27; ECF 79 at 6-7; ECF 80 at 12; ECF 82 at 7. The Seventh Circuit disagrees. All that is required is enough detail to give notice and make the claim plausible, not exhaustive proof at the pleading stage. *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) ("Rule 8 requires notice pleading, not fact pleading."); *Thomas*, 120 F.4th

at 1338. The Defendants have that notice. *See generally* Section V above.

But to the extent that the Court accepts Defendants' argument that they need *more* detail in a 37-page complaint supported by a declaration with dozens of exhibits, Manhart should get the chance to amend the complaint with the Court's guidance on where the Court believes the complaint has fallen short in making allegations. The additional evidence cited and quoted in this brief proves that it would not be futile for him to do so.

The "standard approach" is narrow dismissal with leave to re-plead, as even Dissenters acknowledge. ECF 82 at 14. Unlike in the cases cited by Defendants, this is not a time when Defendants would be prejudiced by re-pleading. *Cf., e.g.*, *Crenshaw v. Antokol*, 206 Fed. App'x 560 (7th Cir. 2006) (dismissing with prejudice where action had been pending for two years and defendants "had been forced to appear in Washington, DC," and already filed "three rounds of motions to dismiss two unintelligible complaints"); *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) (dismissing with prejudice after three rounds of motions to dismiss, substantial delay, and failure to "follow the detailed advice of the district court" to correct deficiencies).

## Conclusion

The motions to dismiss should be denied.

Dated: March 28, 2025        /s/ *Theodore H. Frank*
Theodore H. Frank (IL Bar. No. 6224948)
Neville S. Hedley (IL Bar. No. 6237279)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (703) 203-3848
Email: ted.frank@hlli.org
Email: ned.hedley@hlli.org

M. Frank Bednarz (IL Bar No. 6299073)
HAMILTON LINCOLN LAW INSTITUTE
1440 W. Taylor Street #1487
Chicago, IL 60607
Telephone: (801) 706-2690
Email: frank.bednarz@hlli.org

*Attorneys for Plaintiff*

**Certificate of Service**

I certify that I electronically filed this Omnibus Response via the ECF system for the Northern

District of Illinois, thus effecting service on all attorneys registered for electronic filing.


Dated: March 28, 2025

*/s/ Theodore H. Frank*