IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MANHART, individually ) | |
| and on behalf of all others similarly situated, ) | |
| ) | Case No. 1:24-cv-8209 |
| Plaintiffs, ) | |
| ) | Hon. Mary M. Rowland |
| v. ) | |
| ) | |
| NATIONAL STUDENTS FOR JUSTICE IN ) | |
| PALESTINE, et al., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT JEWISH VOICE FOR PEACE'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT**

**INTRODUCTION**

Defendants are among the millions worldwide who have been driven by their consciences to take a stand against what they view as Israel's genocide in Gaza. Plaintiff does not agree with Defendants' First Amendment protected message, and seeks to shut it down. In his response to Defendants' motions to dismiss, Plaintiff continues to demonstrate that the purpose of this lawsuit is not to recover for the "inconvenience" of becoming stuck in traffic, but rather to suppress a political movement that he disagrees with. After three attempts, Plaintiff has failed to state a single viable claim for relief. The Court should dismiss this lawsuit with prejudice.

**ARGUMENT**

**I.   This is a SLAPP Suit and Should Be Dismissed Pursuant to the Illinois Citizen Participation Act**

This case is a textbook SLAPP suit in which Plaintiff's goal is not to win on the merits but rather to "prevent[] citizens from exercising their political rights or punish[] those who have

1

done so." *Prakash v. Parulekar*, 177 N.E.3d 1, 12 (Ill. App. Ct. 2020). ICPA applies to this lawsuit and, under the statute, dismissal and an award of attorney's fees and costs are warranted.

### a. ICPA Applies to Plaintiff's Lawsuit

Plaintiff makes a Hail-Mary attempt to save his case by arguing that ICPA is a state procedural law that, under the *Erie* doctrine, does not apply to his federal lawsuit, but he is patently incorrect. Dkt. 91, Pl.'s Resp., at 20–22. Courts in this district have repeatedly held that ICPA is a substantive law and is applicable in federal court. *See, e.g. Chi v. Loyola Univ. Med. Ctr.*, 787 F.Supp.2d 797, 808–09 (N.D. Ill. 2011); *World Kitchen, LLC v. American Ceramic Soc.*, 2013 WL 5346424, at *5 (N.D. Ill. Sep. 19, 2013); *Doctor's Data, Inc. v. Barrett*, 2011 WL 5903508, at *2 (N.D. Ill. Nov. 22, 2011); *Trudeau v. ConsumerAffairs.com, Inc.*, 2011 WL 3898041, at *5 (N.D. Ill. Sep. 6, 2011). Courts in other jurisdictions have reached the same conclusion regarding other states' anti-SLAPP laws. *See e.g. Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109–10 (9th Cir. 2003); *Containment Techs. Grp., Inc. v. Am. Soc'y of Health Sys. Pharmacists*, 2009 WL 838549, at *8 (S.D. Ind. Mar. 26, 2009); *Diamond Ranch Academy, Inc. v. Filer*, 117 F.Supp.3d 1313, 1318 (D. Utah 2015); *Kearney v. Foley and Lardner*, 553 F.Supp.2d 1178, 1182 (S.D. Cal. 2008). "A substantive law is one motivated by a desire to influence conduct outside the litigation process, such as a desire to deter accidents, while a procedural law is one motivated by a desire to reduce the cost or increase the accuracy of the litigation process, regardless of the substantive basis of the particular litigation." *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 302 (7th Cir. 2010). ICPA creates immunity from suits targeting the exercise of First Amendment rights and provides for a mandatory award of attorney's fees, provisions that "are plainly meant to affect conduct outside of the litigation process, such as a person's decision to exercise his First Amendment rights

without fear of retaliation. In fact, the ICPA itself makes clear that it is intended to promote free speech, not merely to increase efficiency in litigation." *Loyola*, 787 F.Supp.2d at 808.

In arguing the opposite, Plaintiff misstates the law to a degree that suggests deliberate misrepresentation. Contrary to Plaintiff's assertions, the Seventh Circuit in *Intercon Solutions, Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) did not "strongly hint[] its skepticism of [ICPA's] validity." Dkt. 91 at 21–22. *Intercon Solutions* was not even about ICPA, but rather Washington's anti-SLAPP statute, which the Seventh Circuit concluded could not be applied to the plaintiff's suit because, during the pendency of the appeal, the Washington Supreme Court ruled that the statute was unconstitutional under Washington's constitution. 791 F.3d at 731–32. The Seventh Circuit recognized that "Illinois has its own anti-SLAPP statute, 735 ILCS 110/1 to 110/35, which creates a qualified immunity *that can be resolved in federal court*," but the plaintiff in that case had not invoked it. *Id.* at 732 (emphasis added). Similarly, *Satkar Hosp., Inc. v. Cook Cty. Bd. of Rev.*, 2011 WL 2182106, at *5 (N.D. Ill. June 2, 2011) does not address whether ICPA is a substantive law, but rather whether, under Fed. R. Civ. P. 12(g)(2) and 12(h), a defendant could raise an anti-SLAPP defense in a second motion to dismiss after having failed to raise it in a previous Rule 12(b) motion. Once the defendants raised the defense in a procedurally proper vehicle (as Defendants have done here), the court found that ICPA applied and granted the defendants' motion to dismiss. *See Satkar Hospitality Inc. v. Cook Cnty. Bd. of Review*, 2011 WL 4431029, at *8 (N.D. Ill. 2011).

Plaintiff also erroneously argues that the Illinois Supreme Court in *Sandholm v. Kuecker*, 962 N.E.2d 418 (Ill. 2012) held that ICPA does not apply to cases alleging intentional torts, but that is not what that decision says. Dkt. 91 at 2, 14, 16–17. *Sandholm* did not establish any categorical exception for intentional torts—a ruling that would have functionally wiped out the

3

statute—but rather defined the relevant inquiry as whether the plaintiff is "genuinely seeking relief for damages for the alleged … intentionally tortious acts," or filing "a strategic lawsuit intended to chill participation in government or to stifle political expression." 962 N.E.2d at 430, 434. To answer that question, courts ask whether the lawsuit is meritless and retaliatory, and this lawsuit is both. *See Prakash*, 177 N.E.3d at 12. Post-*Sandholm*, courts continue to assess those factors on a case-by-case basis, and do not reject out of hand any anti-SLAPP defense raised in a suit with intentional tort claims. *See, e.g. id.* at 13–15.

### b. Dismissal is Proper Under ICPA

In addition to being properly invoked as a procedural matter, Defendants satisfy all three prongs to establish that this is a SLAPP suit under ICPA, and therefore their anti-SLAPP defense prevails on the merits. Plaintiff's pleadings make abundantly clear that he has targeted Defendants based on their beliefs, message, and First Amendment protected activity, that he seeks to chill future protests, and that he wants to see Defendants "punished" for their protest activity. Dkt. 33 ¶ 8. Defendants have further shown that Plaintiff's lawsuit is both meritless and retaliatory. And Plaintiff has failed to demonstrate by clear and convincing evidence that Defendants' actions were not aimed at procuring favorable government action.

Plaintiff denies that he is suing Defendants because of their speech, insisting that he is targeting them only for their conduct in allegedly blockading a highway. Dkt. 91 at 14–16. That argument fails both legally and factually. As a legal matter, Plaintiff's attempt to cleanly separate speech from conduct, suggesting the former is entitled to First Amendment protection while the latter is not, is not accurate. The Supreme Court has recognized repeatedly that conduct can have expressive value that brings it within the ambit of the First Amendment. *See, e.g. Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[C]onduct may be sufficiently imbued with elements of

communication to fall within the scope of the First and Fourteenth Amendments") (cleaned up); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed.") (cleaned up). The case law recognizes that "'speech' and 'nonspeech' elements" are often "combined in the same course of conduct." *See Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *U. S. v. O'Brien*, 391 U.S. 367, 376 (1968)). To determine whether conduct "possesses sufficient communicative elements to bring the First Amendment into play," courts ask whether (1) "[a]n intent to convey a particularized message was present," and (2) "the likelihood was great that the message would be understood by those who viewed [the conduct]." *Johnson*, 491 U.S. at 404. Both factors are met here. Plaintiff repeatedly lambastes the participants for conveying their message of solidarity with the people of Palestine, and there is no question that that message was understood by the people who viewed the blockade either in person or on social media and in the news. Dkt. 69 ¶¶ 2–3, 70, 72.

On the facts, it is apparent that Plaintiff has not sued Defendants solely for actions that can be categorized as "non-speech" conduct; he has directly targeted Defendants for their speech and the content of their message. Plaintiff attacks individual defendants who were allegedly physically present at the blockade—but who it is not clear actually participated in blocking traffic—for posting footage of the protest on social media or speaking to the media. Dkt. 69 ¶¶ 19, 21. In addition, multiple Organizational Defendants' sole involvement in the so-called conspiracy was posting on social media in support of the protest. Dkt. 91 at 5, 43–44; Dkt. 69 ¶¶ 3, 72, 74. Without relying on unsupported speculation, Plaintiff has nothing tying many of the Defendants to the protest other than their protected speech.

5

Plaintiff's response also continues to demonstrate his hostility towards Defendants based on their political views, providing further evidence of his ideological motivations and that he would not be suing if not for Defendants' advocacy. As he did extensively in his Complaints, Plaintiff brands Defendants as "terrorists" and baselessly alleges that they support Hamas and acted "at the behest of or in coordination with Hamas and IRGC." Dkt. 91 at 6–7, 16 n. 4.[1] He also quotes a full ten paragraphs from an article in which the author calls for Palestine solidarity protesters including citizens to be deported and for "movement leaders" to be imprisoned. *Id.* at 6–7 (quoting Tal Fortgang, *The Rise of Civil Terrorism*, CITY JOURNAL (Winter 2025)).[2] It is inconceivable that Plaintiff would be pursuing this lawsuit if he had become stuck in traffic for any of the numerous apolitical reasons that people become stuck in traffic every day.

Moving to the second prong of the ICPA analysis, Defendants have demonstrated that Plaintiff's lawsuit is meritless. In addition to the reasons laid out in JVP's motion, Plaintiff now provides an additional one: he acknowledges that despite requesting an injunction in all three versions of his Complaint, under binding Supreme Court precedent he has no legal basis to seek injunctive relief. Dkt. 91 at 13 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Furthermore, as previously argued, Plaintiff's lawsuit is meritless because his alleged injuries—inconvenience, annoyance, and anxiety from being stuck in traffic—are not concrete injuries that confer Article III standing. Plaintiff maintains that he has standing because he alleged a false imprisonment claim, a long-established tort with historical roots, but that is beside the point. Dkt. 91 at 9–10. JVP does not contest that Plaintiff would have standing if he had been falsely

---

[1] There are no allegations in the SAC of any pro-Hamas rhetoric at the protest or in any of Defendants' social media posts. Plaintiff seems to believe that any advocacy critical of Israel's actions in Gaza is inherently pro-Hamas.
[2] That article, which advocates a number of methods to suppress the Palestine solidarity movement that even the author acknowledges "may seem draconian," cites this litigation approvingly, noting that it "may make a dent in the defendants' resources" through the "slow" process of discovery. Fortgang, *supra*.

imprisoned, but he was not. He was stuck in traffic. Per his Complaint, Plaintiff did not suffer any "loss of liberty" and was not "involuntarily trapped in his car." He was free to leave his car at any time but chose not to. Plaintiff's frivolous claim which does not resemble cases, historical or otherwise, in which a false imprisonment claim has been recognized, does not establish Article III standing. *See U.S. v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 616 (7th Cir. 2015) (noting that, to have standing, a plaintiff must have "a colorable claim," meaning "one that is not frivolous"). Plaintiff's undeveloped argument that his second claim for "foreseeable injury caused by intentional breach of duty" establishes standing because it is analogous to claims for "false imprisonment and trespass" fails for similar reasons. Dkt. 91 at 10.

Defendants have also shown that this lawsuit is retaliatory. The timing of the suit—several months after the relevant protest and in the midst of an ongoing protest movement—suggests a retaliatory motive, a point that Plaintiff does not contest and therefore forfeits. In addition, Plaintiff's ludicrous $36 million damages demand based on the "inconvenience" of becoming stuck in traffic is a "classic SLAPP scenario." *Ryan v. Fox Television Stations, Inc.*, 979 N.E.2d 954, 963 (Ill. App. Ct. 2012); *cf. Prakash*, 177 N.E.3d at 14 (contrasting plaintiff's reasonable damages demand seeking compensation for his "destroyed mental and physical health and extreme emotional and financial distress" with "the classic SLAPP situation" in which a plaintiff "seek[s] millions of dollars in punitive damages"). Plaintiff attempts to defend his absurdly inflated demand, suggesting it is not excessive because the putative class could include thousands of members who could be entitled to six-figures each in punitive damages. Dkt. 91 at 17–18.[3] At this stage the notion of a class containing thousands of members is wholly speculative and unsupported. Even if that number were accurate, the Supreme Court has emphasized that,

---

[3] As an aside, it is highly unlikely that Plaintiff will be able to certify his proposed class, but JVP agrees with Plaintiff that the issue of class certification is not ripe for resolution in the instant motion. Dkt. 91 at 23.

7

while it is not a hard-and-fast rule, punitive damages that exceed "four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Plaintiff has not even attempted to justify an award of compensatory damages that could support the $36 million award of punitive damages that he seeks. Nor could he, given the negligible nature of his injuries.

Finally, Plaintiff contends that Defendants' actions were not "solely aimed at procuring favorable government action" because their stated aims also included causing "economic damage" and a Twitter post allegedly made by Defendant Dissenters celebrated the traffic jam. Dkt. 91 at 18–20.[4] Assuming that the goals of the protest included causing economic disruption via a traffic jam, the action was still aimed at influencing the government. Plaintiff himself alleged that the purpose of the economic disruption was to "draw attention to their cause," to "extort political change," and to influence the American government to cease its military support for Israel. Dkt. 69 ¶¶ 1–2, 54. Economic pressure is a time-honored method of attempting to sway policymakers. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (boycott was protected under the First Amendment although organizers "certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign"). Plaintiff also argues that the protest was "aimed not at the government but at innocent commuters," dkt. 91 at 14, but ICPA's definition of "government" is broad and includes the electorate. 735 ILCS 110/10; *Trudeau*, 2011 WL 3898041, at *6 (to be immunized under ICPA, "Defendants' acts need 'only to be made within [their] participation in the government process, which includes acts of gaining public support to influence favorable government

---

[4] Throughout his response, Plaintiff attributes statements made by anonymous A15 Action accounts to Defendants, despite having nothing but unsupported speculation made "on information and belief" to connect any Defendant to those accounts or statements. Dkt. 91 at 16, 19, 31, 33, 42; Dkt. 69 at 58.

action'"); *Satkar Hospitality Inc.*, 2011 WL 4431029, at *5 (ICPA "expressly encompasses exercises of political expression directed at the *electorate* as well as government officials"). The protesters did not need to directly petition the government in order to fall within ICPA's scope. *See Wright Development Group, LLC v. Walsh*, 939 N.E.2d 389, 399 (Ill. 2010) (noting that nothing in ICPA "suggests a requirement of direct appeal to a government official"). Moreover, Plaintiff himself has repeatedly alleged that the protest was intended to influence the government. Dkt. 69 ¶ 1; Dkt. 33 ¶¶ 13, 32, 46. Plaintiff has not met his burden.

## II. All of Plaintiff's Claims Should Be Dismissed Pursuant to Fed. R. Civ. P 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted

Alternatively, this case should be dismissed under for failure to state a claim.

### a. Plaintiff Fails to State a Claim for False Imprisonment

Being stuck in traffic does not constitute the tort of false imprisonment. Plaintiff was free to leave his car, as others did, but chose not to.[5] The Restatement of Torts explicitly rejects a false imprisonment claim based on blocking a highway: "One who blocks off a highway, intending to prevent the public from passing along it, is not liable for false imprisonment to one whose privilege to use the highway has been thus denied. Indeed, the actor does not incur any liability by so doing." Restatement (Second) of Torts § 36, comment d (1965).[6] Plaintiff does not argue that the Restatement does not apply to Illinois false imprisonment claims. Instead, he attempts to twist the straightforward text to justify having pursued this frivolous claim. He

---

[5] Plaintiff states in his response that the participants in the blockade "would not even allow listeners to pass," dkt. 91 at 15, but that contradicts both the SAC and the exhibits attached to the Declaration, both of which state that multiple individuals walked past the blockade to the airport without any interference. Dkt. 69 ¶ 75; Dkt. 33-1, Exs. 35, 43. That statement should not be credited. *See Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015).
[6] Plaintiff relies on *Robinson v. Miller*, 494 N.E.2d 962 (Table) (Ill. App. Ct. 1985), a 40-year-old non-precedential, unpublished case which, under Il. Sup. Ct. R. 23(e), "may not be cited by any party except to support contentions of double jeopardy, res judicata, collateral estoppel or law of the case," none of which apply here. The case also included a dissent in which one judge concluded, based on the Restatement, that blocking traffic does not constitute false imprisonment. The case does not, as Plaintiff suggests, "supersede" the Restatement. Dkt. 91 at 22.

suggests that the Restatement does not apply to someone who was "already on the highway" when the obstruction began. Dkt. 91 at 22–23. The Restatement does not include any such temporal limitations, and Plaintiff provides no support for his tortured interpretation. He similarly points to Illustration 11, which describes a scenario in which an individual encloses part of a highway but "puts no obstacle in the way of [a driver] leaving by the way in which he entered." Plaintiff suggests that the Restatement does not apply to his situation because there was an obstacle behind him, namely traffic. *Id.* at 23. Again, he provides no support for that reading, and it is likely that the drafters of the Restatement considered the possibility of traffic.

Because the Restatement conclusively establishes that a claim for false imprisonment based on blocking traffic is not cognizable, this Court need not reach the question, with which Plaintiff is much concerned, of whether the means of escape available to him were reasonable.[7] *Id.* at 23–24. In any event, his arguments are unpersuasive. Plaintiff believes that he was not free to leave his car, and was thus falsely imprisoned, because 625 ILCS § 5/4-201 prohibits abandoning a vehicle on a highway, "exposing him to criminal penalties." *Id*. However, the portion of the Restatement on which Plaintiff relies states that:

> [I]t is unreasonable for one whom the actor intends to imprison to refuse to utilize a means of escape of which he is himself aware merely because it entails a slight inconvenience or requires him to commit a technical invasion . . . which subjects him at most to the risk of an action for nominal damages which in practice is seldom if ever brought.

Restatement (Second) of Torts § 36, comment a (1965). The "criminal penalties" which Plaintiff supposedly feared are a $200 fine and the cost of towing (if necessary). 625 ILCS 5/4-214. Given that Plaintiff is a practicing attorney who can afford to fly to Virginia for a business trip, those potential penalties fall into the "nominal" category.[8] The other scenarios that Plaintiff cites—in

---

[7] Again, no "means of escape" were necessary because Plaintiff was not confined anywhere.
[8] The minimal possible penalties also underscore, again, the absurdity of Plaintiff's eight-figure damages demand.

10

which escape would require damaging his clothes or risking his safety by jumping out of a moving car—do not apply here, where there was no danger to his person or property, as demonstrated by the other individuals who got out of their cars and walked to the airport unharmed. Dkt. 91 at 24. This Court has already held that choosing to remain in a place to avoid abandoning your vehicle does not constitute false imprisonment under Illinois law. *Marcano v. Nw. Chrysler-Plymouth Sales, Inc.*, 550 F.Supp. 595, 602–03 (N.D. Ill. 1982).

### b. "Foreseeable Injury Caused by Intentional Breach of Duty" Is Not a Valid Cause of Action Under Illinois Law

Next, Plaintiff's supposedly common-law claim for "foreseeable injury caused by intentional breach of duty" for violating 625 ILCS § 5/11-1416 is not a viable claim under Illinois common law. As JVP previously recognized, a statute can provide the basis for a tort duty for purposes of a common-law claim, but Plaintiff still needs to plead a valid common-law claim, which he has not done. Plaintiff fails to cite a single case supporting the existence of his purported cause of action. Instead, he cites negligence cases, or cases discussing other recognizable common-law torts, such as battery, trespass, and intentional infliction of emotional distress, none of which are relevant. Dkt. 91 at 26–27 (*citing Kohn v. Laidlaw Transit, Inc.*, 808 N.E.2d 564, 573 (Ill. App. Ct. 2004); *Noyola v. Bd. of Educ.*, 688 N.E.2d 81, 85 (Ill. 1997)).[9]

Regardless, even if Plaintiff had pleaded a coherent common-law claim, that claim would not be viable under Illinois law. Plaintiff correctly points out that, under Illinois law, "a violation of a statute or ordinance designed for the protection of human life or property is *prima facie* evidence of negligence." Dkt. 91 at 26; *Kalata v. Anheuser-Busch Companies, Inc.*, 581 N.E.2d

---

[9] Plaintiff bizarrely states in a footnote that, "[t]o the extent that Defendants simply quibble with Count II styling, they may consider the common law tort to be negligence." Dkt. 91 at 29 n. 9. Defendants' inability to parse the basis for this claim is not a "quibble," and Plaintiff's attempt to change it in a footnote in his response brief is not acceptable. *See Markovic v. TRU Funding LLC*, 2023 WL 2612594, at *6 (N.D. Ill., 2023) (noting that undeveloped arguments are waived). In any event, Plaintiff has not stated a valid claim for negligence, for the reasons stated.

11

656, 661 (Ill. 1991). However, Illinois courts have held that "statutes seeking to secure the enjoyment of rights to which individuals are entitled as members of the public, *such as ordinances relating to the public right of an unobstructed passage on a public highway*," are not public safety measures that can form the basis of a tort claim brought by an individual. *Nichols by Nichols v. Sitko*, 510 N.E.2d 971, 974, (Ill. App. Ct. 1987) (emphasis added) (*citing* Restatement (Second) of Torts § 288, Comment b, Illustration 1 (1965)). Such statutes are intended to "benefit the interests of the municipality at large," not to "protect[] any individual from harm." *Id.*; Restatement (Second) of Torts § 288, Comment c. Moreover, even if the statute fell into the correct category, an action would lie only if "the kind of injury suffered by [P]laintiff was the kind of injury which the rule sought to prevent." *Gouge v. Central Illinois Public Service Co.*, 582 N.E.2d 108, 112 (Ill. 1991); *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 888 (7th Cir. 2017) (no cause of action where plaintiff did not suffer the kind of injury statute was designed to prevent). If the statute's goal is the "protection of human life," then the kind of injury it sought to prevent was necessarily *threats to human life*, such as traffic accidents, not the inconvenience of becoming stuck in traffic.[10] In all the cases Plaintiff relies on, the court found a valid cause of action because the violation of a vehicle code provision led to a traffic accident that caused the plaintiff physical injuries, not delay from being stuck in traffic. Dkt. 91 at 27–28 (*citing, e.g., Schultz v. Siddens*, 548 N.E.2d 87 (Ill. App. Ct. 1989)).

       In addition, Plaintiff fails to grapple with the significant public policy concerns that would be implicated by imposing a duty here and allowing any driver to pursue litigation for any violation of the vehicle code that causes a traffic jam. *See Klikas v. Hanover Square*

---

[10] Plaintiff argues that preventing traffic jams is related to public safety because traffic can impede emergency vehicles from responding to emergencies. Dkt. 91 at 30. But even if that was the purpose of the statute—which is dubious given the lack of textual support—Plaintiff still did not suffer that kind of injury. Plaintiff was not harmed because of delayed access to emergency care. He missed a networking event.

*Condominium Ass'n*, 608 N.E.2d 541, 545 (Ill. App. Ct. 1992) (declining to impose a tort duty based on an ordinance violation where doing so would have "unreasonable consequences"). Plaintiff dismisses the possibility that allowing his claim to proceed would empower "any irate motorist to sue organizers of any major event that increased traffic," but he offers no principled basis for doing so. Dkt. 91 at 30–31. He says the cause of action he pursues here would not apply to permitted events, because they are legally authorized, and its only impact would be curtailing the specific type of protest he opposes (blockades), *id.* at 32, but that is not the case. *See Gilmore v. Stanmar, Inc.*, 633 N.E.2d 985, 993 (Ill. App. Ct. 1994) (noting that even if defendants had received a permit for construction that obstructed street and contributed to accident, the existence of the permit would not defeat a common-law nuisance action). There is no reason why, if Manhart's claims can go forward here, another driver who becomes stuck in traffic as a result of an ordinary, non-blockade protest march (even a permitted one) could not sue. *See Vodak v. City of Chicago*, 624 F.Supp.2d 933, 940 (N.D. Ill. 2009), *reversed on other grounds by,* 639 F.3d 738 (7th Cir. 2011) ("[B]oth permitted and non-permitted marches cause inconvenience and obstruct traffic."). A holding that essentially outlaws any protesting in the streets absent a permit would not pass constitutional muster. *See Carey v. Brown*, 447 U.S. 455, 460 (1980); *Church of American Knights of Ku Klux Klan v. City of Gary, Indiana*, 334 F.3d 676, 682 (7th Cir. 2003); *N.A.A.C.P., Western Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984).

    **c. Plaintiff's Remaining Claims for In-Concert Liability, Conspiracy, and Aiding-and-Abetting Fail**

Because Plaintiff has failed to state any viable underlying claims, his derivative claims for conspiracy, in-concert liability, and aiding-and-abetting also fail. And, for the reasons stated in JVP's motion, even if any of the underlying claims stand, the derivative ones do not. Plaintiff now asserts for the first time that the conspiracy included numerous "unknown person(s) creating

13

the website and the different organizers and participants at the various locations across the globe," but he has not provided any factual allegations to suggest that any Defendant coordinated with or even had any contact with any of those unidentified individuals. Dkt. 91 at 33. Moreover, the only allegations that Plaintiff cites to support that any Defendant reached an agreement, as is necessary to support a conspiracy claim, are wholly conclusory allegations in the "claims" section that are unsupported by any specific facts. *Id.* (citing Dkt. 69 ¶¶ 119–20, 126–27); *see Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 242 (Ill. App. Ct. 2007); *Trodden, Inc. v. J & E Auto Enterprises, Ltd*, 2014 WL 1117028, at *6 (Ill. App. Ct. 2014). Contrary to Plaintiff's assertions, allegations that multiple Palestine solidarity activists and organizations shared the same social media posts about a Palestine solidarity protest are insufficient to plausibly plead the existence of a conspiracy.[11]

Other than contending that "substantial assistance" is a question for the jury, Plaintiff does not address how posting on social media during and after the event constituted substantial assistance that would support an aiding-and-abetting or in-concert liability claim, and has therefore forfeited any such arguments. Dkt. 91 at 35. Illinois courts routinely resolve this issue at the motion to dismiss stage. *See, e.g. Umble v. Sandy McKie & Sons, Inc.*, 690 N.E.2d 157, 158–59 (Ill. App. Ct. 1998). The derivative claims should be dismissed.

### d. Plaintiff Has Not Plausibly Alleged that JVP was Involved in the Action

Finally, Plaintiff's claims against JVP should be dismissed because he has failed to plausibly allege that JVP was personally involved in the protest. Plaintiff now concedes that Defendant Tucker was not employed by JVP at the time of the protest, but suggests that, "given JVP's participation in the blockade, it remains a reasonable inference that JVP rewarded

---

[11] Even if such posts were sufficient to suggest a conspiracy (they are not), Defendant JVP is not listed as a "collaborator" with any other organization on any social media posts related to the blockade. Dkt. 33-1, Ex. 42.

Tucker's work on the blockade with paid employment" and "perhaps paid [them] before then." Dkt. 91 at 4–5, 36, 44. Those are not reasonable inferences; they are totally unfounded speculation which this Court should not accept. *See Taha v. International Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) ("[W]hen considering the viability of a claim in the face of a Rule 12(b)(6) challenge, we may reject sheer speculation, bald assertions, and unsupported conclusory statements."). Even if true, it is not clear how employing Tucker *after* the protest could have contributed to Plaintiff's injuries in any way. Plaintiff baldly alleges that JVP was "at the blockade," dkt. 91 at 35, 44, but he has not provided any facts to support that anyone other than Tucker affiliated with JVP was present at the protest, or that, even if they were, they were acting "within the scope of their actual or apparent authority" as JVP members to support organizational liability. *Claiborne Hardware Co.*, 458 U.S. at 930.

Plaintiff also points to other blockades organized by JVP to suggest that JVP must have been involved in this one. Dkt. 91 at 36, 43. But, even if it were appropriate to consider allegations about unrelated protests (some of which did not even occur in Chicago), those protests do not raise a plausible inference that JVP planned or organized the April 15 blockade. On the contrary, the fact that JVP proudly took credit for other, similar blockade actions but did not do so here strongly suggests that they were not involved.

With all that stripped away, the only thing remaining to tie JVP to this protest is its social media posts supporting the blockade. Indeed, Plaintiff admits that the only facts supporting that Defendants JVP, Dissenters, and NSJP[12] were in any way connected to the relevant action were their social media posts supporting it. Dkt. 91 at 5, 43–44. Based on those posts, Plaintiff asks for "reasonable inferences" that those Defendants had members physically present at the protest and

---

[12] Because Plaintiff's theory of liability against WESPAC is solely based on its supposed responsibility for NSJP's actions as its fiscal sponsor, this argument applies to WESPAC as well.

15

were involved in organizing or planning it. *Id.* But anyone can post on social media about a current event, whether they are directly involved or not, and Plaintiff's requested inferences are not reasonable. JVP's posts do not support the logical leap that JVP must have "planned, organized, and participated in the O'Hare blockade." *Id.* at 44. Nor does Plaintiff's dislike of their message deprive those posts of their First Amendment protection.

## CONCLUSION

For these reasons, this Court should dismiss this meritless and retaliatory SLAPP suit with prejudice and award Defendants reasonable attorneys' fees and costs.

Dated: April 28, 2025

Respectfully submitted,

/s/ Nora Snyder
Nora Snyder
Brad J. Thomson
People's Law Office
1180 N. Milwaukee Ave
Chicago, IL 60642
773-235-0070
norasnyder@peopleslawoffice.com
brad@peopleslawoffice.com

/s/ Hanna Chandoo
Hanna Chandoo
Dan Stormer
Hadsell Stormer Renick & Dai, LLP
128 N Fair Oaks Ave
Pasadena, CA 91103
(626) 585-9600
hchandoo@hadsellstormer.com
dstormer@hadsellstormer.com

***Attorneys for Defendant Jewish Voice for Peace***